IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PATRICIA RODNEY

　　　　　　　　*Plaintiff*

　　　　v.

THE CITY OF NEW YORK, ET AL.,

　　　　　　　　*Defendants*

Case No.: 22-cv-1445 (LAK)

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
BY AMICI CURIAE LATINOJUSTICE AND
THE OFFICE OF THE PUBLIC ADVOCATE**

Lourdes Rosado
*President and General Counsel*
Andrew Case
Rayza Goldsmith
LatinoJustice PRLDEF
475 Riverside Drive, No. 1901
New York NY 10115

Elizabeth Guzmán
*General Counsel*
Wesley Paisley
Office of the New York City
Public Advocate
David N. Dinkins Municipal
Building
1 Centre Street, 15th Floor North
New York, NY 10007

# Table of Contents

INTRODUCTION ................................................................................................................... 1

INTERESTS OF AMICI CURIAE ....................................................................................... 2

ARGUMENT ........................................................................................................................ 3

I.    Recording Law Enforcement is the Most Effective Means of Holding Officers
Accountable for Misconduct. ......................................................................................... 3

    A. Recording Devices Have Revolutionized Misconduct Investigations....................... 3

    B. Recordings Have Led to Discipline or Prosecution of Police and Exonerations of
Defendants ..................................................................................................................... 4

    C. Recordings Improve Police Conduct, both Directly and Indirectly .......................... 5

    D. The NYPD Has a History of Unlawfully Interfering with Recording...................... 7

II.    The Right To Record Act Was Passed To Prevent the NYPD From Interfering with
Recording by Civilians, Including in Police Precincts.................................................... 8

    A. Principles of Legislative Interpretation ..................................................................... 8

    B. The Plain Language of the RTRA Applies in Precincts ............................................ 9

    C. The Legislative History of the City RTRA Shows It Applies in Precincts ............. 10

III.    The NYPD's No Recording In Precincts Policy Is Unlawful and Superseded by the
Right to Record Act...................................................................................................... 14

    A. The No Recording in Precincts Policy was Enacted In Violation of the City
Administrative Procedures Act and is Therefore Invalid ............................................. 15

    1. Agency Obligations Under the Citywide Administrative Procedure Act................. 15

    2. The NYPD Did Not Follow CAPA When Enacting the No Recording Policy........ 16

    B. The No-Recording Policy Is Superseded by the Right to Record Act .................... 17

IV.    The Exception For Physical Interference Is Not Met Simply by Charging Obstructing
Governmental Administration....................................................................................... 18

    A. Obstructing Governmental Administration and Physical Interference.................... 19

    B. The NYPD has a Long History of Charging Passive Resisters with OGA as a Means
of Punishing Protected First Amendment Conduct...................................................... 20

CONCLUSION .................................................................................................................. 22

# Table of Authorities

**Cases**

*1700 York Associates v. Kaskel*, 701 N.Y.S.2d 333 ............................................................. 21, 22

*439 E. 88 Owners Corp. v. Tax Com'n of City of New York*, 06 Misc. 3d 1014(A). ......... 21, 22

*Adkins v. Limtiaco*, 537 F. App'x 721 (9th Cir. 2013) .............................................................. 14

*Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...................... 14

*Anonymous v. Molik*, 32 N.Y.3d 30 (2018) ............................................................................... 10

*Colon v. Martin*, 35 N.Y.3d 75 (2020) ...................................................................................... 12

Colon v. Martin, 38 N.Y.3d 1122 (2022) .................................................................................. 12

*Comm. For Taxi Safety, Inc. v. City of New York,* 971 N.Y.S. 793

   (Sup. Ct. N. Y. Cnty., 2013) ................................................................................................... 22

*Decker v. Campus*, 981 F. Supp. 851 (S.D.N.Y. 1997) .............................................................. 24

*Dowling v. City of New York*, No. 11-cv-4954 (E.D.N.Y. Sept. 30, 2013) .............................. 24

*Ekukpe v. Santiago*, 823 F. App'x 25 (2d Cir. 2020) ............................................................... 25

*Fana v. City of New York*, No. 15-cv-8114, 2018 (S.D.N.Y. Mar. 27, 2018) .......................... 25

*Gericke v. Begi*n, 753 F.3d 1 (1st Cir. 2014) ............................................................................. 14

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) ........................................................................... 14

*Green v. United States*, 79 F.3d 1348, (2d Cir. 1996); ............................................................. 12

*Kass v. City of New York*, 864 F.3d 200 (2d Cir. 2017) ........................................................... 24

*Kimmel v. State*, 29 N.Y.3d 386 (2017) ............................................................................. 10, 11

*Ligon v. City of New York*, 925 F. Supp. 2d 478 ......................................................................... 2

*Majewski v. Broadalbin–Perth Cent. School Dist.*, 91 N.Y.2d 577 (1998) ............................... 9

*Nadkos, Inc. v. Preferred Contractors Ins. Co. Risk Retention Grp. LLC*,

   34 N.Y.3d 1 (2019) ................................................................................................................. 10

*New York City Comm. for Taxi Safety v.*

   *New York City Taxi & Limousine Comm'n*, 256 A.D.2d 136 (1998) ................................... 19

*New York City Comm. for Taxi Safety v.*

   *New York City Taxi, Limousine Comm'n*, 677 N.Y.S.2d 449 .............................................. 19

*New York Cnty. Lawyers' Ass'n v. Bloomberg*, 19 N.Y.3d 712 (2012) ...................................... 9

*Ousmane v. City of New York*, 7 Misc. 3d 1016(A) (N.Y. Cnty. Sup. Ct. 2005) .................... 18

*Pagan v. City of New York et al.*, No. 25402/2020E.  (Sup. Ct., Bronx Cnty., Jul. 21, 2022) ... 8

*People v. Case*, 42 N.Y.2d 98 (N.Y. 1977) .............................................................................. 24

*People v. Mobil Oil Corp.*, 48 N.Y.2d 192 (1979) ................................................................... 10

*Petersen v. Inc. Vill. of Saltaire*, 77 A.D.3d 954 (2010). ........................................................ 11

*Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504 (D.N.J. 2006) ........................... 14

*Walsh v. New York State Comptroller*, 34 N.Y.3d 520  (2019) ................................................. 9

*Wilder v. Village of Amityville*, 288 F. Supp. 2d 341 (E.D.N.Y. 2003) ................................... 25

*Xiang Fu He v. Troon Mgmt., Inc.*, 34 N.Y.3d 167 (2019) ................................................. 10, 12

**Statutes**

General Municipal Law § 50-h ............................................................................................. 12

N.Y. City Charter § 1041–46 ........................................................................................ *passim*

N.Y.C. Admin. Code. § 14-189 ................................................................................ 11, 12, 23

N.Y.P.L. § 195.05 ................................................................................................................. 23

**Other Authorities**

ACLU of Oregon, "Victory! ACLU of Oregon Settles Lawsuit on Behalf of Portland Woman
    Whose Phone Was Seized While Filming Police in 2013," Apr. 10, 2017 ........................... 6

Blau, Reuven, "Protesters Filing First Wave of Police Brutality Lawsuits Against NYPD,"
    *The City*, June 16, 2020 ..................................................................................................... 26

City of New York, The City Record, May 1, 2017 ............................................................... 21

Civilian Complaint Review Board, 2011 Annual Report ......................................................... 7

Civilian Complaint Review Board, 2021 Annual Report ......................................................... 7

Civilian Complaint Review Board, Executive Director's Monthly Report, Oct. 2022 .............. 7

Coltin, Jeff, "NYPD Officers are Supposed to be Fired for Lying. They Aren't." *City & State
    New York*, Apr. 11, 2022 ...................................................................................................... 7

Cruz, David, "An Unexpected Attack': NYPD Charges at Bewildered West Village Diners to
    Arrest Handful of Protesters," *Gothamist*, Sept. 27, 2020. .................................................. 26

Del Signore, John, "Brooklyn Woman Sues NYPD For Arresting Her Because She Filmed
    Stop-And-Frisk," *Gothamist*, Dec. 17, 2012 ..................................................................... 26

Dwyer, Jim, "A Switch is Flipped, and Justice Listens In,"
    *The New York Times*, Dec. 8, 2007 ...................................................................................... 3

Goldstein, Joseph & Surico, John, "New York Detective Guilty of Lying About Drug Arrest,"
    *The New York Times*, Jan. 24, 2018. ..................................................................................... 4

Goldstein, Joseph " 'Testilying' by Police: A Stubborn Problem," *The New York Times*, Mar.
    18, 2018. ............................................................................................................................... 5

LatinoJustice PRLDEF, "Shielded From Accountability: How NYPD Officers Get Away
    With Lying To The CCRB," Apr. 2022 .................................................................................. 8

Meara, Paul, "Surveillance Video Proves NYPD Officer Lied About Alleged Vehicular
    Assault," *BET*, Nov. 24, 2019. ............................................................................................. 5

Metropolitan Police Department OPS-304-19, July 19, 2012 ................................................ 16

Moore, Tina and Woods, Amanda, "NYPD Bans Civilians From Recording Video Inside
    Precincts," *New York Post*, Aug. 18, 2018 .......................................................................... 22

New York City Civilian Complaint Review Board, *Worth A Thousand Words: Examining
    Officer Interference with Civilian Recording*, June 2017. ................................................... 15

New York City Council, Committee Report of the Justice Division, June 18, 2020, at 6. ...... 15

New York City Council, Committee Report of the Justice Division, June 18, 2020, at 7. ...... 14

New York City Council, Transcript of the Minutes of the Committee on Public Safety, June 18, 2020, at 35:15–20 .......................................................................................................... 15

New York City Council, Transcript of the Minutes of the Committee on Public Safety, June 18, 2020, at 7:8–11. ............................................................................................................ 17

New York City Council, Transcript of the Minutes of the Committee on Public Safety, June 9, 2020, at 36:4–7 ........................................................................................................... 13

New York City Department of Investigation, "Investigation into NYPD Response to the George Floyd Protests," Dec. 18, 2020, pp. 9–16 ................................................................ 26

Office of the Mayor, "Mayor de Blasio Signs NYPD Accountability Package at Black Lives Matter Mural," July 15, 2020 at 26:30 ................................................................................ 16

Parker, Billy, "Cops Caught Lying on Tape Gets 4 Months in Jail," *Gothamist*, Sept. 23, 2009. ................................................................................................................................................ 4

Pereira, Sydney and Hogan, Gwynne "Heavily Armored NYPD Officers Arrest 11 While Quashing Small Anti-Trump Protest In Manhattan," *Gothamist*, Nov. 1, 2020 .................. 27

Southall, Ashley, Video of Man Berating Officer Opens Debate Over Recording in Police Stations, *New York Times*, Aug. 21, 2018. .................................................................... 13, 18

Tempey, Nathan "A Friendly Reminder That It's Legal to Film the Police," *Gothamist*, Apr. 29, 2015 ............................................................................................................................... 8

United States Department of Justice, "Attorney General Merrick B. Garland Announces Investigation of the City of Minneapolis, Minnesota, and Minneapolis Police Department," *Department of Justice, Office of Public Affairs*, Apr. 21, 2021 ............................................ 5

Vasilogambros, Matt "The Feds are Investigating Local Police Departments Again. Here's What to Expect," *Pew Charitable Trusts*, May 3, 2021 ........................................................ 6

## INTRODUCTION

In this past decade, we have witnessed an unprecedented amount of civilian documentation of police abuse, driven by individuals recording with their personal cell phones. Leading up to and after the murder of Eric Garner in 2014, multiple courts recognized that the First Amendment of the United States Constitution protects civilians' right to record police. But at the same time, the New York Police Department ("NYPD") confiscated phones, harassed civilians over recording, and even arrested individuals in retaliation. A report by the Citizens Complaint Review Board ("CCRB) in 2017 identified 257 complaints of officers improperly interfering with cell phone recording.

It was in this context that the New York City Council took up and eventually passed the Right to Record Act ("RTRA" or "the Act"), which secures the right of civilians to record police by allowing them to sue departments that unlawfully interfere with that right. The plain language of the Act is expansive and meant to apply to any location where a person is legally allowed to be. Even as the Act provides exceptions and affirmative defenses, it does not include an exception or an affirmative defense when the recording takes place in a police precinct, let alone a precinct vestibule, as in the instant case before this Court. The legislative history shows that councilmembers understood that the right to record already existed and intended to push back at the NYPD's refusal to acknowledge the expansive nature of the right.

Not long before the Act was passed, the NYPD had publicly announced that it would prohibit recording inside police precincts. Then-Chair of the Council's Public Safety Committee, Donovan Richards, explicitly addressed this "No Recording Rule" when he spoke about the RTRA. The city council intended for the RTRA to supplant the NYPD's rule. And in any event, the NYPD did not follow the City Administrative Procedure Act ("CAPA"), a requirement for any rule to take effect, when it banned recording in precincts, so the rule has

no legal effect. Finally, the RTRA was specifically designed to prohibit the NYPD from using the charge of Obstructing Government Administration as a cover for interfering with the right to record.

## INTERESTS OF AMICI CURIAE

**LatinoJustice PRLDEF**, founded in 1972 as the Puerto Rican Legal Defense and Education Fund, is a national not-for-profit civil rights organization that advocates for and defends the constitutional rights of Latinos under the law. LatinoJustice has challenged discriminatory policies and practices in the areas of criminal justice and immigrant rights by suing police departments, correctional institutions, and federal law enforcement agencies, including the Department of Homeland Security and Immigration & Customs Enforcement. During its nearly fifty-year history, LatinoJustice has also brought impact litigation to address discrimination against Latinos in education, employment, fair housing, language rights, redistricting, and voting rights.

Among its work investigating and litigating discriminatory policing, LatinoJustice is co-counsel to plaintiffs in *Ligon v. City of New York*, 925 F. Supp. 2d 478 (S.D.N.Y. 2013) one of the three related cases that led to the imposition of a monitor over the New York Police Department.[1]

**The Public Advocate for the City of New York**, a citywide elected official and first in line to succeed the mayor, serves as a direct link between the electorate and City government, essentially acting as a "watchdog" for New Yorkers. He is a non-voting member of the City Council, with the right to introduce and co-sponsor legislation, and presides over

---

[1] LatinoJustice PRLDEF and the Office of the Public Advocate submit a joint brief in the interest of economy and saving judicial resources. Each organization only signs on its own behalf, and neither serves as counsel to the other.

Council Stated meetings. The Public Advocate is a member of the New York City Employee

Retirement System governing body, the Board of Trustees.

The Office of the Public Advocate monitors public information and complaint

systems, investigates citizens' complaints about city services and administrative actions, and

makes legislative or policy proposals to address the identified shortcomings of those services.

Amici affirm that no counsel for a party authored this brief in whole or in part, and no

party other than amici or their counsel made a monetary contribution to the preparation or

submission of this brief.

## ARGUMENT

I.   **Recording Law Enforcement is the Most Effective Means of Holding Officers Accountable for Misconduct.**

A.   **Recording Devices Have Revolutionized Misconduct Investigations**

In April of 2006, Detective Christopher Perino took the stand to testify against Erik

Crespo, a seventeen-year-old on trial for allegedly shooting a man in the Bronx.[2] On the stand,

Detective Perino stated twelve times that Mr. Crespo had not been questioned by the police—

his exact words were, "I never interrogated your client."[3] But Perino had interrogated Crespo,

sixteen months earlier, inside the 44th precinct, without allowing Crespo access to a lawyer or

his parents. What Perino did not know was that Crespo had used a concealed MP3 recorder to

record the entire conversation. After Perino testified, Crespo produced the recording.

Detective Perino was charged with 12 counts of first-degree perjury and eventually sentenced

to 4 months in jail.[4] Without Crespo's secret recording, made inside an NYPD interrogation

---

[2] Jim Dwyer, "A Switch is Flipped, and Justice Listens In," *The New York Times*, Dec. 8, 2007.

[3] *Id*.

[4] Billy Parker, "Cops Caught Lying on Tape Gets 4 Months in Jail," *Gothamist*, Sept. 23, 2009.

room in the precinct, Detective Perino would no doubt have gotten away with testifying falsely. There is no way to know how many times he had done so before.

Erik Crespo's story is not unique. Recordings of the killings of Eric Garner, George Floyd, and countless examples in between, have shown public acts of shocking lawlessness by police. Recordings—whether made by individuals or by surveillance cameras, and whether on the streets, in vehicles, or in police precincts—have become the most significant tool in holding law enforcement accountable for misconduct.

### B.   Recordings Have Led to Discipline or Prosecution of Police and Exonerations of Defendants

At the time of the Crespo case, it was nearly unthinkable for police officers to be prosecuted for perjury. But these prosecutions, while still rare, have been made possible through recordings. For example, in 2014, NYPD Detective Kevin Desormeau was prosecuted for perjury after a video recording showed he falsified an arrest and lied about it on the stand.[5] At trial, prosecutors exposed Desormeau and his partner as "having little compunction about covering up an illegal search with a false cover story so that a case would not be thrown out in court for constitutional violations."[6] And in 2019, NYPD Officer Michael Bergman pled guilty to perjury after he testified that a defendant had driven a car straight towards him so that "if I didn't jump out of the way, I would have been under his vehicle," when a recording showed the man had simply driven away, nowhere close to the officer.[7] Likewise, recordings have led prosecutors to drop charges, as when NYPD Officer Nector Martinez falsely testified that he entered and searched an apartment only after the resident set a gun down in the

---

[5] Joseph Goldstein & John Surico, "New York Detective Guilty of Lying About Drug Arrest," *The New York Times*, Jan. 24, 2018.

[6] *Id*.

[7] Paul Meara, "Surveillance Video Proves NYPD Officer Lied About Alleged Vehicular Assault," *BET*, Nov. 24, 2019.

hallway until a recording showed that he simply (and unlawfully) forced his way inside.[8]
Without the recording, Officer Martinez's false testimony could have sent the woman to
prison for years.

### C.    Recordings Improve Police Conduct, both Directly and Indirectly

Recordings have likewise served as the basis for federal investigations of local police
departments and civil litigation that has led to department-wide reform. Most notably, the
Department of Justice investigation of the Minneapolis Police Department was implemented
in the wake of the recording of the murder of George Floyd.[9] Such federal investigations are
now more common than ever and represent one path to "major innovations in modern
policing."[10] Similarly, civil litigation brought by a woman whose cell phone was confiscated
while she was trying to record police officers in Portland, Oregon, led to a settlement that
requires updated policy and training recognizing the public's right to record.[11]

In fact, the most recent report of the NYPD Monitor, released on October 17, 2022,
demonstrates that recording official police activity does in fact deter misconduct. The
monitoring team studied the changes in stop and arrest patterns among NYPD Housing
Bureau Officers before and after they had been required to wear Body-Worn Cameras. After
officers were equipped with the cameras, the number of stops they reported in required
paperwork *increased* by 48% but the number of summonses issued *decreased* by 23%. During

---

[8] Joseph Goldstein, " 'Testilying' by Police: A Stubborn Problem," *The New York Times*, Mar.
18, 2018.
[9] United States Department of Justice, "Attorney General Merrick B. Garland Announces
Investigation of the City of Minneapolis, Minnesota, and Minneapolis Police Department,"
Apr. 21, 2021.
[10] Matt Vasilogambros, "The Feds are Investigating Local Police Departments Again. Here's
What to Expect," *Pew Charitable Trusts*, May 3, 2021.
[11] ACLU of Oregon, "Victory! ACLU of Oregon Settles Lawsuit on Behalf of Portland
Woman Whose Phone Was Seized While Filming Police in 2013," Apr. 10, 2017.

the same period, civilians filed fewer complaints against these officers, and the officers reported using force less often.[12] The only explanation for what appears to be a contradiction is that, before they were required to record their activities, officers conducted a large number of unlawful stops that they simply never reported. Now that the recordings will catch officers who fail to document a stop they conducted, they are stopping, searching, and arresting many fewer people. They are still documenting more stops because many stops previously went unrecorded.

Perhaps most significantly, the advent of recording in New York City has allowed the Civilian Complaint Review Board to drastically improve its ability to substantiate allegations of misconduct. In 2011, the CCRB was able to substantiate misconduct in only eight percent of those cases it fully investigated.[13] In 2021, that number was thirty-four percent.[14]  Through October 2022, the substantiation rate was forty-two percent.[15] It is no secret that the increase in substantiation rates is directly tied to the availability of video evidence. The CCRB now reports separately on cases with and without video evidence, showing that the rate at which it substantiates misconduct in cases with video is double and sometimes triple the rate for cases with no video.[16]

Earlier this year, LatinoJustice released a study of CCRB investigations in which the agency found that an officer lied during an interview with a CCRB investigator.[17] Of the 181

---

[12] NYPD Monitor, "The Deployment of Body Worn Cameras on NYPD Housing Bureau Officers Assigned to Police Service Areas," Oct. 17, 2022.

[13] Civilian Complaint Review Board, 2011 Annual Report, page 15.

[14] Civilian Complaint Review Board, 2021 Annual Report, page 30.

[15] Civilian Complaint Review Board, Executive Director's Monthly Report, Oct. 2022, page 17.

[16] Id., page 22.

[17] Jeff Coltin, "NYPD Officers are Supposed to be Fired for Lying. They Aren't." *City & State New York*, Apr. 11, 2022.

officers whom CCRB found lied in an interview between 2010 and 2020, ninety-seven were caught because their statement had been contradicted by a video or audio recording.[18] As recordings of police actions have proliferated, officials have been better able to catch officers who engage in misconduct and give false testimony.

      **D.**      **The NYPD Has a History of Unlawfully Interfering with Recording**

Civilian recording of police activity ensures accountability. So it is not surprising that NYPD officers have a long history of strong resistance to civilian recording. This resistance continues despite the fact that it is unlawful. NYPD officers have sought to keep people from recording and have harassed, detained, and arrested those who fail to comply. For example, when a bystander witnessed Officer Jonathan Muñoz conducting an illegal search in 2014, he started to record. In response, the officer grabbed the bystander's phone, arrested him, and once he was in the back of a police car, threw the phone out the window.[19] And, when a Bronx high schooler started recording officers who were arresting her cousin in 2018, the officers turned on her and arrested her for gun possession.[20]  The officers later claimed that a gun had fallen out of her waistband, but yet another recording shows that nothing fell from her. The gun that officers later claimed had been in her possession did not have her fingerprints or DNA on it.[21]

---

[18] LatinoJustice PRLDEF, "Shielded From Accountability: How NYPD Officers Get Away With Lying To The CCRB," Apr. 2022.

[19] Nathan Tempey, "A Friendly Reminder That It's Legal to Film the Police," *Gothamist*, Apr. 29, 2015.

[20] Amended Complaint at 13, *Pagan v. City of New York et al.*, No. 25402/2020E.  (Sup. Ct., Bronx Cnty., Jul. 21, 2022), Doc. 136.

[21] *Id*.

II.     **The Right To Record Act Was Passed To Prevent the NYPD From Interfering with Recording by Civilians, Including in Police Precincts**

The sponsors of the city's Right to Record Act[22] (RTRA) and the councilmembers who passed it were well aware of the above history. They passed the RTRA to end the NYPD practice of allowing its officers to deny civilians the right to record them. By its plain language and the clear intent of the drafters, the RTRA was meant to protect this right as broadly as possible, including in the publicly-accessible areas of police precincts. But if any confirmation is needed that the RTRA was intended to apply in precincts, the legislative history and the attached declaration of the RTRA's primary sponsor, provide it.

### A.     Principles of Legislative Interpretation

"When presented with a question of statutory interpretation, a court's primary consideration is to ascertain and give effect to the intention of the Legislature." *Walsh v. New York State Comptroller*, 34 N.Y.3d 520, 524 (2019) (internal quotations omitted). To do so, it "must look first to the statutory text, which is 'the clearest indicator of legislative intent.'" *New York Cnty. Lawyers' Ass'n v. Bloomberg*, 19 N.Y.3d 712, 721 (2012) (quoting *Majewski v. Broadalbin–Perth Cent. School Dist.*, 91 N.Y.2d 577, 583 (1998)). When considering that text, a court applies the statutory definitions to defined terms, and can "construe words of ordinary import with their usual and commonly understood meaning." *Nadkos, Inc. v. Preferred Contractors Ins. Co. Risk Retention Grp. LLC*, 34 N.Y.3d 1, 7 (2019).

Canons of construction apply in interpreting statutes. For example, when "the legislature has addressed a subject and provided specific exceptions to a general rule," a court may apply the canon of *expressio unius est exclusion alterius*, to hold that exceptions that are

---

[22] This brief does not discuss the state Right to Record Act other than to note that N. Y. CVR § 79-P shares nearly identical text to § 14-189.

not on that list were left out on purpose. *Kimmel v. State*, 29 N.Y.3d 386, 394 (2017),

Throughout this analysis, "a statute or ordinance must be construed as a whole and [] its

various sections must be considered together and with reference to each other." *People v.

Mobil Oil Corp.*, 48 N.Y.2d 192, 200 (1979).

If a court determines that the language of a statute is clear and unambiguous, it need

not go further. *See Xiang Fu He v. Troon Mgmt., Inc.*, 34 N.Y.3d 167, 173 (2019). But when

"the language is ambiguous or where a literal construction would lead to absurd or

unreasonable consequences that are contrary to the purpose of the statute's enactment," courts

may resolve the ambiguity by looking to legislative history. *Anonymous v. Molik*, 32 N.Y.3d

30, 37 (2018). And in any event, legislative history "is not to be ignored, even if words be

clear, because the primary goal of the court in interpreting a statute is to determine and

implement the Legislature's intent." *Kimmel v. State*, 29 N.Y.3d 386 at 397.

As set forth below, the plain language, legislative intent, and overall purpose of the

Right to Record Act demonstrates that it is meant to apply within the publicly-accessible areas

within a police precinct.

### B.      The Plain Language of the RTRA Applies in Precincts

The RTRA states that "[a] person may record police activities and maintain custody

and control of any such recording and of any property or instruments used in such recording."

N.Y.C. Admin. Code. § 14-189(b). The RTRA does not include any language limiting the

right to record based on the location of the subject officer or the person recording. This broad,

straightforward provision means what it says: people can record the police. Reading into the

law an exception that is not in the text—"except inside police precincts"—would "extend a

statute beyond its express terms or the reasonable implications of its language." *Petersen v. Inc. Vill. of Saltaire*, 77 A.D.3d 954, 956 (2010).

The RTRA contains a number of other exceptions, which shows that the legislature could have added one for police precincts had it intended to. For example, the RTRA shall not be construed "to permit a person to engage in actions that physically interfere with an official and lawful police function, or to prevent the seizure of any property or instruments used in a recording of police activities where the seizure is otherwise authorized by law, or to prohibit any officer from enforcing any other provision of law." N.Y.C. Admin. Code. § 14-189(b). The city council included all the exceptions it intended to, and the canon of *expression unis* "cautions us against engrafting an additional exception to what is an already complex statutory scheme." *Green v. United States*, 79 F.3d 1348, 1355 (2d Cir. 1996); s*ee also Colon v. Martin*, 35 N.Y.3d 75, 81 (2020), *reargument dismissed,* 38 N.Y.3d 1122 (2022) (relying on *expression unis* doctrine to determine who may attend an examination under General Municipal Law § 50-h).

The RTRA sets forth a generally applicable provision. It does not include an exception for police precincts even though it includes others. The plain text of the RTRA therefore permits recording of law enforcement officers engaged in law enforcement activities, even when the recording is taking place in the publicly-accessible areas of police precincts.

### C.    The Legislative History of the City RTRA Shows It Applies in Precincts

When the text is clear, as the text to the RTRA is, the court need not consider additional legislative history. *Xiang Fu He*, 34 N.Y.3d at 173. But since such history only confirms that the legislature, including the lead sponsor, intended for the RTRA to supersede

the NYPD's policy of barring recording in precincts, it should be reviewed as the best evidence of the legislature's intent. *See Kimmel*, 29 N.Y.3d at 397.

The legislative history of the RTRA shows that the Council understood that the right to record police officers acting in their official capacity was already firmly established in New York City. It also knew that the NYPD administration refused to prevent its officers from interfering with that constitutional right. The language surrounding the introduction and passage of the legislation emphasizes that the intent was to ensure that the NYPD could not stand by while its officers interfered with civilians' rights.

When the NYPD had first introduced the No Recording Policy, Chair Richards had specifically announced that the RTRA would address the ban, which he said created a "double standard in police stations."[23] And when Public Advocate Jumaane Williams, who had first sponsored the bill as a councilmember, introduced it in June 2020, he said: "Let's make something very clear, there is no local law that makes it illegal to record the police. In fact, *federal and state law allow people to record in a public space*. However, we have seen officers inconsistently respond to recordings of their actions."[24] Public Advocate Williams has attached a Declaration emphasizing that he understood and intended the RTRA to supplant the NYPD's No Recording Policy.

The committee report for the bill noted that the "federal constitution protects the right to film police activities generally."[25] The committee collected a number of federal cases that had recently affirmed the right, including *Gericke v. Begi*n, 753 F.3d 1, 9 (1st Cir. 2014); *Am.*

---

[23] Ashley Southall, Video of Man Berating Officer Opens Debate Over Recording in Police Stations, *New York Times*, Aug. 21, 2018.

[24] New York City Council, Transcript of the Minutes of the Committee on Public Safety, June 9, 2020, at 36:4–7 (emphasis added)

[25] New York City Council, Committee Report of the Justice Division, June 18, 2020, at 7.

*Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013) and *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011), including the right to photograph on-duty police officers who were *in police headquarters*, let alone a police precinct. *See Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504, 507 (D.N.J. 2006). The council emphasized that as early as 2013, the United States Department of Justice had submitted a Statement of Interest in a case in the District of Maryland, writing that "[i]t is now settled law that the First Amendment protects individuals who photograph or otherwise record officers engaging in police activity in a public place."[26]

The Council highlighted a CCRB report released in 2017 which found that "from January 1, 2014 through December 31, 2016 the CCRB closed 257 complaints, covering 346 allegations, in which civilians reported that officers interfered with their ability to record."[27] The report was also cited by then-Councilmember Richards before he introduced the bill, when he stated that "we must ensure every person is entitled to their right to record a police officer without the fear of repercussions."[28] That report detailed the scope of police interference with the lawful right to record, and the limited remedies available to those whose rights are violated.[29] Over the course of two years, the CCRB had substantiated ninety-six of the 257 allegations that officers had improperly interfered with recording.[30]

---

[26] Statement of Interest of the United States, *Garcia v. Montgomery Cnty., Maryland, et al.*, No. 8:12-cv-03592 (D. Md. Mar. 4, 2013), Doc. 15.

[27] New York City Council, Committee Report of the Justice Division, June 18, 2020, at 6.

[28] New York City Council, Transcript of the Minutes of the Committee on Public Safety, June 18, 2020, at 35:15–20.

[29] New York City Civilian Complaint Review Board, *Worth A Thousand Words: Examining Officer Interference with Civilian Recording*, ("CCRB Report") June 2017.

[30] CCRB Report at 18.

The 2017 CCRB report identified a policy shortcoming at the NYPD and recommended a change. At the time, the NYPD had issued a Legal Bulletin and broadcast a FINEST message reminding officers not to interfere with recording, but had no Patrol Guide order directing officers how to protect the right.[31] The CCRB recommended that the department model its policy on an order issued by the District of Columbia's Metropolitan Police Department, which emphasizes that the "members of the general public have a First Amendment right to video record, photography, and/or audio record MPD members while MPD members are conducting official business or while acting in an official capacity *in any public space*."[32]

The Council voted to provide redress for those who had been thwarted in exercising a right that Mayor de Blasio described during his signing statement as "about as basic an American right as it gets, cementing your legal right to record, with your camera, interactions with police officers."[33] And it voted specifically to take away the police department's power to decide when, where, and how members of the public can record police. As then-Chair Richards stated on the morning of the vote, "We need you to say that the NYPD cannot decide how we are going to police this city."[34]

In any event, the bill's lead sponsor, then-Councilmember Jumaane D. Williams specifically intended it to supersede the department's No Recording policy.[35] Williams was

---

[31] CCRB Report at 7,

[32] Metropolitan Police Department OPS-304-19, July 19, 2012.

[33] Office of the Mayor, "Mayor de Blasio Signs NYPD Accountability Package at Black Lives Matter Mural," July 15, 2020 at 26:30.

[34] New York City Council, Transcript of the Minutes of the Committee on Public Safety, June 18, 2020, at 7:8–11.

[35] *See* October XX, 2022 Declaration of Jumaane Williams ("Williams Dec.") attached hereto as **Exhibit A**.

aware that the NYPD had issued a policy barring recording in precincts (the No Recording Policy) sometime in or before 2018. (Williams Dec. ¶ 9–11.) He was aware that multiple courts had held that civilians had a right to record the police. (Williams Dec. ¶¶ 5–6.) He was aware of the CCRB report showing the number of times NYPD officers interfered with the recording of police. (Williams Dec. ¶ 8.) He intended the bill to "protect the rights of those interacting with the police and of promoting social change overall." (Williams Dec. ¶ 17.) He specifically understood and intended that the bill would "prohibit police officers from impeding recording in public spaces, including such spaces within police precincts." (Williams Dec. ¶ 13.) He understood and intended that the RTRA would pre-empt or supersede the No Recording Policy, so that when the RTRA passed, the right to record would exist and be enforceable inside police precincts. (Williams Dec. ¶ 12-14.) Williams believed that the affirmative defenses provided to officers sued under the bill were sufficient to safeguard the concerns that the NYPD claimed required the imposition of the No Recording policy. (Williams Dec. ¶ 20.)

### III.   The NYPD's No Recording In Precincts Policy Is Unlawful and Superseded by the Right to Record Act

The NYPD's No Recording Policy was first announced in 2018, when the NYPD told members of the press that the NYPD had issued a memo enacting the policy, claiming that "police department facilities have long been off-limits to recording." [36] The current version of the No Recording Policy, from NYPD Administrative Guide, is attached hereto as **Exhibit B.** NYPD Admin. Guide. No. 304-21 ¶ 7 ("[m]embers of the public are not allowed to

---

[36] Ashley Southall, "Video of Man Berating Officer Opens Debate Over Recording in Police Stations," *New York Times*, Aug. 21, 2018. While the NYPD stated that facilities had previously been off-limits to recording, the department has cited no prior rule or regulation, which would of course have been subject to the CAPA requirements when it was promulgated.

photograph and/or record police activity within Department facilities."). But as set forth below, because the No Recoding Policy is a "rule" as defined by the New York City Administrative Procedure Act ("CAPA"), for it to have "the force and effect of law, it must be adopted in accordance with the rule-making requirements under CAPA." *Ousmane v. City of New York*, 7 Misc. 3d 1016(A) (N.Y. Cnty. Sup. Ct. 2005). The NYPD did not follow CAPA when implementing the No Recording policy, and the policy therefore does not have the force of law.

      **A.**    **The No Recording in Precincts Policy was Enacted In Violation of the City Administrative Procedures Act and is Therefore Invalid**

          *1.*    *Agency Obligations Under the Citywide Administrative Procedure Act*

      The New York City Charter's City Administrative Procedures Act (CAPA) requires agencies to meet strict requirements when enacting rules. N.Y. City Charter § 1041–46 CAPA defines a "rule" as "any statement or communication of general applicability that (i) implements or applies law or policy, or (ii) prescribes the procedural requirements of an agency including an amendment, suspension, or repeal of any such statement or communication." *Id.* § 1041(5).  It specifically includes any statement that "prescribes standards which, if violated, may result in a sanction or penalty." *Id.* § 1041(5)(a).

      This definition is intentionally expansive. Requiring taxi drivers to provide air conditioning to those in the rear seats is a rule. *New York City Comm. for Taxi Safety v. New York City Taxi, Limousine Comm'n*, 677 N.Y.S.2d 449, 452 (Sup. Ct. 1998), *aff'd sub nom. New York City Comm. for Taxi Safety v. New York City Taxi & Limousine Comm'n*, 256 A.D.2d 136 (1998). Modifying the guidelines that Administrative Law Judges use to determine fines for street vending violations is a rule. *Ousmane v. City of New York*, 7 Misc.

3d 1016(A), 801 N.Y.S.2d 238 (Sup. Ct. 2005). Prohibiting ownership of pet ferrets is a rule. *1700 York Assocs. v. Kaskel*, 701 N.Y.S.2d 233, 241 (Civ. Ct. 1999).[37]

Under CAPA, City agencies are required to publish an annual regulatory agenda, subject to mayoral review, that describes and justifies proposed rules. N.Y. City Charter §1042(a) and (b). To promulgate a rule not on this agenda, an agency must explain the omission and otherwise follow CAPA's rulemaking procedures. *Id.* § 1042(c).[38] To enact a rule, the agency must arrange and prominently announce a public hearing no sooner than thirty days after the full text of the proposed rule is made public. *Id.* § 1043(b). The draft of the proposed rule must be approved by the Mayor's office and the New York City Law Department, which must confirm, among other things that the proposed rule is "not in conflict with other applicable rules." *Id.* § 1043(4)(d).[39]

### 2. The NYPD Did Not Follow CAPA When Enacting the No Recording Policy

The No Recording Policy subjects members of the general public to arrest and prosecution for engaging in First Amendment activity in a place open to the public. It unquestionably "prescribes standards which, if violated, may result in a sanction or penalty." N.Y. City Charter § 1041(5)(a). A policy that requires you to comply or to lose rights is a rule under CAPA. *439 E. 88 Owners Corp. v. Tax Comm'n of City of New York*, 9 Misc. 3d 1014(A) (Sup. Ct. 2002), *aff'd*, 307 A.D.2d 203, 763 N.Y.S.2d 12 (2003) (Tax Commission

---

[37] CAPA contains a number of exceptions to this definition as well, exempting internal agency communications, explanations that do not affect policy, resource allocation, traffic guidance, communications about street closures, and certain provisions regarding interagency transfers. N.Y. City Charter § 1041 (5)(b).

[38] Inadvertent failure to comply with the regulatory agenda provision does not invalidate a rule under CAPA. N.Y. City Charter § 1042(c), 1043(b).

[39] Certain rules, including those involving monetary penalties and those implementing federal, state, or local laws, are exempt from some of these requirements. N.Y. City Charter. §1043(4).

policy of requiring building owners to disclose their dealings with certain people convicted of bribery or lose their right to review is a rule subject to CAPA). Whether the NYPD itself considers the policy a "rule" is of no import because an agency "may not circumvent CAPA's rulemaking requirements by giving a different label to what is in purpose or effect a rule or amendment to a rule." *1700 York Associates v. Kaskel*, 701 N.Y.S.2d 333 at 240-41.

Yet the NYPD did not comply with CAPA. The NYPD's Fiscal Year 2018 Regulatory Agenda contains no mention of the proposed rule.[40] A search of NYPD notices under CAPA in the City Record website yields results regarding the U-Visa certification process, handgun licenses, and press credentials, but nothing related to a No Recording rule in 2018 or since.[41] Because the No Recording Policy is a rule that was not promulgated pursuant to the requirements of CAPA, it does not have "the force and effect of law." *1700 York Associates v. Kaskel*, 701 N.Y.S.2d 333 at 240.

### B.    The No-Recording Policy Is Superseded by the Right to Record Act

Had the NYPD followed CAPA, the No Recording Policy still would not have survived review because it is "in conflict with other applicable rules," namely the Right to Record Act. N.Y. City Charter. § 1043(4)(d). A rule—even one passed through CAPA—can be struck down if it is inconsistent with statutory language because "an agency cannot promulgate rules or regulations that contravene the will of the legislature or the terms of the authorizing statute." *Comm. For Taxi Safety, Inc. v. City of New York,* 971 N.Y.S. 793, 797 (Sup. Ct. N. Y. Cnty., 2013). Administrative agencies have "no authority to create a rule out

---

[40] City of New York, The City Record, May 1, 2017 pp 2574–5.
[41] Department of Citywide Administrative Services, *The City Record Online*, https://a856-cityrecord.nyc.gov/Search/Advanced (Section: "Agency Rules," Agency: "Police Department (NYPD)".

of harmony with the statute." *439 E. 88 Owners Corp. v. Tax Com'n of City of New York*, 06 Misc. 3d 1014(A).

The NYPD apparently enacted the No Recording Policy in response to, and merely hours after, one person posted to a social media platform a recording of himself cursing at a Sergeant in the 28th precinct.[42] Without providing notice to the public or any opportunity to comment, without noticing the rule in its regulatory agenda or giving a reason it could not do so, and without allowing the Mayor's office or the Law Department to review the rule for conflicts with other laws, the NYPD determined that it had the power to arrest people for exercising their First Amendment rights on public property. Then, when the City Council specifically passed a law telling it not to, the NYPD did it again. The No Recording Policy is illegal.

## IV.    The Exception For Physical Interference Is Not Met Simply by Charging Obstructing Governmental Administration

In contrast to the New York State Right to Record Act, which provides an affirmative defense when an officer has probable cause to arrest a person for a "crime defined in the penal law involving obstructing governmental administration," the municipal affirmative defense only applies when a person recording "physically interfered with an official and lawful police function, or that such officer's actions were otherwise authorized by law." N.Y.C. Admin. Code. § 14-189(c)(2). This difference is intentional. Although courts have held that to be guilty of Obstructing Governmental Administration ("OGA") interference must in some sense be "physical," the NYPD has a long history of using OGA as a de facto cudgel against its

---

[42] Tina Moore and Amanda Woods, "NYPD Bans Civilians From Recording Video Inside Precincts," *New York Post*, Aug. 18, 2018.

critics. Simply charging someone with OGA does not satisfy the affirmative defense under the RTRA.

### A.    Obstructing Governmental Administration and Physical Interference

A person is guilty of OGA when he or she "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y.P.L. § 195.05. OGA has three elements: "(1) a public servant is performing an official function; (2) the individual prevents or attempts to prevent the performance of that function by interfering with it; and (3) the individual does so intentionally." *Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017).

In considering cases in which people were arrested for OGA, "New York courts have long read 'physical' as modifying 'interference' in the text of the statute." *Dowling v. City of New York*, No. 11-cv-4954, 2013 WL 5502867, at *5 (E.D.N.Y. Sept. 30, 2013). Using a CB Radio to inform other drivers about speed traps, for example, does not provide justification for an arrest for OGA. Or as the Court of Appeals wrote, "To say that there is a Smokey takin' pictures up the road does not subject the speaker to a year's imprisonment." *People v. Case*, 42 N.Y.2d 98, 99 (N.Y. 1977).

To be subject to OGA, a person must physically impede government actors trying to do their job. Officers have probable cause to arrest someone at the scene of an accident who "approached a rescue worker, touched his arm, and asked him questions, while the worker was trying to save [the accident victim's] life." *Decker v. Campus*, 981 F. Supp. 851, 858 (S.D.N.Y. 1997). While refusing to move can satisfy the physical component of OGA, that

19

refusal must itself impede government action. For example, officers had probable cause to arrest a person who refused to move a safe distance away from a team removing a tree, and therefore prevented the tree-removal-team from performing their jobs without risking injury to her. *Wilder v. Village of Amityville*, 288 F. Supp. 2d 341, 344–45 (E.D.N.Y. 2003). *See also Kass*, 864 F.3d at 209 (granting qualified immunity to officers who arrested a man for OGA when he refused to either move along a sidewalk or cross a police barricade into a protest side, and pulled his arm away when the officer touched him, because they had "arguable probable cause" to arrest him).

This physical component is particularly important when people are arrested while recording officers. One court recently held that officers had not shown they had probable cause to arrest a person recording them for OGA because "Plaintiff never had any physical contact with Officer Demkiw or any other officer, and never attempted to physically obstruct Officer Demkiw's search of the car." *Fana v. City of New York*, No. 15 cv-8114, 2018 WL 1581680, at *10 (S.D.N.Y. Mar. 27, 2018).

### B. The NYPD has a Long History of Charging Passive Resisters with OGA as a Means of Punishing Protected First Amendment Conduct

Despite the fact that OGA requires a physical element, NYPD has long charged people with the offense simply for challenging their authority, and in particular for recording police officers on official business. The Second Circuit upheld a jury verdict that found officers had falsely arrested someone for OGA when that person merely asked why he and his friends were being asked to disperse. *Ekukpe v. Santiago*, 823 F. App'x 25, 30 (2d Cir. 2020). Recently,

Hideya Charles, a health policy advocate, found herself under arrest after recording officers frisking teenagers.[43]

And, most significantly, officers have often used OGA to charge demonstrators, particularly those who are recording them, as an apparent means of stifling dissent. In September 2020, the NYPD used overwhelming force to break up a small protest over the murder of Breonna Taylor, making a number of arrests for OGA.[44] Many people arrested during the summer 2020 protests were arrested for OGA, and have alleged in subsequent lawsuits that they were not interfering with any government actions.[45] The subsequent Department of Investigations report into the NYPD activity at the demonstrations emphasized the number of arrests for OGA.[46] Perhaps most significantly, the NYPD has used OGA as a charge to break up small protests to demonstrate against a caravan of Donald Trump supporters, even as the Trump supporters "had been allowed to drive around for hours, some with their license plates brazenly covered."[47]

Thus, when considering an affirmative defense to a Right to Record Act claim, a court should consider the City Council's intent to signal the NYPD's over-reliance on OGA charges that do not stand up to scrutiny.

---

[43] John Del Signore, "Brooklyn Woman Sues NYPD For Arresting Her Because She Filmed Stop-And-Frisk," *Gothamist*, Dec. 17, 2012.

[44] David Cruz, "An Unexpected Attack': NYPD Charges at Bewildered West Village Diners to Arrest Handful of Protesters," *Gothamist*, Sept. 27, 2020.

[45] Reuven Blau, "Protesters Filing First Wave of Police Brutality Lawsuits Against NYPD," *The City*, June 16, 2020.

[46] New York City Department of Investigation, "Investigation into NYPD Response to the George Floyd Protests," Dec. 18, 2020, pp. 9–16 (detailing arrests for OGA).

[47] Sydney Pereira and Gwynne Hogan, "Heavily Armored NYPD Officers Arrest 11 While Quashing Small Anti-Trump Protest In Manhattan," *Gothamist*, Nov. 1, 2020.

## CONCLUSION

For the reasons stated above, the Right to Record Act protects the right to record

police activity in the publicly-accessible areas of precincts, and the NYPD's No Recording In

Precincts Policy is unlawful.

Dated: November 1, 2022

/s/ Lourdes Rosado
Lourdes Rosado
*President and General Counsel*
Andrew Case
Rayza Goldsmith
LatinoJustice PRLDEF
475 Riverside Drive, No. 1901
New York NY 10115

Respectfully Submitted,

/s/ Elizabeth Guzmán
Elizabeth Guzmán
*General Counsel*
Wesley Paisley
Office of the New York City
Public Advocate
David N. Dinkins Municipal
Building
1 Centre Street, 15th Floor North
New York, NY 10007

22

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PATRICIA RODNEY

*Plaintiff*

v.

THE CITY OF NEW YORK, ET AL.,

*Defendants*

Case No.: 22-cv-1445 (LAK)

**DECLARATION OF NYC PUBLIC ADVOCATE JUMAANE D. WILLIAMS IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I, JUMAANE D. WILLIAMS, herby declare and state:

1.   I am the Public Advocate for the City of New York, serving in this position since March 2019. As Public Advocate, I am one of three City-wide elected officials with the sole mission of protecting and defending New York City constituents. As Public Advocate, I have a duty to protect the safety of New Yorkers.

2.   As Public Advocate, I act as an ombudsman for City government, providing oversight for City agencies such as the New York City Police Department (NYPD), investigating citizens' complaints, and making proposals to address shortcomings or failures in City services.  In the event of a vacancy or incapacity of the Mayor, I am the first in line to serve as Mayor.  I am a non-voting member of the New York City Council, with the right to introduce and co-sponsor legislation and an *ex officio* member of all Council committees.

3.   I write in opposition to Defendants' Motion to Dismiss. As explained in greater detail below, I believe this matter — NYPD's unlawful prohibition of a citizen's right to record within the

1

public spaces of a police precinct — raises urgent constitutional and public safety concerns, impedes transparency, and fails to promote government accountability. These are matters of great concern.

4.  As detailed below, the proliferation of citizen recording of police work, due to the ubiquity of cell phones and other mobile devices, has changed the nature of policing in New York City — citizen recordings have played a critical role in safeguarding New Yorkers and in holding police officers accountable for misconduct. While citizen recordings cannot solve the problem of police misconduct in public spaces, limiting such recordings serves to make citizens more vulnerable.

5.  Before my team drafted the RTRA, I was aware that the Supreme Court had long held that the creation and dissemination of information is speech within the protection of the First Amendment. Prohibiting citizen recordings interferes with this constitutional right — the right to create speech and the end-product of such speech itself.

6.  I was also aware that federal courts throughout the nation have specifically ruled that recording official police business is constitutionally protected activity.

7.  Well before 2018, I became aware that NYPD officers were brazenly impeding this fundamental right by detaining, questioning, threatening arrest, and, *in many cases,* arresting and charging citizens recording either their interactions with officers or that of bystanders.

8.  These violations were well-documented by the CCRB, an agency I cultivated a close relationship with as a Council member and one I have preserved during my time as Public Advocate.

9.  In addition to this general interference and in violation of the constitutionally protected right of citizens to record in all public spaces, the NYPD defiantly issued an internal manual that

2

prohibited the recording of police activity within the entirety of police stations, including areas open to the general public.

10. Unfortunately, the internal manual included misinterpreted law and ignored the salient body of law that permits civilian recording in public spaces.

11. Moreover, the NYPD policy ignored the possibility of police misconduct occurring within police stations. It also ignored that police officers themselves are allowed to record within their precincts.

12. In response and in an attempt to end these proscriptive practices, the Council codified the right to record in the RTRA, which defended the right of citizens to record interactions with officers performing their official duties, with the goal of deterring well-documented police misconduct in public spaces, including misconduct inside the public spaces of a police station.

13. I intended and expected that passage of the RTRA would supersede the NYPD No Recording Policy and prohibit police officers from impeding recording in public spaces, including such spaces within police precincts.

14. I anticipated that this tool of ensuring police accountability would have a profound impact on civilians by fostering their belief that police work and practices would be fair since they would have eyes on the officers.

15. I also want to underscore that the RTRA, which I first introduced in 2016 and reintroduced in early 2018, and which was passed by the Council in 2020, had as a primary goal codifying the right of New Yorkers to record NYPD official activity in public spaces so as to protect the rights of our citizens and free them from fearing for their safety whenever and wherever they interacted with police. Such protections demand the right to record police activity within the

public spaces of police stations. While citizen recordings cannot solve the problem of police misconduct, they do protect citizens who record their own legitimate and lawful conduct.

16. The evidence demonstrates that recordings of police work have been central in documenting police misconduct. In fact, following the passage of RTRA, the increase in official findings of police misconduct, such as lying about official interactions with citizens, demonstrates the importance of civilian recording. And, because police misconduct is not limited to the streets and can occur in precincts, this check on government activity cannot be excluded from police stations. The recording of all police work in all public spaces is what we intended when the bill was passed.

17. In addition, I envisioned that a more robust protection of a citizen's right to record would address past concerns of police violence in our communities by shifting power differentials between police officers and the communities they police. Civilian recordings of police work can even out the playing field and act as a tool to protect the rights of those interacting with the police and of promoting social change overall.

18. While police do surveil and record their interactions with citizens, as happened in the instant case, too often the NYPD act as gatekeepers of police bodycam recordings. Citizens cannot control when officers turn on and off their cameras, cannot stop police from manipulating footage, and cannot stop the NYPD from delaying or refusing to make recordings public. With citizen recordings, citizens are free to publish their recordings for present and for future use.

19. Thus, citizen recordings of police work have become a tool of police accountability and act as a check on government abuse. Despite, or because of these facts, police officers continue to interfere with a citizen's right to record their official activities in all public spaces.

20. I also trusted and continue to believe that the affirmative defenses we placed into the bill struck a balance that would ensure the safety of police officers, while also ensuring the civil liberties of our fellow New Yorkers.

21. Finally, I hoped that the possibility of dual recordings from citizens and officer bodycams would start a rich and productive dialogue concerning law enforcement interactions.

22. Unfortunately, the NYPD continues to act contrary to local law by prohibiting civilian recording within the public areas of precincts, as this case demonstrates.

23. I do hope that, in future, police adherence to the dictates of the RTRA leads to a productive policing environment for officers and communities, as was envisioned by RTRA supporters.

November 1, 2022                    _____

Jumaane D. Williams
Public Advocate for the City of New York

# Exhibit B

# ADMINISTRATIVE GUIDE



| Section:   General Regulations | Procedure No:   304-21 |
|---|---|

### WHEN A MEMBER OF THE SERVICE ENCOUNTERS AN INDIVIDUAL OBSERVING, PHOTOGRAPHING, AND/OR RECORDING POLICE ACTIVITY

| DATE EFFECTIVE: 06/10/21 | LAST REVISION: I.O. 47 | PAGE: 1 of 2 |
|---|---|---|

1.      Individuals have a right to lawfully observe and/or record police activity including, but not limited to detentions, searches, arrests or uses of force. The right to lawfully observe and/or record police activity extends to individuals in public places, such as streets, sidewalks, and parks, as well as private property in which the individual has a legal right to be present, such as buildings, lobbies, workplaces or an individual's own property.  This right to observe and/or record police action can be limited for reasons such as the safety of officers or other members of the public, or when a violation of law is committed by the individual(s) who are observing/recording.  The following guidelines should be utilized by members of the service whenever the above situation exists:

    a.      DO NOT:
        (1)      Intentionally prevent, or attempt to prevent, an individual from recording police activities,
        (2)      Threaten, intimidate, or otherwise discourage an observer from recording police activities,
        (3)      Command an individual to cease recording when an individual is authorized to do so under law,
        (4)      Stop, seize, search, summons, or arrest an individual solely because such individual recorded police activities,
        (5)      Seize property or instruments used by an individual to record police activities,
        (6)      Delete or seize recorded images of police activity from an individual's recording device, unless authorized by law, and/or
        (7)      Copy a recording of police activity without consent of the individual who made the recording.

    b.      Absent additional actions constituting a violation of law, an individual CANNOT be arrested for:
        (1)      Taking photographs, videotaping, or making a digital recording,
        (2)      Requesting or making note of shield numbers or names of members of the service,
        (3)      Criticizing the police or objecting to police activity,
        (4)      Refusing to leave the area, and/or
        (5)      Using crude or vulgar speech.

2.      An arrest for Obstruction of Governmental Administration (Penal Law section 195.05) requires probable cause to believe the person(s) is obstructing governmental administration.  Actual interference with the performance of an official police function is required.  Interference can include actual physical force (touching or physically interfering with the officer or the suspect, (e.g., using a camera so close to the officer's face that it intentionally obstructs their view), intruding into the physical space necessary to safely perform police operations and refusing to obey an order to move back, or purposefully engaging in passive behavior that prevents an officer from taking enforcement action (e.g., blocking a prisoner van, etc.). Members of the service are required by Administrative Code 14-189 to document instances in which an individual who was recording police activities is arrested or summonsed, as per P.G. 209-03, P.G. 209-09, and P.G. 209-12, by indicating "RTR" for "Right to Record" on the summons.

## NEW • YORK • CITY • POLICE • DEPARTMENT

## ADMINISTRATIVE GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | LAST REVISION: | PAGE: |
|---|---|---|---|
| 304-21 | 06/10/21 | I.O. 47 | 2 of 2 |

3.　　　This procedure is not intended in any manner to limit the authority of the police to establish police lines (e.g., crowd control at scenes of fires, demonstrations, special events, etc.).

4.　　　When probable cause exists that a recording device contains evidence of a crime:

a.　　Inform the observer that there is probable cause to believe that the recording contains evidence of a crime,

b.　　Request consent to view the recording in a manner that elicits a clear "yes" or "no" response. If possible, use Body-Worn Camera to record request and the individual's response. If consent is given, it may be possible for the individual to email the recording directly to the member of the service's Department-issued smartphone,

c.　　If the observer refuses to give consent, inform them that a search warrant for the device will be requested. Inform the observer that deletion of the content of the recording may be considered tampering with physical evidence in violation of Penal Law section 215.40,

d.　　If the member of the service reasonably believes that the observer will delete the recording, obtain approval from a supervisor to seize the device if feasible (or obtain approval from a supervisor either before or immediately after seizing a device). Seize the device only for the time necessary to secure a warrant,

e.　　Do not view or delete the recording,

f.　　Obtain a search warrant, and

g.　　If there is probable cause to believe that an exigency exists and that the recording contains evidence of a crime, contact a supervisor to determine whether review of the recording absent a warrant is permitted.

5.　　　A supervisor must be requested to respond where an observer is arrested for interference with police action or where the contents of a recording device are believed to contain evidence of a crime.

6.　　　Members of the service may contact the Legal Bureau if they have any questions regarding an arrest for Obstruction of Governmental Administration or the seizure of a recording device that may contain evidence of a crime.

7.　　　Members of the public are not allowed to photograph and/or record police activity within Department facilities. Members of the service may order any member of the public who is photographing or recording within Department facilities to stop such activity. If such person refuses to stop, they then should be ordered to leave the premises. If such person refuses to leave the premises, members of the service may take proper enforcement action under the trespass statutes (i.e., Penal Law sections 140.05 and 140.10).

**NEW • YORK • CITY • POLICE • DEPARTMENT**