**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PATRICIA RODNEY

*Plaintiff,*

v.

THE CITY OF NEW YORK., ET AL.,

*Defendants*

**22-cv-1445 (LAK)(OTW)**

---

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS**

---

COHEN&GREEN P.L.L.C.
   J. Remy Green
   Elena L. Cohen
   Jessica Massimi
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

GIDEON ORION OLIVER
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

August 18, 2023

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iv

PRELIMINARY STATEMENT.........................................................................................1

STATEMENT OF FACTS ................................................................................................2

    A.    Ms. Rodney makes a simple, reasonable, necessary request of the NYPD. .................3

    B.    Defendants brutally assault Ms. Rodney for saying she was recording them. ..............4

    C.    The NYPD's unconstitutional and illegal No Recording Policy. ...................................7

    D.    NYPD encourages the public to view stations as public spaces. .................................10

    E.    Background on State and City right to record laws.........................................................10

        1.    Section 79-P. ...................................................................................................10

        2.    Section 14-189. ................................................................................................12

        3.    Conclusion on Legislative History...................................................................14

STANDARDS OF REVIEW.............................................................................................14

ARGUMENT ....................................................................................................................15

    I.    Defendants' Probable Cause Arguments on Plaintiff's False Arrest Claim Fail..............16

    A.    Defendants lacked even arguable probable cause to arrest Plaintiff for trespass. ......17

    B.    Defendants lacked arguable probable cause to arrest Plaintiff for OGA. ..................19

    II.    Plaintiff's Fair Trial Rights Claims are Well-Pled Against All Individual Defendants....22

    III.    Defendants' Partial Motion to Dismiss Plaintiff's First Amendment Retaliation Claims Fails.......................................................................................................................................25

A.   Defendants waive any motion to dismiss Plaintiff's retaliation claims beyond retaliatory arrest.................................................................................26

B.   Defendants ignore that stating, in substance, "I am recording" is itself First Amendment activity, and have waived challenges beyond that.......................................27

C.   Defendants' argument that a person must *in fact* record to get First Amendment protection is backwards and does not provide sufficient breathing room for First Amendment rights.........................................................................................28

IV.   Defendants' Section 79-P Argument Fails, In Large Part Because it is an Overly Simplistic Reading of the Statute........................................................................29

A.   Plaintiff adequately pleads that she was attempting to record, and Defendants' arguments otherwise require the Court to resolve fact disputes........................................30

B.   As a matter of law, or as at least construing the SAC in the light most favorable to Plaintiff, Defendants lacked probable cause to arrest for OGA. ......................................32

V.   Defendants' Arguments Against Plaintiff's First Amendment Challenge Fail. ...............33

VI.   Defendants Concede the No Recording Policy is Barred and Preempted by State and City Law, Dooming the Entire Motion.......................................................................36

A.   The No Recording Policy conflicts with the plain text of State and City law. ............38

B.   State and City law preempt the No Recording Policy.......................................39

C.   The No Recording Policy was unlawfully adopted........................................43

VII.   Defendants are not Entitled to Qualified Immunity. ...........................................43

VIII.   Plaintiff's *Monell* Claims Do Not Exist Outside the Parameters Above..........................45

CONCLUSION.................................................................................46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Civil Liberties Union of Ill. v. Alvarez,*
 679 F.3d 583 (7th Cir. 2012).................................................................................44

*Arizona v. United States,*
 567 U.S. 387 (2012)................................................................................... 40, 41

*Ashwander v. TVA,*
 297 U.S. 288 (1936) (Brandeis, J., concurring)...........................................16

*Barboza v D'Agata,*
 151 F Supp 3d 363 (SDNY 2015) ................................................................28

*Barnhart v. City of Rochester,*
 2022 U.S. Dist. LEXIS 116343 (W.D.N.Y. June 30, 2022) ................29, 30, 32

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)........................................................................................15

*Bond v. United States,*
 572 U.S. 844 (2014).......................................................................................16

*Brandon v Kinter,*
 938 F3d 21 (2d Cir. 2019) .............................................................................28

*Brown v. City of New York,*
 No. 14-CV-5372 (BMC), 2014 U.S. Dist. LEXIS 181736 (EDNY Dec. 23, 2014) ........................25

*Brown v. Diaz,*
 2020 U.S. Dist. LEXIS 148067 (E.D. Cal. Aug. 14, 2020) ............................27

*Carpenter v. City of New York,*
 984 F. Supp. 2d 255 (SDNY 2013)...............................................................18

*Matter of Carr v. De Blasio,*
 197 AD3d 124 (1st Dept 2021)......................................................................13

*Case v. City of N.Y.,*
 408 F. Supp. 3d 313 (SDNY 2019).................................................20, 21, 23, 25

*Case, et al. v. City of N.Y., et al.,*
 233 F. Supp. 3d 372 (SDNY 2017).................................................................15

*Collins v. City of New York*,
  295 F. Supp. 3d 350 (SDNY 2018)....................................................................25

*Matter of Council of City of NY v Bloomberg*,
  6 NY3d 380 (2006) ..........................................................................................40

*Devenpeck v. Alford*,
  543 U.S. 146 (2004)..........................................................................................16

*DiFolco v. MSNBC Cable LLC*,
  622 F.3d 104 (2d Cir. 2010) ............................................................................15

*Dinler v City of NY*,
  2012 US Dist LEXIS 141851 (SDNY Sep. 30, 2012)........................................34

*Dowling v. City of N.Y.*,
  2013 U.S. Dist. LEXIS 142108 (E.D.N.Y. Sep. 30, 2013) ...............................21

*Enbridge Energy Co. v. Dane Cty.*,
  387 Wis. 2d 687 (WI 2019) ..............................................................................42

*Espinal v Goord*,
  558 F3d 119 (2d Cir. 2009) ..............................................................................28

*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) ..............................................................................44

*Gallagher v. NY State Bd. of Elections*,
  477 F Supp 3d 19 (SDNY 2020).......................................................................28

*Gavin v. City of N.Y.*,
  2021 U.S. Dist. LEXIS 159908 (SDNY Aug. 24, 2021)....................................19

*Gericke v. Begin*,
  753 F.3d 1 (1st Cir. 2014).................................................................................5

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)....................................................................................28, 29

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) .......................................................................*passim*

*Gray v. City of Denham Springs*,
  2021 U.S. Dist. LEXIS 63591 (M.D. La. Mar. 29, 2021) ................................26

*Hamilton v City of NY*,
  No. 15-CV-4574 (CBA) (SJB), 2019 US Dist LEXIS 56606 (EDNY. Mar. 18, 2019)...................24

*Hartman v. Moore*,
   547 U.S. 250 (2006).................................................................................................25

*Higginbotham v City of NY*,
   105 F Supp 3d 369 (SDNY 2015) .........................................................................44

*Hilderbrandt v. City of N.Y.*,
   2014 U.S. Dist. LEXIS 128170 (E.D.N.Y. Sep. 11, 2014).......................... 21, 33

*Houston v. Hill*,
   482 U.S. 451 (1987)................................................................................................28

*Houston v. Hill*,
   482 US 451 (1987)..................................................................................................27

*Jackson v. City of N.Y.*,
   939 F. Supp. 2d 219 (E.D.N.Y. 2013)...................................................................22

*Lakeside Lodge v Town of New London*,
   158 NH 164 (NH 2008) ..........................................................................................42

*Marcavage v. City of NY*,
   689 F.3d 98 (2d Cir. 2012).....................................................................................20

*Marom v. Blanco*,
   2019 US Dist LEXIS 124343 (SDNY July 25, 2019) ..............................23, 24, 25

*Mashantucket Pequot Tribe v. Connecticut*,
   913 F.2d 1024 (2d Cir. 1990).................................................................................39

*McKinney v City of Middletown*,
   2022 U.S. App. LEXIS 26863 (2d Cir. Sep. 26, 2022) (Calabresi, J., *dissenting*)..................43, 44, 45

*Mocek v City of Albuquerque*,
   3 F Supp 3d 1002 (DNM 2014)..............................................................................36

*Morse v. Fusto*,
   804 F.3d 538 (2d Cir. 2015)................................................................................6, 24

*N.Y. Times v. Sullivan*,
   376 U.S. 254 (1964)................................................................................................28

*NAACP v. Button*,
   371 U.S. 415 (1963)................................................................................................28

*Nieves v. Bartlett*,
   587 U.S. ___, 139 S.Ct. 1715 (2019) ...............................................................26, 27

*In re NY City Policing During Summer 2020 Demonstrations*,
548 F Supp 3d 383 (SDNY 2021) ...................................................................13

*Ohioans for Concealed Carry, Inc. v. City of Clyde*,
120 Ohio St. 3d 96 (OH 2008) ......................................................................42

*Olugbenga Akinnagbe v. City of N.Y.*,
128 F. Supp. 3d 539 (E.D.N.Y. 2015) ............................................................20

*Pascual v. Holder*,
723 F.3d 156 (2d Cir. 2013) ...........................................................................31

*Matter of Patrolmen's Benevolent Assn. of the City of N.Y. v de Blasio*,
171 AD3d 636 (1st Dept 2019) ......................................................................35

*Patrolmen's Benevolent Assn. of the City of NY, Inc. v City of NY*,
142 AD3d 53 (1st Dept 2016) ........................................................................42

*People v. Arbeiter*,
169 Misc.2d 771 (1st Dept. 1996), *app. den'd* 89 NY2d 918 (1996) *and cert den'd*, 520 U.S. 1213
(1997) ..............................................................................................................20

*People v. Basch*,
36 NY2d 154 (1975) .......................................................................................17

*People v Brown*,
25 NY2d 374 (1969) .......................................................................................19

*People v. Brown*,
925 N.Y.2d 374 (1969) ...................................................................................33

*People v Leonard*,
62 NY2d 404 (1984) ................................................................................. 18, 38

*People v Peak Carting, Inc.*,
11 Misc 3d 4 (2d App Term 2005) .................................................................41

*People v Pennisi*,
61 Misc 3d 1224[A], 2018 NY Slip Op 51731[U] (Crim Ct, Queens County 2018) .....................19

*People v Ranieri*,
144 AD2d 1006 (4th Dept 1988) ...................................................................18

*People v. Reape*,
22 Misc. 3d 615 (Kings Cty Crim. Ct. 2008) .................................................33

*Posr v Ct. Officer Shield # 207*,
180 F3d 409 (2d Cir 1999) .............................................................................28

*Provost v. City of Newburgh*,
  262 F3d 146, 158 (2d Cir 2001) ................................................................ 34, 35

*Reyes v. City of New York*,
  23-cv-6369 ...............................................................................................7, 45

*Rodriguez v City of NY*,
  291 F Supp 3d 396 (SDNY 2018) ...................................................................25

*Rowe v Las Vegas Metro. Police Dept.*,
  2022 US Dist LEXIS 21237 (D Nev Feb. 7, 2022) ...........................................36

*Rucks v. City of New York*,
  96 F. Supp. 3d 138 (SDNY 2015)....................................................................25

*Russo v Cent. Sch. Dist.*,
  469 F2d 623 (2d Cir. 1972) ...............................................................................5

*Scott v. Harris*,
  550 US 372 (2007)...........................................................................................15

*Shamir v. City of N.Y.*,
  804 F.3d 533 (2d Cir. 2015)............................................................................14

*Shamir v. City of NY*,
  804 F.3d 555 (2d Cir. 2015)............................................................................16

*Sloley v. Vanbramer*,
  945 F.3d 30 (2d Cir. 2019) ..............................................................................43

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) .......................................................................44

*Soomro v. City of New York*,
  174 F. Supp. 3d 806 (SDNY 2016)...................................................................25

*Stambovsky v. Ackley*,
  169 A.D.2d 254 ...............................................................................................34

*Stolarik v City of NY*,
  2017 US Dist LEXIS 168096 (SDNY Sep. 7, 2017).........................................44

*Stuckey v. United States*,
  878 F.3d 62 (2d Cir. 2017) ..............................................................................31

*Syracuse Police Benevolent Assn. v Young*,
  156 Misc 2d 513 (Sup Ct, Onondaga County 1992) ...................................41, 42

*Talmadge Adib Talib v. Guerrero,*
 2019 U.S. Dist. LEXIS 219889 (C.D. Cal. Oct. 17, 2019) ..................................27

*Tardif v. City of New York,*
 991 F. 3d 394 (2d Cir. 2021) ......................................................................... 26, 37

*Tellier v. Fields,*
 280 F.3d 69 (2d Cir. 2000) ....................................................................................43

*Trapp-Miley v. City of N.Y.,*
 2012 U.S. Dist. LEXIS 44243 (E.D.N.Y. Mar. 29, 2012) ....................................33

*United States v. Burke,*
 431 F.3d 883 (5th Cir. 2005)...............................................................................32

*United States v. Springer,*
 262 Fed. Appx. 703 (6th Cir. 2008) ......................................................................32

*Yorzinski v City of NY,*
 175 F Supp 3d 69 (SDNY 2016)............................................................................19

*Youdon v. Bd. of Immigration Appeals,*
 No. 06-2525-ag (NAC), 2006 WL 3219278 (2d Cir. 2006)....................................9

*Zakrzewska v New Sch.,*
 14 NY3d 469 (2010) ..............................................................................................41

*Zellner v. Summerlin,*
 494 F.3d 344 (2d Cir. 2007) ........................................................................... 15, 16

## Statutes

N.Y.C. Admin. C. § 14-189(a) ........................................................................... 38, 39

N.Y.C. Admin. C. § 14-189(c) ........................................................................... 38, 39

N.Y.C. Admin. C. § 14-189, et seq. .....................................................................*passim*

N.Y. Civ. R. L. § 79-P ...........................................................................................*passim*

N.Y. Civ. R. L. § 79-P(1)(b) .................................................................................*passim*

N.Y. Civ. R. L. § 79-P(1)(c)(2) ................................................................... 9, 33, 41

N.Y. Civ. R. L. § 79-P(3)(a) ........................................................................29, 30, 33

N.Y. Civ. R. L. § 79-P(3)(b) ........................................................................... 30, 33

N.Y. Civ. R. L. § 79-P(c)(2) ....................................................................................39

N.Y. Civ. R. L. § 79-P(c)(3) ...................................................................................................38

N.Y. Crim. P. L. § 510.40 ......................................................................................................24

N.Y. Muni. Home R. L. § 10 ..................................................................................................40

N.Y. Pen. L. § 140.05 .............................................................................................................17

N.Y. Pen. L. § 140.05 .............................................................................................................17

N.Y. Pen. L. § 140.10(a) .........................................................................................................17

N.Y. Pen. L. § 195.05 .............................................................................................................17

N.Y. Pen. L. § 240.20 .............................................................................................................34

**Other Authorities**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 165-87 (2023) ...45

Ashley Southall, *Video of Man Berating Officer Opens Debate Over Recording in Police Stations*, N.Y. TIMES (Aug. 21, 2018) ........................................................................................................12

Audra D.S. Bursch and John Eligon, *Bystander Videos of George Floyd and Others Are Policing the Police*, N.Y. TIMES (May 26, 2022) ............................................................................13

Barry H. Ginsberg, *Blood Glucose Monitoring: Necessary and Sufficient?*, 1 J. DIABETES SCI. TECH. 612, 612 (2007) ...............................................................................................................3

Fed. R. Civ. P. 8(a)(2) .............................................................................................................14

Int'l Diabetes Feder., *COVID-19 and diabetes* (updated May 20, 2021) .................................3

N.Y. State Const., Art. IX, § 2 ................................................................................................40

Nicol Turner Lee, *Where would racial progress in policing be without camera phones?*, BROOKINGS (Jun. 5, 2022).......................................................................................................13

Robert Press, *Crime Down Citywide But Murders Up in the Bronx*, BRONX CHRONICLE (Jul. 11, 2018)...10

U.S. Const. amend. I...................................................................................................*passim*

## PRELIMINARY STATEMENT

"These are the things that are happening when they know they are being watched and filmed. What do you think is going on when they aren't?  There is a sickness in the culture of this Department and I want to know if the people sitting before me understand that it is on them to root it out."

-Queens Borough President Donovan J. Richards,[1]
introducing the City Right to Record Act, Jun. 9, 2022
Council Meeting Tr. (Green Ex. 5) at 33:15-18.

"[T]he officers insisted she was breaking policy by filming them, despite her Right to Record protections, and tackled her, breaking her arm. The sign inside the precinct stated, 'Members of the public are prohibited from audio/video recording or photography inside the facility.'

However, that sign, and the behavior of the NYPD, are seemingly in violation of the Right to Record Act … the city and my office need clarity on how the NYPD will meet their obligation and comply with the Right to Record Act moving forward."

-Public Advocate Jumaane Williams (May 18, 2022 Letter
to NYPD Commissioner Sewell and NYPD Asst. Dep.
Commissioner Chernayavsky (Green Ex. 6) ("PA Letter")).

When Plaintiff Patricia Rodney lost her glucometer, her insurance company told her she needed to provide a police report to have it replaced.  The interaction the insurance company asked for — between citizens and the police — should be simple, straightforward, and unfraught.  That was not to be.  Rather than get a simple piece of paper, Ms. Rodney was brutalized, repeatedly lied to, and hospitalized.  As it happens, all of that is on video — and that video is profoundly disturbing.  *See, e.g.*, Green Ex. 1.[2]  Naturally, Plaintiff sought redress.

In their renewed motion, Defendants move to dismiss the bulk of Plaintiff's claims, largely trying to litigate the underlying facts.  For example, despite that Defendants ***have admitted*** many members of the NYPD and public in fact moved through the stationhouse door with no issue — and not only could a reasonable juror find that there was no blocking of anything, but it is almost inconceivable

---

[1] Current Queens Borough President, and then-Chair of the City Council Committee on Public Safety.

[2] The Court's Records Office has the official version of this video on file from the previous iteration of this motion (Dkt. No. 47-1), and the Court instructed Plaintiff not to place a new version in the record on this motion.  *See* Dkt. No. 110.

they would find anything else based on the video — they baldly state: "multiple uniformed officers and civilians [were] unable to easily step through the door."  Dkt. No. 40 ("DMOL") at 7.  Similar issues abound.

But none of that gets to the biggest problem:  as the First Amended Complaint (Dkt. No. 29; "FAC") makes clear, "the City Council has long since made the legal decision that citizens must be allowed to record **all** the public activities of the NYPD" and the City's "No Recording Policy" for precincts is "unauthorized under City law."  SAC ¶¶ 6-7; 154 (emphasis added).  That law appears to have been passed with the express purpose of preempting the No Recording Policy.  *See, e.g.*, Green Ex 8; *see also, generally,* PA Letter; Dkt. No. 55-1.  And the policy is also void (1) under similar state law (SAC ¶ 154) and (2) because the City violated the City Charter's City Administrative Procedures Act ("CAPA").  Yet nothing in the motion to dismiss attempts to explain how the No Recording Policy **itself** — the undisputed but-for cause of everything that followed (*see, e.g.*, DMOL at 2, SAC ¶¶ 51 and 151) — is anything but a clear "violation of the Right to Record Act" (PA Letter at 1) or even ground-level lawful.

That leaves every conclusion but one waived for this motion.  The Court is bound to find that the No Recording Policy was illegally passed and preempted as a matter of City and State law.  Therefore, without the policy providing a lawful basis for the police to demand Plaintiff leave the station without the report required to replace her life-saving medical device, the City's motion collapses.

## STATEMENT OF FACTS

In many instances—only some of which Plaintiff mentions below—Defendants' arguments depend on impermissibly ignoring facts that are well-pled in the SAC or even that they have **admitted**.  The reason that since the initial briefing Defendants have admitted the facts they assert in their motion are untrue is likely that many of the relevant events were captured on a collection of body-worn camera

(or "BWC") videos.  *See* Dkt. No. 40 ("DMOL") at 8.  The relevant video for this motion has been provided to the Court along with this opposition.  *See* Green Ex. 1; Green Decl. ¶ 3.

### A.  Ms. Rodney makes a simple, reasonable, necessary request of the NYPD.

Plaintiff Patricia Rodney is a grandmother who works as a school lunch lady.  She has diabetes. Second Amended Complaint, Dkt. No. 90 ("FAC") ¶ 30.  She has to check her blood sugar about 5 times a day.  *Id.* ¶ 32.  And she works and worked in an environment — particularly on December 2, 2020, when the events at issue took place — where she faces a high risk of contracting COVID-19, along with the added complications it brings for people with diabetes.  *Id.*; Int'l Diabetes Feder., *COVID-19 and diabetes* (updated May 20, 2021).[3]  Plaintiff also has a history of high blood sugar, and had been hospitalized for it in the recent past.  SAC ¶ 33.  With that in the background, in November 2020, Plaintiff lost her glucometer — a medical device that is necessary for her to live.  *See* SAC ¶¶ 28-34; Barry H. Ginsberg, *Blood Glucose Monitoring: Necessary and Sufficient?*, 1 J. DIABETES SCI. TECH. 612, 612 (2007) ("There is little doubt of the need for self-monitoring of blood glucose (SMBG) in patients using insulin.").

Plaintiff's insurance company told her that to obtain a new glucometer, she was first required to file a police report for the missing glucometer.  SAC ¶ 30.  They also instructed her that they required her to fax to them an actual copy of the police report.  *Id.* ¶ 31.  Thus, in accordance with the insurance company's requirements, on November 30, 2020, Plaintiff spoke to a police officer inside the 62nd Precinct stationhouse to get her police report.  *Id.* ¶ 34.  The officer gave her a blank report form, and Plaintiff filled it out as required.  *Id.* ¶¶ 35-36.  She then asked this police officer for a copy of the report so that she could fax it to her insurance company and obtain her glucometer.  *Id.*  The police officer responded to Plaintiff's request by telling her, essentially, "I can't give you a copy of this paper you filled out. I have to make an official report. You can come back Wednesday [, December 2] to get

---

[3] *Available at* https://www.idf.org/aboutdiabetes/what-is-diabetes/covid-19-and-diabetes/1-covid-19-and-diabetes.html.

3

this report." *Id.* ¶¶ 37-38.

### B. Defendants brutally assault Ms. Rodney for saying she was recording them.

As instructed, Plaintiff returned to the stationhouse to obtain her police report on December 2. SAC ¶ 39.  One of the Defendants spoke to Plaintiff inside the stationhouse and refused to give Plaintiff a copy of the police report, even though another officer specifically told plaintiff to return to that stationhouse to obtain a copy when she filed the report.  *Id.* ¶ 40.  That Defendant and Defendant Sergeant Hernandez both (1) spoke to Plaintiff inside the stationhouse (specifically in the atrium area) and (2) refused to give Plaintiff a copy of the police report.  *Id.* ¶¶ 42-43.

At this point, Plaintiff was in the atrium of the stationhouse — a place separated by a sealed door from even the ***public*** part of the station's interior (to say nothing of any private portion of the station). SAC ¶ 46.  Not only is it well pled, but it is now an undisputed fact that, Plaintiff was not blocking access to anything.[4]  SAC ¶ 46-49; Green Ex. 12 at 6 (RFAs 27(A) and 27(B)).[5]  The video shows, and Defendants have ***admitted***, that all 5 people who attempted to pass through the door managed to do so.  Green Decl. ¶¶ 4-8; Green Ex. 12 at 6.

As seen in the video, Plaintiff tries everything she can to get the officers to honor their promise to give her the piece of paper she needs to obtain medical care necessary to keep living — something, as a citizen of New York City, she has every right to do.  And until Defendants state they are activating their body cameras, matters — while tense — remained peaceful.  *See* Green Ex. 1 at 0:00-1:25.

Everything changed when Plaintiff said she was recording.  SAC ¶¶ 51-58.  Defendants say they are activating their body cameras, and in turn, Plaintiff says, "This is my camera," and holds up her

---

[4] Defendants attempt to dispute this fact.  That is facially improper.  At a minimum, a reasonable jury could, viewing the video, determine that Plaintiff was not blocking anything because nearly a dozen people walk through the door while Plaintiff was supposedly blocking it.  *See* Green Ex. 1 at 0:00-1:15; Green Decl. ¶¶ 5-6.

[5] Indeed, based on the video, Plaintiff may have even been standing beyond the door's opening radius.  But even if she were not, the door is not materially obstructed.  SAC ¶¶ 42-45; *see also, generally,* Green Ex. 1.  At most, the video shows that Plaintiff very briefly breaks the plane of the door with her hand at a moment no one is using it.  Green Decl. ¶ 7; Green Ex. 1 at 0:38; 1:03.

iPhone.[6]  *Id.* ¶ 54.  Her intention in doing so was pure First Amendment-protected expression:  She wanted Defendants to feel she knew her rights as a citizen, and was afraid that without knowing they were being recorded, Defendants would abuse her.  SAC ¶ 54 n. 3.[7]  Instead, following well-trod (but unlawful) NYPD policies, Defendants gave an (unlawful) order and — without allowing time to comply — immediately jumped to brutal violence.  *Id.* ¶¶ 57-59.

With no warning, justification, or legal excuse, Defendants handcuffed Plaintiff's wrists and shackled Plaintiff's ankles, pushed Plaintiff to the ground, and began twisting Plaintiff's arms, causing Plaintiff to cry out in pain.  SAC ¶ 59.  And despite Plaintiff's cries[8] and total lack of resistance, Defendants continued to use extreme force against her.  *Id.* ¶ 60.  Defendants broke Plaintiff's elbow (or in technical terms, caused an avulsion fracture).  *Id.* ¶ 61.  While abusing her, Defendants screamed in audible, teeth-gritted rage, "I'm not playin' with you!," "That's it, you're going to jail," and the like.  *Id.* ¶ 62; Green Ex. 1 at 1:35-2:07.  The brutality had obvious physical consequences:  Plaintiff sustained pain and swelling to both elbows, arms, and wrists, including, but not limited to, an avulsion fracture of her left elbow.  SAC ¶ 63.  Once her elbow was broken, Plaintiff was not physically capable of putting her arm behind her back without extreme pain — and she told Defendants as much (indeed, she screamed it at them, then spoke it through tears at them), which they ignored.  Green Ex. 1 at

---

[6] Defendants stress that Plaintiff wasn't *in fact* recording.  While that is not legally relevant to the basic First Amendment right (*see Gericke v. Begin*, 753 F.3d 1, 3 n.2 (1st Cir. 2014)) or right under § 79-P, as explained below it also is a red herring:  Saying, in substance, "I'm recording" is *itself* protected speech.  And Defendants mount no argument otherwise.

[7] Defendants also claim that somehow in saying she was not actually recording, Plaintiff admits she was "in no way actually *attempting* to record."  DMOL at 2 (emphasis added).  Wrong.  Plaintiff *was* attempting to record — though she knew she was failing even then.  All the footnote says is "Plaintiff was not actually recording Defendants: she told them she was because she was afraid that without knowing they were being recorded, they would abuse her."  SAC ¶ 54 n. 3.  Nothing in that footnote says Plaintiff was not trying, as well as she could in a difficult situation, to record.  That is, Defendants supply no reason to think that a flustered and terrified grandmother, not exactly a technology wizard, pulling out a phone and declaring she was recording is not an attempt to record in the sense the statute means.  Certainly, as discussed below, understanding that as an "attempt" would be the only result consistent with the broader purposes of the statute to stop officers from any attempt to intimidate citizens who film police.  And it would track how Courts generally approach the "breathing room" First Amendment rights generally need.  *Cf., e.g., Russo v Cent. Sch. Dist.*, 469 F2d 623, 631-34 (2d Cir. 1972) ("it matters not that the expression takes the form of silence" and discussing how the First Amendment "requires 'breathing room'").

[8] Defendants claim "Plaintiff begins exclaiming loudly prior to being touched by officers."  DMOL at 3.  That an objective mistruth.  *See* Green Decl. ¶ 9.  Defendants have since offered an unqualified admission that saying so was untrue Green Ex. 13 at 9-10 (RFA Nos. 18-20), yet they renewed the motion without correcting the mistruth.

1:35-2:07.

Defendants' actions caused Plaintiff's protective face mask to fall below her nose.  SAC ¶ 64. One of the Doe Defendants then punitively adjusted Plaintiff's mask to cover her entire face before calmly walking away.  SAC ¶ 65.  That act served no legitimate purpose:  the only possible purpose it served was to humiliate, mock, and embarrass Plaintiff.  SAC ¶¶ 64-65 (screengrabs from a different video); Green Ex. 1 at 2:47-2:53.  And, tellingly, Defendants do not even try to explain, address, or even reference this act anywhere in their memo (nor did they address it in reply on the first motion).

Defendants then took Plaintiff (still handcuffed) to a local area hospital to receive treatment for the injuries she sustained when they assaulted her.  SAC ¶ 70.  Defendants then brought Plaintiff back to the 62nd Precinct where they continued to detain her for several additional hours.  *Id.* ¶ 71. Defendant Clemente swore out the criminal complaint against Plaintiff.  *Id.* ¶¶ 71-72.  She made several false statements that she knew to be false when she made them.  *Id.* ¶¶ 71-73.  Specifically, she swore that Plaintiff "resist[ed] lawful arrest by extending and locking [her] arms and refusing to turn onto [her] stomach while [Clemente] attempted to place [plaintiff] in handcuffs."  SAC ¶ 71.  That statement is false or deliberately omits all material context:  Defendants were sitting on Plaintiff the entire time. *See generally,* Green Ex. 1.  For this motion to dismiss, Plaintiff has pled — and the Court must accept as true — that she did everything she could to comply with the (unlawful) order she was given once the beating started.[9]  But she was unable to:  Defendants prevented her from complying with the demand to move her arms, both (1) by breaking her elbow and (2) by holding and sitting on her arms.[10]

---

[9] Further cementing this conclusion, Defendants' response to the RFAs was to say it was impossible to deny the assertion that Defendants "intended to arrest Plaintiff for recording."  Green Ex. 13 at 13 (RFA No. 30; compare, e.g., RFA No. 36 (denying a similar allegation about intent).  In other words, Defendants concede at a *minimum* this is a fact in dispute: if this was something so far from dispute that the Court could ignore the SAC, Defendants would be able to deny the RFA without qualification.

[10] That Defendant Clemente knowingly omitted these facts — facts that were material — is enough to sustain Plaintiff's fair trial right claim.  *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015).  Defendants' factual claim that the "Amended Complaint contains only bare assertions of false statements" (DMOL at 14) seems to presume that *Morse* was wrongly decided and the well-pled fact that Defendant Clemente omitted material facts is not relevant.

Indeed, all Defendants muster in their memo is a sheepish "plaintiff did not *immediately* comply with requests for her to turn onto her stomach while officers are attempting to handcuff her," DMOL at 3 (emphasis added) — which is itself a substantial departure from the statement Defendant Clemente put in the charging instrument:  that Plaintiff was "refus*ing*" to turn over."  Even putting aside that half a dozen officers were on top of Plaintiff (and that omission is sufficient for Plaintiff's claim), the difference between using the infinitive and qualifying that Plaintiff did not "immediately" comply — as Defendants seem to admit must be done for the statement to accurately describe the video — is substantial and would make a difference in a charging decision.

Defendant Clemente forwarded these false and misleading allegations or caused the allegations to be forwarded to the Kings County District Attorney's Office despite the false nature of the allegations.  SAC ¶ 73.  At her arraignment, Plaintiff acceded to an adjournment in contemplation of dismissal and her charges were eventually dismissed.  SAC ¶¶ 74-75.  That adjournment was consistent with Plaintiff's innocence.  *Id.*

The charges Plaintiff faced — trespassing and OGA — are exactly what the No Recording Policy instructs officers to charge people for when they record.  *See* Green Ex 12 ¶ 7.  And indeed, as demonstrated throughout the fast-moving injunctive proceedings in *Reyes v. City of New York*, 23-cv-6369, those charges are exactly what someone who does nothing *besides* record will face.  Put otherwise, the charges here demonstrate specifically that Plaintiff was arrested for recording, and nothing else.

At no time did any of the defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the conduct engaged in by their fellow officers.  SAC ¶ 77.  At all times, Defendants were acting within the scope of their employment, and in furtherance of the City of New York's interests and without legal justification or excuse.  *Id.* ¶ 78.

### C.  The NYPD's unconstitutional and illegal No Recording Policy.

In 2018, the NYPD developed a new policy forbidding civilians from recording video inside precincts (the "No Recording Policy"). SAC ¶ 79. The No Recording Policy was released in apparent response to a person who swore at police officers in a station, recorded the incident, ended up in an argument about recording, and left with no arrest. *Id.* ¶ 80. That is, the timing along with the many years without such a policy strongly suggests the No Recording Policy was crafted to provide police a way to arrest citizens recording at stations and to avoid bad publicity from such recordings — not because of a genuine concern for safety. *Id.* ¶ 81.

The No Recording Policy was enacted without any attempt at compliance with CAPA. That is, the No Recording Policy is obviously a "rule" in the rule-making sense (*see* N.Y. City Chart. § 1041-46), and the City did not (among other things) (1) post any notice of undergo any of the CAPA process; (2) receive approval of the Mayor's Office and the Law Department confirming that the rule does not conflict with other rules.[11] Indeed, the City of New York's official, authoritative (and judicially noticeable) list of rules, available at https://rules.cityofnewyork.us/recently-adopted-rules/, does not list the No Recording Policy anywhere.

The No Recording Policy, on its face, does not make any distinction in terms of time, place, and manner. SAC ¶ 86. First, the No Recording Policy does not distinguish in terms of "place": by its terms and as applied, it forbids recording in the wholly public atrium where there is no sensitive information in the same way it forbids recording aimed at sensitive information behind the desk. *Id.* ¶ 87. It similarly fails to distinguish because of "place" in that it applies to recording in places the public has total access to, with no justification. *Id.* ¶ 88. The No Recording Policy does not distinguish in terms of "time": it applies at all times. *Id.* ¶ 89. And the policy does not distinguish in terms of "manner": it applies to totally unobtrusive recordings (like Plaintiff's) as much as any other. *Id.* ¶ 90.

Further, all the recording that the policy restricts is recording of things that can freely be seen by

---

[11] CAPA notices are government documents subject to judicial notice. The lack of CAPA notices is likewise noticeable.

members of the public.  SAC ¶ 91.  Indeed, any sensitive information the policy addresses is already well-protected by other policies, laws, and regulations.  *Id.* ¶ 92.  For example — and presumed true for this motion — if a person tried to sneak a camera behind the desk at a station, the physical act of crossing the desk into the protected area behind it would be an independent source of probable cause. SAC ¶ 93.  Thus, all the policy does is restrict legitimate attempts to document and record the exercise of public duties by police.  *Id.* ¶ 94.  Defendants also apply the No Recording Policy with a categorical approach:  if someone is recording, officers may arrest because the City defines filming itself as interference.  SAC ¶ 162.  Thus, officers are not trained to — and in fact do not — evaluate whether "a person [is] engage[d] in actions that physically interfere with law enforcement activity."  N.Y. Civ. R. L. § 79-P(1)(c)(2); SAC ¶ 162.  Indeed, in the reports required by City law, "TRESPASS" regularly shows up in the report as one of the offenses people who are arrested while exercising City Right to Record rights are charged with (among the hundreds of arrests of others who are arrested while recording police each quarter[12]).  And the City's written policy tells officers to charge people with "trespassing" for mere recording.  Green Ex. 11 ¶ 7.

    The facts as pled — and presumed true for this motion — would allow a reasonable juror to infer the No Recording Policy was the but-for cause of all the individual Defendants' actions.  SAC ¶ 153; *see also, id.* ¶¶ 57 and 157.  That is, Defendants' claim that Plaintiff interfered with police activity and that Plaintiff was trespassing depend entirely on the assertion Plaintiff violated the No Recording Policy — and Defendants would not have given any order to leave the premises if Plaintiff had not told Defendants she was recording.  *Id.* ¶¶ 156-157.  Put differently: Defendants decisions to (1) tell Plaintiff she must disperse, (2) direct Plaintiff to leave the station, (3) tell Plaintiff to stop recording,

---

[12] The racial demographics of those arrests are also quite troubling.  *See, e.g.,* Right to Record Arrests, Second Quarter 2022 (221 of 413 right to record arrestees were Black; 135 were Hispanic); Right to Record Arrests, First Quarter 2022 (184 of 340 right to record arrestees were Black; 98 were Hispanic); Right to Record Arrests, Fourth Quarter 2021 (187 of 332 right to record arrestees were Black, 90 were Hispanic).  All of this material is judicially noticeable.  *See, e.g., Youdon v. Bd. of Immigration Appeals*, No. 06-2525-ag (NAC), 2006 WL 3219278, at *2-3 (2d Cir. 2006) (judicial notice taken of State Department Report on Human Rights Practices for China).

(4) arrest Plaintiff, (5) use additional force, and each subsequent act, all happened because Defendants believed Plaintiff was violating the No Recording Policy.  SAC ¶ 157.

Finally, as set out below, the No Recording Policy existed before the State (§ 79-P) or City (§ 14-189) Right to Record Act were passed.  Yet, in the wake of both enactments, no modification at all was made to the No Recording Policy — and by all appearances, no one at the NYPD even considered whether the policy could exist consistently with § 79-P or § 14-189.

### D.  NYPD encourages the public to view stations as public spaces.

Around the same time as the No Recording Policy emerged, the NYPD made public statements making clear, "Our message to New Yorkers going forward, [is that police stations] are *your* station houses" — that is, per then-commissioner James P. O'Neil, stations should be viewed as "shared public spaces."  Green Ex. 8 at 8.  Commissioner O'Neil repeated the same line in national and local press.  *See, e.g.,* Robert Press, *Crime Down Citywide But Murders Up in the Bronx*, BRONX CHRONICLE (Jul. 11, 2018); Green Ex. 10.  He explicitly compared stations to traditional public fora like "blocks" and "parks," saying the station needs to be "a two-way street" for speech.  Green Ex. 10 at 2.  "That was our promise to all 8.6 million New Yorkers."  *Id.*  New Yorkers relied on it.

### E.  Background on State and City right to record laws.

Beyond the initial failure to follow basic rulemaking procedures, NYPD's failure to revisit their policy following the passage of N.Y. Civ. R. L. § 79-P — and the later passage of N.Y.C. Admin. C. § 14-189 — thwarts the policy ends both laws were intended to serve.

#### 1.  *Section 79-P.[13]*

Section 79-P was signed into law in June 2020, during an emergency session of the state legislature.  It was part of a sweeping package of police reform measures.  As the Sponsor Memo explains, the purpose was to make recording the default, with only limited, express exceptions:

The purpose of this legislation is to unambiguously affirm, by statutory enactment, the right of

---

[13] There are two laws both technically codified at § 79-P.  The second is irrelevant here.

New Yorkers to record, with expressed exceptions, the actions of persons acting under the color of law.

Green Ex. 2 at 15.  Indeed, given the intent of the legislature discussed below, it would be perverse if the law did not apply where officers have the greatest — and least checked — "tremendous power" in interacting with the public (*Id.*):  At the public part stationhouse.  Thus, the law defines "law enforcement activity" as "***any*** activity by an officer acting under color of law," with no exceptions.  § 79-P(1)(b) (emphasis added).

In introducing § 79-P, sponsor and Assemblyman Nick Perry made clear the act was intended to change NYPD behavior:  "This is not about you or I knowing [we have a right to record], it's affirming his so that the police agencies like the NYPD will know for sure and not just know, but respect that right."  Green Ex. 3 at 101-102 (as paginated).  That is, it was specifically intended to "hurt the City and their pocketbooks if they continue to allow officers and to cover for officers who violate that right."  *Id.*[14]  As he explained, the law was intended to apply everywhere:  "***whenever*** you see a police activity, it's instinctive for you to record it because you … can't trust that the officer is going to be protecting the rights of the person that they are attempting to enforce the law against."  *Id.* at 103 (emphasis added).  And after some debate, the idea of including "buffer zones" of any kind (like the No Recording Policy) was rejected.  *Id.* at 107-113.

Many other comments throughout the debate and voting reflected ***exactly*** the sentiment Plaintiff was expressing and that led to Defendants breaking her arm: "there is nonstop unwarranted surveillance of everyday people by the police in the form of sidewalk videos and -- and towers that look over us every single day. And they get to watch us without any kind of oversight."  *Id.* at 127; *see*

---

[14] In explaining their votes, other members of the Assembly made similar comments:  "No one should be able to be afraid to videotape an injustice as it occurs[]" (Assemblywoman Bichotte, *id.* at 123); "This bill affirms that ***absolute*** right for people to take a video. To take that video and protect ourselves" (Assemblyman Ramos, *id.*); "We should be able to film what is happening in public space. And we should not be setting up any artificial boundaries for where people must stand [to film] from" (Assemblywoman Wright, *id.* at 125); and "[This is about] the idea that I, as a member of the community, or anybody in my community, should have the right to record what a police officer is doing [during] an encounter [and that right] should be protected" (Assemblywoman Cruz, *id.* at 133).

*also, id.* at 118.  The right codified in in § 79-P evens that scale and so that "everyday folks have some sense of empowerment that, you know, we can push back" (*id.* at 127) — and say things, perhaps something like "this is **my** camera."  Green Ex. 1 at 1:09.

### 2. *Section 14-189.*

The history of § 14-189 directly connects to the No Recording Policy.  As noted above, the No Recording Policy emerged after a 2018 viral incident with recording in precincts that the NYPD found embarrassing.  *See* SAC ¶¶ 80-82.  In the immediate wake of that incident and the creation of the No Recording Policy, Councilman Donovan Richards — the chair of the relevant committee — commented that the No Recording policy would be addressed in a bill.  Ashley Southall, *Video of Man Berating Officer Opens Debate Over Recording in Police Stations*, N.Y. TIMES (Aug. 21, 2018) (Green Ex. 8).[15] And as the bill's author himself explained in his *amicus* brief and declaration,

> "*I intended and expected that passage of the RTRA would supersede the NYPD No Recording Policy* and prohibit police officers from impeding recording in public spaces, *including such spaces within police precincts.*"

Williams Decl. ¶ 13 (emphasis added).[16]

Section 14-189 was passed in June 2020 and signed in July — going into effect 30 days after the signature.  Like its State counterpart, § 14-189 was signed as part of a large package of police reform measures — including measures aimed systemically reforming police misconduct.  Its purpose was to

---

[15] The version of the bill introduced in 2018 had no relevant differences, at least as far as recording in precincts is concerned, from the version ultimately passed.  *Compare, e.g.,* Int. 721(A)-2018 *with* Int. 721(B)-2018.

[16] Confirming the intent of § 14-189 to abolish the No Recording Policy, the bill's author and lead sponsor, Public Advocate Jumaane Williams, even before his *amicus* brief has commented on this case in particular — expressing concern over the City's plain refusal to follow the law.  In a May 18, 2022 letter to relevant NYPD brass, his office explained that the No Recording Policy unambiguously violates City law.  Green Ex. 6 ("PA Letter") at 1-2 (quoted in part above).  The Public Advocate closed his letter with demands for more information:  (1) "What policies are in place for police officers to interact with individuals that record near or in police stations when they do not pose a physical threat? (2) "How has the New York Police Department incorporated the Right to Record Act within these policies?' and (3) "[I]s the Right to Record Act incorporated into all written materials and signage inside and around police precincts?"  PA Letter at 1-2.  Whatever Defendants may have said in any formal response, their motion itself provides these answers unambiguously:  (1) None; (2) It has not; and (3) It is not.  That is, the City is candid in admitting it does not obey the clear command of duly passed legislation — or in training its officers on their obligations under City law.

be transformative — not merely to codify the status quo.[17]  That is, as noted at the outset of this opposition, it purpose was to "root … out" a "sickness in the" NYPD's culture and policies.  Jun. 9, 2022 Council Meeting Tr. (Green Ex. 5) at 33:15-18.  And it was, as noted above, meant to address the No Recording Policy in specific.

The moment the law ultimately passed also provides a window into its purpose.  June 2020 marked the height of the protests that "erupt[ed] throughout New York City" in the wake of the murder of George Floyd by police in Minneapolis.  *See, e.g.*, *In re NY City Policing During Summer 2020 Demonstrations*, 548 F Supp 3d 383, 392 (SDNY 2021).  For citizens of the City in particular, Mr. Floyd's murder struck a chord, as it mirrored the open wound of Officer Daniel Panteleo's killing of Eric Garner — and the profoundly lacking investigation that followed.  *See, e.g.*, *Matter of Carr v. De Blasio*, 197 AD3d 124, 126 (1st Dept 2021).  The City Council — spurred by demands of New Yorkers of all stripes — felt the need to do something.  And given that civilian recordings of police are the only reason the deaths of Garner, Floyd, and others initial mistruths in police stories about the incidents did not persist, a major point was to protect — without equivocation — the right to record police.  *See, e.g.*, Audra D.S. Bursch and John Eligon, *Bystander Videos of George Floyd and Others Are Policing the Police*, N.Y. TIMES (May 26, 2022); Nicol Turner Lee, *Where would racial progress in policing be without camera phones?*, BROOKINGS (Jun. 5, 2022).[18]

As the Public Advocate stated, describing his bill:  "Imagine if the [many instances of misconduct discussed] were not [recorded].  Imagine if we were not aware."  Green Ex. 5 at 33:15-18.  Or, as Donovan Richards, the Chair of the Committee on Public Safety and chair of the major hearing on § 14-189, put it:  "A right to beat another man's body over nothing. Pushing a young girl to the ground.

---

[17] The Public Advocate specifically said on the Right to Record Act, "if all we get now is 50-A and reduction of police budget then all of this was not worth it.  So, let's use this time to go further, to go bolder, to create the society we all said we wanted when we ran."  Green Ex. 5 at 38:2-14.
[18]  *Available at*  https://www.brookings.edu/blog/fixgov/2020/06/05/where-would-racial-progress-in-policing-be-without-camera-phones/.

Pulling a mask down to pepper spray someone. These are the things that are happening when they know they are being watched and filmed. What do you think is going on when they aren't?" Green Ex. 5 at 16:11-24. Again, emphasizing the transformative nature of the Right to Record Act, he concluded: "There is a sickness in the culture of this Department and I want to know if the people sitting before me understand that it is on them to root it out." *Id.*[19]

### 3. *Conclusion on Legislative History.*

In that context, had either the City Council or the State Legislature intended to carve out an exception for the extant (and well-known) No Recording Policy, either could have and would have done so explicitly. As noted above, the City law was crafted with the No Recording Policy and its history in mind. Both bills clearly only leave limited, enumerated exceptions. *See, e.g.*, Summary of Int. No. 721-B (Green Ex. 7) (stating § 14-189 "codif[ies] a person's right to record New York City police officers or peace officer acting in their official capacity, with limited exceptions."). And the City law's author has made clear he intended the law to cover precinct recording when he wrote it. *See* Dkt. No. 55-1. Thus, neither law permits a "precinct" exception — or any categorical exceptions at all. Rather, both require officers to determine whether there is a meaningful, physical interference with doing their job. So whether by the plain text or history, NYPD's No Recording Policy exists in a continued "violation of the Right to Record Act" on a City level (PA Letter at 1) and a State level.

### STANDARDS OF REVIEW

The applicable federal rules require only that a plaintiff plead "a short and plain statement of the claim" to entitle them to discovery. *See* Fed. R. Civ. P. 8(a)(2). *See also, e.g.*, *Shamir v. City of N.Y.*, 804 F.3d 533, 556 (2d Cir. 2015). Under that standard of review, the Court must accept as true all plausibly

---

[19] The broader legislative history available is also deep, rich, and informative, but given that the City has waived any argument the No Recording Policy is permissible under State and City law, Plaintiff stops with a general description. As noted below, if the Court, despite waiver, allows the City to argue the No Recording Policy is valid under City and State law — or that P.A. Williams has misunderstood his own bill — Plaintiff respectfully asks for permission to brief the statutory history at greater length.

pled allegations in the SAC and draw all reasonable inferences in Plaintiff's favor.  *See, e.g.*, *Case, et al. v. City of N.Y., et al.,* 233 F. Supp. 3d 372, 382 (SDNY 2017) (citing cases).  If the allegations in the pleadings sufficiently "raise the right to relief above the speculative level," dismissal is inappropriate. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Along with the FAC's allegations, the Court "may consider … documents attached as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010).

As to the video evidence, contrary to the City's suggestion (DMOL at 8), unless it "blatantly contradict[s]" Plaintiff's version of events, the Court is constrained to view it, too, in the light most favorable to Plaintiff.  *Cf. Scott v. Harris*, 550 US 372, 378-81 (2007) (same, even at summary judgment). And to the extent there are any disputed facts related to probable cause or any other material matter, they are for a jury to decide.  *See, e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 368, 371 (2d Cir. 2007) (citing cases).

## **ARGUMENT**

Defendants' main arguments rely on glossing over both the legal and factual content of Plaintiff's FAC.  They also rely heavily on reading the video (Green Ex. 1) in a light that is most favorable to *Defendants* (to the extent it is not just contradicting the video and inconsistent with Defendants' admissions).  Indeed, Defendants seem to go as far as saying — as if this were closing at trial and inferences from a lack of evidence were permissible — because at "no point during the body worn camera footage are plaintiff's ankles shackled" on screen, the Court should infer it never happened at any point.  *But see* Green Dec. ¶ 10 (image of Plaintiff's feet shackled); *see also,* Green Decl. ¶ 9 (Defendants' factual claims contradicted by both SAC and video).  That is impermissible on a motion to dismiss.

More to the point, though Defendants' arguments fail on their own merits for the reasons discussed below, the Court need not — and should not — get there.  As explained in Point VI,

Defendants never explain how the No Recording Policy is legal as a matter of City or State law.  Nor could they — it is not.  SAC ¶¶ 6-7; *see generally,* PA Letter.  So since the No Recording Policy is the source of Defendants' claim to have probable cause (SAC ¶¶ 57; 157), and since relying on City and State law preemption to resolve the motion does not require the Court to make any pronouncements on federal constitutional law, it is the preferrable path.  *See, e.g., Ashwander v. TVA*, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring); *see also, Bond v. United States*, 572 U.S. 844, 855 (2014) (courts should not "not decide a constitutional question if there is some other ground upon which to dispose of the case" or motion).  Thus, the Court should deny the motion (except as described in note 34, below) without reaching the merits of most of Defendants' arguments.

## I.   **Defendants' Probable Cause Arguments on Plaintiff's False Arrest Claim Fail.**

Courts analyze probable cause based only on "the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Shamir v. City of NY,* 804 F.3d 555, 557 (2d Cir. 2015).  Disputed facts related to probable cause are for a jury to decide.  *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (citing cases).  Here, the Court should reject Defendants' main argument for probable cause — that the dispersal order was lawful and so Plaintiff's arrest was justified by at least arguable probable cause — because it relies on interpreting material, disputed facts in Defendants' favor, when a jury could find for Plaintiff as to those facts based on the record. Further, Defendants' argument fails on the law, as there was not even arguable probable cause to arrest Plaintiff.

Defendants argue there was probable cause to arrest Plaintiff on one of two trespass charges or Obstruction of Governmental Administration ("OGA"), thus justifying her arrest and therefore requiring the dismissal her false arrest claim.  DMOL pp. 5-9.  But the SAC does not establish as a matter of law that probable cause existed for Ms. Rodney's arrest or for her subsequent detention.  To the contrary, the SAC pleads facts that, if proven, establish that there was no probable cause for

Defendants to arrest or prosecute Plaintiff for violating New York Penal Law 140.05 (trespass), New York Penal Law 140.10(a) (criminal trespass in the third degree), and New York Penal Law 195.05 (obstruction of governmental administration).

In the first instance, Defendants' only justification to arrest was the No Recording Policy (and a failure to obey requests or orders made because of the policy).  But as explained in Points V and VI below, the No Recording Policy is unlawful under city, state, and federal constitutional law.  And as pled in the SAC, and confirmed by Defendants' own written version of the No Recording Policy, that policy was the only reason officers gave Ms. Rodney orders to leave.  *See, e.g.*, SAC ¶¶ 57, 157; Green Ex. 11 ¶ 7.  So Defendants' False Arrest arguments fail for that reason alone.  But beyond that, Defendants concede that Plaintiff entered the 62nd NYPD Precinct lawfully.  And given that, they fail to meet the relevant tests.  That is, even if the No Recording Policy were not (1) preempted, (2) unconstitutional, and (3) illegally adopted, as shown below, Defendants have failed to establish probable cause to arrest.  And their only argument otherwise relies heavily on crediting charging documents over the facts in the SAC — which, of course, the Court cannot do on a motion to dismiss.

### A. Defendants lacked even arguable probable cause to arrest Plaintiff for trespass.

Defendants' argument that Plaintiff's SAC somehow admits that Defendants had probable cause to arrest for trespass fails because it does not address the full relevant test.  To win that argument, Defendants must establish that the SAC itself pleads that Plaintiff "[1] knowingly [2] enter[ed] or remain[ed] [3] unlawfully in or upon [a] premises."  N.Y. Pen. L. § 140.05.  Defendants can only argue an unlawful "remaining" theory because they do not (and cannot) dispute that Plaintiff entered the station atrium with a license and privilege to enter and remain because it was open to the public at the time she entered.  On a "remaining" theory, "a person who enters upon premises accidently, or who honestly believes that he is licensed or privileged to enter is not guilty of any degree of criminal trespass." *People v. Basch*, 36 NY2d 154 (1975).  So, to establish the knowledge element of unlawful

remaining-type criminal trespass, Defendants need to show that Plaintiff affirmatively pled she "[had] knowledge that remaining is unlawful." *People v Ranieri*, 144 AD2d 1006, 1008 (4th Dept 1988). They do not.

To be lawfully excluded from premises generally open to the public under New York's trespass laws, the person must first defy a *lawful* order to leave the premises that is "communicated … by a person with authority to make the order." *Carpenter v. City of New York*, 984 F. Supp. 2d 255 (SDNY 2013); *see also* PL § 140.00(5); *People v Leonard*, 62 NY2d 404, 408 (1984). But any order to leave a public place must have "a legitimate basis and …, considering the nature and use of the subject property, its enforcement [must] not unlawfully inhibit or circumscribe the defendant from engaging in constitutionally or statutorily protected conduct." *Leonard*, 62 NY2d at 411. Whether Defendants meet their "burden of proving" these elements (*id.*, 62 NY2d at 408) is inherently a fact-intensive inquiry. And at this procedural stage, to prove that the order itself was lawful in the face of the FAC's pleading otherwise, Defendants would need to show that the SAC itself "demonstrate[s] that, given the nature and purpose of the property, the particular exercise of the power to exclude had a legitimate basis; and that the purpose would not be legitimate if its enforcement unduly infringed upon an independent statutory or constitutional right of the defendant to be present on the property." *Id.* at 407, 411 ("person who had been issued a 'persona non grata' letter by a State University president banishing him from part of a college campus normally 'open to the public' may not be convicted of trespassing for entering the campus when government failed to prove that the banishment order was lawful"). For reasons explored elsewhere, Defendants cannot and do not meet that burden.

Beyond the problems with knowledge, taking the facts in the SAC as true, Defendants do not argue that Plaintiff had a sufficient opportunity to comply with their requests to leave such that she can be said to have knowingly remained illegally. By analogy, whether a police officer has probable cause to arrest someone "for refusing a lawful order to disperse depends on satisfaction of two factors:

(1) the extent to which police communicated the orders to the crowd; and (2) whether individuals had an opportunity to comply with the orders." *Yorzinski v City of NY*, 175 F Supp 3d 69, 80 (SDNY 2016). But here, in line with the "uninterrupted history of NYPD officers mishandling dispersal orders" by failing to provide opportunities to disperse (*Gavin v. City of N.Y.*, 2021 U.S. Dist. LEXIS 159908, at *15 (SDNY Aug. 24, 2021)), the video shows — and the SAC pleads — that Defendants provided no meaningful for Plaintiff to comply with their orders. That is, within seconds of the first audible words that *might* be called orders (that they did not in fact constitute orders is discussed below) — a statement that Defendants were "asking" Plaintiff to leave — and "without even allowing a response," Defendants violently brought Plaintiff on the ground and broke her arm. SAC ¶¶ 52-58.

Defendants' own cases — *People v Pennisi*, 61 Misc 3d 1224[A], 2018 NY Slip Op 51731[U], *2 (Crim Ct, Queens County 2018) and *People v Brown*, 25 NY2d 374, 377 (1969), *cited in* DMOL at 7 — aptly makes this point. Like Defendants here, the officers in *Pennisi* "merely … advised [Plaintiff] that [she] would be arrested if he did not stop taking [video footage] inside of the building." *Pennisi* at *5. That is, even if any orders were given, they did not "specify for what defendant would be arrested." *Id.* In *Pennisi*, the No Recording Policy itself "explain[ed] why [Defendants' argument was] facially insufficient" because it "require[ed] that the officer order the defendant to leave, which in this instance the officer failed to do so." *Id.; see also, Brown*, 25 NY2d at 377 ("We are going to talk right here or not at all" and similar statements that implied leaving were not orders). And so too here: the video does not establish that Defendants clearly revoked Plaintiff's license to be present (let alone did so lawfully), so Defendants must await discovery to try to dispute the facts from the SAC.

### B. Defendants lacked arguable probable cause to arrest Plaintiff for OGA.

In the first instance, Defendants' OGA probable cause argument turns on a fact dispute, and fails on that basis alone. Defendants assert probable cause for OGA solely because they say Plaintiff was "blocking entry and exit to the stationhouse while she stood behind a door [such that the door] could

not be opened fully." DMOL at 17. But the video they cite for that proposition reveals that about a dozen officers and civilians were easily able to move through the door. SAC ¶ 42; Green Ex. 1. And in the OGA statute, "[t]he word 'prevent' implies 'an **insurmountable** obstacle or impediment.'" *People v. Arbeiter*, 169 Misc.2d 771, 773-4 (1st Dept. 1996) (emphasis added), *app. den'd* 89 NY2d 918 (1996) *and cert den'd,* 520 U.S. 1213 (1997). Thus, since Defendants have admitted (Green Ex. 12 at 6 (RFA Nos. 27(A) and (B)) that officers and others **in fact** "[]surmount[ed]" any impediment (169 Misc.2d at 773-4), the Court is bound to deny the motion. *Accord, e.g., Case v. City of N.Y.*, 408 F. Supp. 3d 313, 321 (SDNY 2019) (denying summary judgment on probable cause for obstructing traffic because "[a]lthough the video depicts individuals gathered on a sidewalk … it does not show any pedestrians attempting to pass at any moment prior to Kushneir's arrest.").

But even if the Court could — as Defendants urge —read the video against the SAC and their own admissions to find that Plaintiff slowed some (unidentified) subset officers who wanted to walk through the door, it is well-settled that such conduct would fall well short of OGA. To be guilty of OGA, a person must not just act with general intent, but "an intent to prevent the public servant from engaging in a **specific** official function." *Olugbenga Akinnagbe v. City of N.Y.*, 128 F. Supp. 3d 539, 546 (E.D.N.Y. 2015) (emphasis added). Such intent appears nowhere in the SAC — quite the opposite. *See* SAC ¶¶ 21-25.

Further, even where the predicate for an OGA arrest is a purportedly intentional refusal to comply with a lawful order, courts have required persistent, physical acts that go well beyond the passive refusal here before an OGA charge will lie. *See, e.g., Marcavage v. City of NY*, 689 F.3d 98, 110 (2d Cir. 2012) ("Plaintiffs rejected 17 directives (by three officers) to leave [a] no-demonstration zone [that the Court found was a lawfully imposed time/place/manner regulation], insisting on a constitutional right to demonstrate where they stood" and where they were "hostile and non-compliant" and "in effect, they courted arrest"). As seen on the video, the time between an officer

first audibly "asking[20] Plaintiff] to leave" and then telling her to "turn around" and arresting her is measured in seconds — and within the same breath. *See* Green Ex. 1 at 1:17-1:25.  And before Plaintiff has a meaningful chance to comply, she is grabbed by Defendants and arrested.  A reasonable jury could well find that Defendants did not in fact terminate Plaintiff's license and privilege to the space, or give an order to leave as the caselaw requires.[21]

Indeed, the Second Circuit's obstruction of traffic cases also show, by analogy, how Defendants' arguments are fundamentally misguided.  For those offenses — offenses that, like OGA, require interference to take place before there is probable cause — "[t]he Second Circuit requires a showing that the putative offender was 'actually and immediately blocking' the pedestrian or vehicular traffic in question."  *Case v. City of N.Y.*, 408 F. Supp. 3d 313, 320 (SDNY 2019), *quoting Zellner v. Summerlin*, 494 F.3d 344, 372 (2d Cir. 2007).  As shown in the video — and is well-pled in the SAC — not one officer is prevented from moving (let alone insurmountably) through the door.  Instead, officer after officer moves through without a single issue.

It is also simply well settled that "[f]ailing to obey a police order, in itself, will not satisfy the requirements of the statute."  *Hilderbrandt v. City of N.Y.*, 2014 U.S. Dist. LEXIS 128170, at *10 (E.D.N.Y. Sep. 11, 2014); *see also, Dowling v. City of N.Y.*, 2013 U.S. Dist. LEXIS 142108, at *13-14 (E.D.N.Y. Sep. 30, 2013) (no probable cause for OGA, even where "Plaintiff does not dispute the fact that he did not back up when told to do so, and that he continued to disobey the command when Officer Gasquez repeated it.").  And even that is an *arguendo* concession to Defendants:  As explained throughout this memo, Defendants did not give any lawful order.  Rather, Defendants' issuance of

---

[20] As an independent basis to reject Defendants arguments, a reasonable jury could also find that an officer saying they are "***asking*** you to leave" is not, in the relevant sense, an order to disperse.

[21] To be clear, the SAC does not plead otherwise.  Rather, it pleads Defendants "***ask[ed]*** Plaintiff to leave" because she was recording — and then "immediately escalated … from demanding Plaintiff ***stop recording*** to assaulting her."  SAC ¶ 44; 52.  Though SAC does plead that Defendants made "decisions to" tell Plaintiff to disperse (SAC ¶ 151) — because it does appear they did make those decisions — the actual words they said, at least at this stage, are not orders to disperse as a matter of law.

dispersal orders was "based on (1) th[e] belief [Plaintiff was recording] and (2) Defendants' understanding of the City's official no-recording policy for police stations." SAC ¶ 51. "Therefore, Plaintiff[']s failure to comply with an (unjustified) order … cannot, without more, create the predicate probable cause to justify her arrest for obstruction of governmental administration." *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013).

## II.   Plaintiff's Fair Trial Rights Claims are Well-Pled Against All Individual Defendants.

Defendants devote only one paragraph to fair trial rights arguments, making legal arguments that the Court should reject. *See* DMOL pp. 12-14. Contrary to Defendants' claim that the SAC "contains only bare assertions of false statements, at most alleging" violations against Defendant Clemente, *see* DMOL p. 14, the SAC sufficiently alleges that Defendant Clemente — as well as potentially Defendants Does 1-9 and Hernandez — provided false information to prosecutors, or, in the case of the Does and Hernandez, either directly participated, or failed to intervene, when Defendant Clemente did so. *See, e.g.*, SAC ¶¶ 71-73. Specifically, the SAC alleges Defendant Clemente swore out a criminal court complaint against Plaintiff containing materially false allegations — for example, that Plaintiff refused to comply with certain instructions, when in fact, Defendants prevented her from complying — which Defendant Clemente knew to be false when swearing them, and forwarded those allegations to the Office of the Kings County District Attorney ("KCDA"). It also alleges — and Defendants fail to address, and therefore concede — that Defendant Clemente's complaint included "material omissions." SAC ¶ 73. Those allegations suffice, for pleading purposes, to show NYPD members took part in creating or forwarding false information to prosecutors — or that they failed to intervene to prevent Defendant Clemente from doing so.

Although Defendants suggest that "multiple officers" can be heard "instructing plaintiff to comply with directions so they can handcuff her, while plaintiff is not doing so" on police body-worn camera footage (DMOL at 14), that is of no moment: As seen in the fact section and Point I above, Plaintiff

could not comply with those instructions — as Defendant Clemente and the other NYPD members present well knew — because NYPD members had broken her arm and were physically on top of her, they prevented her from complying.   And though Defendants also claim Ms. Rodney was "refusing to turn on her stomach" (DMOL at 14), Defendants have cited no evidence at all to support that bald assertion, let alone evidence sufficient to disproves Ms. Rodney's version of events on a motion to dismiss, viewing all the evidence and construing all inferences in her favor, (as, of course, the Court must here).   Crediting Ms. Rodney's description of what occurred in the SAC, which the video evidence supports, she did not refuse to turn onto her stomach, extend or lock her arms, or otherwise resist arrest.

Put directly, Defendant Clemente's falsely-sworn criminal court complaint cannot overwhelm Plaintiff's well-pled claims at this stage.   Indeed, an officer's own false account of their observations of alleged criminal activity can count as the sort of fabricated evidence required to ground a fair trial rights claim.  *See, e.g.*, *Marom v. Blanco*, 2019 US Dist LEXIS 124343, at *20 (SDNY July 25, 2019), *citing Collins v. City of New York*, 295 F. Supp. 3d 350, 371 (SDNY 2018), *quoting Garnett v. Undercover Officer C0039*, 848 F. Supp. 3d 265, 371 (2d Cir. 2016); *see also, e.g.*, *Case v City of NY*, 408 F Supp 3d 313, 323 (SDNY 2019) ("Statements made in charging instruments, such as a criminal complaint, can be actionable").   In ruling on summary judgment motions in *Marom*, Judge Castel ruled a jury could find that Defendant Cynthia Boyle had provided false information likely to influence a jury's verdict — allegations related to her own purported observations in police booking paperwork and a sworn criminal court complaint that supported the plaintiff's prosecution for resisting arrest and obstruction of governmental administration charges — based on the differences between the plaintiff's testimony and Boyle's version of events alone.  *Id.* at *26-28.   Here too, a jury could ultimately find that Defendant Clemente's statements about what she allegedly observed Ms. Rodney do, like Defendant Boyle's in *Marom*, were both false, and likely to influence a jury's verdict.

Relatedly, Defendant Clemente omitted material evidence in the form of her observations that police had just injured Ms. Rodney's arm (as she knew, at a minimum, from Plaintiff's screams), and that Defendant Clemente was on top of her, physically preventing her from moving her arm or turning over onto her stomach, providing another ground for Plaintiff's fair trial rights claim against Defendant Clemente. *See, e.g.*, *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) ("government officials may be held liable for fabricating evidence through false statements *or omissions* that are both material and made knowingly") (emphasis added). "That is because '[i]nformation may be 'false' if material omissions render an otherwise true statement false.'" *Hamilton v City of NY*, No. 15-CV-4574 (CBA) (SJB), 2019 US Dist LEXIS 56606, at *59-60 (EDNY. Mar. 18, 2019) (fair trial rights claim predicated on failing to forward material information to prosecutors), quoting *Morse,* 804 F.3d at 548. And beyond Defendant Clemente, the SAC also adequately pleads a fair trial rights claim for Defendants Does and Hernandez based on their direct involvement and/or failures to intervene based on the false statements and omissions above. *See, e.g.*, *Marom*, 2019 US Dist LEXIS 124343, at *34-37.

The Court should also reject Defendants' second argument that none of Defendant Clemente's statements "would be material" because — as Defendants claim — "officers had probable cause to arrest plaintiff." DMOL p. 14. First, as seen in Points I and VI, there was no probable cause to arrest Ms. Rodney. Second, probable cause to arrest is not a defense to a fair trial rights claim. *See, e.g.*, *Marom*, 2019 US Dist LEXIS 124343, at *29-30 (citing cases). That is, even "where there exists probable cause for an arrest," a fair trial rights claim may proceed to trial if a plaintiff can "establish that 'the fabricated evidence cause[d] some further deprivation' beyond the arrest supported by probable cause." *Id.* at *30 (internal citations omitted). Here, Plaintiff has pled such post-detention "further deprivations" of liberty and/or property, in the form of appearing at her arraignment, and having her case adjourned for six months after her arraignment, during which it was open and she was subject to the orders and processes of the Court pursuant to N.Y. Crim. P. L. § 510.40. SAC ¶ 67; *see,*

*e.g.*, *Marom*, 2019 U.S. Dist LEXIS 124343, at *28-33.

Finally, the Court should reject Defendants' claim that the criminal court complaint "could not be found to be material and have been able to influence a jury's decision as it would have constituted inadmissible hearsay."  DMOL p. 14.  For this argument, Defendants cite only *Brown v. City of New York*, No. 14-CV-5372 (BMC), 2014 U.S. Dist. LEXIS 181736, at *9-10 (EDNY Dec. 23, 2014).  But *Brown* is based on two propositions that overwhelming subsequent authority has since rejected: First, that a fair trial rights claim can only go forward if there is a trial, and second, that statements in police paperwork and criminal court complaints cannot support fair trial rights claims, because they are hearsay at trial.  *See* 2014 U.S. Dist. LEXIS 1817736, at *9-10.  On the first point, "a trial is not a prerequisite to a [fair trial] claim."  *Collins*, 295 F. Supp. 3d at 371, *quoted in Marom*, 2019 U.S. Dist LEXIS 124343, at *20.  On the second point, "where plaintiff never proceeded to trial, the question is if the allegedly false information is material such that it would 'likely influence the jury *if* it arrived at a jury,'" *Case*, 408 F Supp 3d at 323, quoting *Garnett v. Undercover Officer C0039*, No. 13 Civ. 7083, 2015 U.S. Dist. LEXIS 45232, 2015 WL 1539044, at *8 (SDNY Apr. 6, 2015), and "the fact that allegedly fabricated evidence would be inadmissible at trial by itself is not a bar to the claim," *Soomro v. City of New York*, 174 F. Supp. 3d 806, 816 (SDNY 2016) (citing *Rucks v. City of New York*, 96 F. Supp. 3d 138, 148 (SDNY 2015); *see also Rodriguez v City of NY*, 291 F Supp 3d 396, 415-417 (SDNY 2018) (elaborating on *Rucks*).  Thus, "[s]tatements made in charging instruments, such as a criminal complaint, can be actionable." *Case,* 408 F. Supp. 3d at 323.

## III. <u>Defendants' Partial Motion to Dismiss Plaintiff's First Amendment Retaliation Claims Fails.</u>

To start, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  Defendants do not contest that.  Rather, they argue that their subjective intent is not relevant because they claim they had probable cause standing alone.  But that argument

ultimately fails.  First, it fails for the reasons discussed below in Point VI.  Second, it fails because it misconstrues the claims at issue — and thus neglects to argue in any way to dismiss Plaintiff's retaliatory **force** and (for lack of a better title) humiliation claims.  And past there, both by missing facts and underestimating the sweep of the First Amendment, Defendants' argument that Plaintiff engaged in no protected activity is dead on arrival.  Deprived of its foundation, Defendants' larger argument collapses, leaving nothing of their motion.

### A. Defendants waive any motion to dismiss Plaintiff's retaliation claims beyond retaliatory arrest.

Defendants construe Plaintiff's claims as solely being about a "retaliatory **arrest**." DMOL at 21 (emphasis added).  Not so.  Plaintiff pleads both a retaliatory arrest claim *and* a retaliatory force claim. Indeed, the claim has an entire section labeled "*First Amendment Retaliation by Violence*" (SAC ¶¶ 131-134 (emphasis in original)).  Yet Defendants do not say a word about retaliatory force or violence.  Nor do they even acknowledge the factual allegation that they visited retaliatory humiliation on Plaintiff by punitively blindfolding her with her COVID mask.  SAC ¶¶ 64-65.  And since Defendants, in misconstruing the complaint, make no argument at all to dismiss the retaliatory force or humiliation claims, they may not argue for it for the first time on reply.  *Tardif v. City of New York*, 991 F. 3d 394, 404 n.7 (2d Cir. 2021).[22]

But even without waiver, Plaintiff would prevail on this claim because probable cause is not a defense (qualified or otherwise) to First Amendment retaliation claims outside the "retaliatory arrest" context *Nieves* discusses, such as retaliatory use of force claims.  *See, for example, Gray v. City of Denham Springs*, 2021 U.S. Dist. LEXIS 63591, at *25 (M.D. La. Mar. 29, 2021) ("*Nieves* is distinguishable … [because] it addresses a claim of retaliatory *arrest*.  Here, by contrast, Jacob alleges retaliatory *excessive*

---

[22] Nor, on the initial reply, did Defendants make **any** attempt to argue these claims are not well-pled.  *See* Dkt. No. 64 at 11-12.  That is, Defendants did not even bother mentioning the humiliating act of covering Plaintiff's eyes with her mask; nor do they mention the obvious link between the viciousness of the assault and Plaintiff's First Amendment conduct (whether it is the attempt to record, or the speech **saying** she is recording).  An attempt to do so now would be a fourth bite at the apple.

*force*") (emphasis in original).[23]   And Defendants offer no authority that touches on a retaliatory force or any other non-arrest claim, because they cannot.   Moreover, since Defendants have expressly declined to challenge (and thus implicitly conceded) that the force they used was excessive, they have logically abandoned any challenge to the First Amendment claim that turns on the proportionality of the force used.   Similar is their failure to address the appropriateness of their attempts to humiliate Plaintiff.   Since any argument is at this point waived at least four times over, the Court should decline to dismiss Plaintiff's non-arrest-based retaliation claims.

### B.  Defendants ignore that stating, in substance, "I am recording" is itself First Amendment activity, and have waived challenges beyond that.

As shown above, Defendants' claim that Plaintiff made no *attempt* to record is misguided.   *See,* note 7.   But even *if* Defendants were right about that (they are not), their follow-on analysis fails because Ms. Rodney's statement that she was recording was itself a speech act.   Indeed, the SAC explicitly pleads that "Plaintiff was engaged in the exercise of a First Amendment Right **when she stated** she was recording Defendants."   SAC ¶ 131 (emphasis added).   In other words, Plaintiff's SAC pleads an alternative factual and legal theory in her challenging Defendants by saying "this is *my* camera."   Even in their previous reply, Defendants did not contest this.   So, since Defendants concede (by not addressing it in any way over three briefs so far) that their actions were based on that speech act, they concede the elements of a First Amendment retaliatory arrest claim for *that* statement — at least beyond their general *Nieves* argument (addressed below).   *See, e.g.*, DMOL at 15-17.[24]

On the merits, a statement saying, "this is my camera" falls in the "significant" range of "challenge" to police officers the First Amendment protects directly (*Houston v. Hill*, 482 US 451, 461

---

[23] *See also, Talmadge Adib Talib v. Guerrero*, 2019 U.S. Dist. LEXIS 219889, at *33-34 (C.D. Cal. Oct. 17, 2019) ("probable cause for his arrest would not bar" retaliatory force claim); *Brown v. Diaz*, 2020 U.S. Dist. LEXIS 148067, at *43 (E.D. Cal. Aug. 14, 2020) ("Because this claim is not one for a retaliatory arrest, but rather for a retaliatory use of force, the court declines to grant summary judgment on the basis that Officer Howard likely had probable cause for an arrest").

[24] Plaintiff concedes for efficiency that, if Defendants had probable cause, her First Amendment retaliatory *arrest* claim would fail under *Nieves*.

(1987)) — particularly given its mildness compared to what else courts have found protected.[25] Finally, in terms of causation, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action" — particularly before trial. *Espinal v Goord*, 558 F3d 119, 129 (2d Cir. 2009) (six months suffices to show causation); *see also, Brandon v Kinter*, 938 F3d 21, 40 (2d Cir. 2019).  The mere seconds elapsed between protected activity and adverse action here strongly support causation, and require a causal inference on a motion to dismiss.

Thus, Defendants' argument that "[Plaintiff] was not exercising [First Amendment rights]" (DMOL at 16) requires the Court to ignore well-pled facts and clearly presented alternative legal theories (*see, e.g.*, SAC ¶ 131-133).  Since the Court cannot do that — and Defendants waive any claim that the **statement** was not constitutionally protected — Defendants' argument that Plaintiff was engaged in no First Amendment activity fails on its face.

### C. Defendants' argument that a person must *in fact* record to get First Amendment protection is backwards and does not provide sufficient breathing room for First Amendment rights.

Defendants argue throughout their motion that Plaintiff "was not exercising" First Amendment rights when they brutalized her (DMOL at 16) — and therefore there is nothing to see here.  "But the Constitution is not so toothless."  *Gallagher v. NY State Bd. of Elections*, 477 F Supp 3d 19, 45 (SDNY 2020).  First Amendment rights in particular are "delicate and vulnerable, as well as supremely precious in our society."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).[26]  So, to give adequate breathing room

---

[25] Starting with *Houston v. Hill* itself, courts have found saying, "Yes, [I am 'interrupting you in your official capacity as a police officer,] why don't you pick on someone your own size?" (482 US at 453); telling an officer, "One day you're gonna get yours" (*Posr v Ct. Officer Shield # 207*, 180 F3d 409, 415 (2d Cir 1999)); "writing 'fuck your shitty town bitches' on a parking ticket" (*Barboza v D'Agata*, 151 F Supp 3d 363, 370 (SDNY 2015)); and the like all to be protected speech. *See also, Glik v Cunniffe*, 655 F3d 78, 84 (1st Cir. 2011).  Plaintiff's meek "this is *my* camera" falls comfortably on the protected side of that line.

[26] Thus, just as a court should not "presume [a] statute curtails constitutionally protected activity as little as possible," nor should it presume conduct that is First Amendment-adjacent (accepting *arguendo* Defendants' framing) is unprotected. Indeed, that is the entire principle driving the *Sullivan*/*Gertz* principle that "the First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974), *discussing N.Y.*

to the undisputed right to record, even if the Court accepts Defendants' highly technical argument Plaintiff did not engage in First Amendment activity, Supreme Court precedent still suggests the Court should find the conduct here protected to give such rights breathing room. *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011). Defendants say, essentially, Plaintiff walked right up to the line of First Amendment protection, but she did not cross fully into First Amendment-land. Thus, the argument runs, she gets no protection at all. But even assuming everything Defendants do,[27] saying Defendants acts are of no constitutional moment will cause immeasurable First Amendment chill. That is because "punishment of [technically unprotected activity adjacent to the First Amendment] runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech." *Gertz*, 418 US at 403. The breathing room doctrine requires protection for — to put it on Defendants' terms — even an attempt *to attempt* to record on the facts here.

## IV. Defendants' Section 79-P Argument Fails, In Large Part Because it is an Overly Simplistic Reading of the Statute.

As discussed above, § 79-P establishes a private right of action for "unlawful interference with recording a law enforcement activity" (§ 79-P(3)(a)), where "law enforcement activity" is defined as "**any** activity by an officer acting under color of law." § 79-P(1)(b). A claim under § 79-P exists "when (1) a person demonstrates that he or she exercised or attempted to exercise the right [to record] established in subdivision two and (2) an officer acted to interfere with that person's recording of a law enforcement activity." *Barnhart v. City of Rochester*, 2022 U.S. Dist. LEXIS 116343, at *31-32 (W.D.N.Y. June 30, 2022) (cleaned up). The statute also provides a limited affirmative defense when "at the time of such conduct by an officer, such officer had probable cause to arrest the person recording such a law enforcement activity for a crime defined in the penal law involving obstructing

---

*Times v. Sullivan*, 376 U.S. 254, 271 (1964) (though the First Amendment does not protect falsehoods directly, it must protect some falsehood because "erroneous statement is inevitable in free debate").

[27] That is, assuming that (1) Plaintiff's speech was not itself protected (it is); (2) failed attempts at recording are not protected (they are); and (3) even so, Plaintiff did not attempt to record (she did).

governmental administration." § 79-P(3)(b).[28]

In a single paragraph, Defendants argue Plaintiff may not proceed with this claim because (1) "she was not exercising or attempting to excise the right[]" to record and (2) that "defendants had probable cause to arrest plaintiff for obstruction of governmental administration based, in part, on her blocking entry and exit to the stationhouse while she stood behind a door for an extended period that could not be opened fully." DMOL at 17-8; *but see* SAC ¶¶ 47-49; Green Decl. ¶¶ 4-8; Green Ex. 12 at 6 (RFA No. 27(A) and (B)). In making these arguments, Defendants cede every other element of the § 79-P claim: that Defendants interfered intentionally (§ 79-P(3)(a)(i)–(a)(v)), that § 79-P applies in police stations by its plain language, and that punitive damages and injunctive relief are appropriate. As explained below, both arguments Defendants make are flawed and rely on an overly anemic and "simplistic reading of the statute." *Barnhart v. City of Rochester*, 2022 U.S. Dist. LEXIS 116343, at *31-34 (W.D.N.Y. June 30, 2022) (causation under § 79-P was satisfied even when plaintiff affirmatively pled she had stopped recording by the time she was arrested and subjected to excessive force). The Court should reject them both.

### A. Plaintiff adequately pleads that she was attempting to record, and Defendants' arguments otherwise require the Court to resolve fact disputes.

Defendants argument that Plaintiff was not within the scope of § 79-P's protection turns on one *ipse dixit*: "As plaintiff concedes in n. 2 plaintiff was not actually recording but was pretending to record, and as such she was not exercising or attempting to excise the rights established in subsection 2 of the statute." DMOL at 17-18. Defendants misread the footnote. *See* SAC ¶ 54 n.3.; *see also,* note 7, above. The word "attempt" does not appear anywhere in the footnote — and elsewhere Plaintiff affirmatively pleads she had "attempted" to exercise the right to record. SAC ¶ 142; *see also,* ¶ 149. In

---

[28] Defendants seem to concede, as they must, that probable cause for trespassing would not be a defense to the § 79-P claim. *See* DMOL at 17-18; *see also,* Green Ex. 3 at 106-108 (Assemblyman Perry making clear there are only two defenses to the claim — OGA, and "that they did not interfere," and another Assemblymember proposing another defense that was rejected).

the face of that pleading, Defendants seem to be arguing that, if Plaintiff knew she was not *succeeding* at recording, she could not have — as a matter of law — been attempting to record.  Not so.  First, on a motion to dismiss, the Court cannot reject well-pled facts.  And, as explained in n. 7 above, the accompanying text, and in Green Decl. ¶¶ 19(a)-(c),[29] the SAC has at least raised a fact dispute over whether Plaintiff was attempting to record.  Defendants may not simply claim they know what was in Plaintiff's mind and heart of hearts "as a matter of law."  DMOL at 17.  And in any event, Defendants' argument is without authority:  Defendants do not cite a single case in the entire section.

The term "attempt" is not defined in the statute, so the Court should turn to other contexts where courts grapple with the application of similar language.  *See, e.g., Stuckey v. United States*, 878 F.3d 62, 68 n.9 (2d Cir. 2017) ("the identical language of the elements clauses of [two different statutes] means that cases interpreting the clause in one statute are highly persuasive in interpreting the other statute").  Even in the criminal context — where courts must construe statutes narrowly — attempt liability only requires "intent" and "an 'overt act.'"  *Pascual v. Holder*, 723 F.3d 156, 159 (2d Cir. 2013).  There is little doubt that Plaintiff had the intent to record (even if she knew that intent were frustrated), and that raising her phone was an "overt act" furthering that intent.  If recording was criminal, Plaintiff would have committed attempted recording.  Defendants even explicitly say that ***because*** "plaintiff was informed that she was not permitted to record" and she made an overt act in furtherance of recording, "defendants had probable cause."  DMOL at 12.  So on whether there was an attempt to record, Defendants have eaten their cake — they can no longer have it.

Consistent with that conclusion, cases about attempt liability routinely reach the commonsense result that where a person pretended — or ultimately did not in fact — do something, while also

---

[29] That is, while Plaintiff believes the facts here are well-pled — and the additional paragraphs cited are simply spelling out common-sense inferences from what is already pled — she respectfully requests permission to add the allegations in these paragraphs to clarify that she does not make the concession Defendants assert she does.  These were not included in the most recent amendment because that amendment was by consent (except for two paragraphs) with the premise that the amendment would ***not*** moot the pending motion.

having the relevant intent, they engaged in an attempt.  For example, Courts routinely find that selling "fake drugs" — that is, technically committing no actual drug offense — can be an "attempt," and the relevant question at trial is what a criminal defendant intended.  *United States v. Burke*, 431 F.3d 883, 886 (5th Cir. 2005); *United States v. Springer*, 262 Fed. Appx. 703 (6th Cir. 2008).  That is, attempt essentially turns on what the person in Plaintiff's position wanted the ***other*** person to believe.  And Defendants do not dispute that.

In light of the statutory history described above, Defendants' argument that pretending to record is not an "attempt" in the relevant sense is an anemic reading of the statute.  Persuasively, in *Barnhart*, Judge Geraci rejected a similar argument that an officer "could not have prevented or attempted to prevent Plaintiff from recording because she was not recording at the time."  2022 U.S. Dist. LEXIS 116343, at *33.  That argument, like the argument here, turned on a "a simplistic reading of the statute" that fails to account for the goals of § 79-P.  Adjacent statutory text itself also supports this reading.  A brief look at what the statute intends to be actionable — "preventing or attempting to prevent [a] person from recording"; "threatening [a] person for recording"; "commanding that [a] person cease recording"; "stopping, seizing, searching, ticketing or arresting [a] person because that person recorded"; and "unlawfully seizing property or instruments used by [a] person to record" — shows that the actions here fall well within the toxic law enforcement pattern the statute is designed to chill.  That is, Defendants did — and they do not contest this — exactly what the statute bars.  They only claim Plaintiff, in a panic, moved herself out of the statute's protection.  Given the goals of the statute, the Court should not adopt such a cramped reading.

### B. As a matter of law, or as at least construing the SAC in the light most favorable to Plaintiff, Defendants lacked probable cause to arrest for OGA.

Defendants assert that, as a matter of law, they will prevail on § 79-P's probable-cause-for-OGA defense.  As explained in Point I above, however, that argument misreads both the facts in the SAC and well-trod OGA caselaw.

32

Put simply, clear obstruction of governmental administration caselaw — expressly incorporated by the word "otherwise" in § 79-P(c)(2) — shows that Plaintiff's purely passive acts are not included in the statutory carveout to § 79-P because "[f]ailing to obey a police order, in itself, will not satisfy the requirements of the [OGA] statute." *Hilderbrandt v. City of N.Y.*, 2014 U.S. Dist. LEXIS 128170, at *10 (E.D.N.Y. Sep. 11, 2014). *Cf. also, Trapp-Miley v. City of N.Y.*, 2012 U.S. Dist. LEXIS 44243, at *16 (E.D.N.Y. Mar. 29, 2012) (probable cause for OGA where plaintiff "unlawfully interjected herself by leaning into a **non-public** area of the police station") (emphasis added).

Additionally, the OGA affirmative defense, by its plain terms, does not apply to a claim under § 79-P(3)(a)(ii) or (v) (*see* § 79-P(3)(b)[30]).   Since Defendants concede that they were "threatening [Plaintiff] for recording a law enforcement activity," even if the Court finds there were probable cause to arrest for OGA, Plaintiff's § 79-P claims under 79-P(3)(a)(ii) or (v) cannot be dismissed even **with** probably cause to arrest for OGA.

## V.   Defendants' Arguments Against Plaintiff's First Amendment Challenge Fail.

Defendants argue that there is no First Amendment right of any stripe to record police engaged in their official duties — at least at the stationhouse.   To make this argument, they say, "a police stationhouse is a nonpublic forum" (DMOL at 20) and cite two state cases for the proposition: *People v. Reape*, 22 Misc. 3d 615, 618-19 (Kings Cty Crim. Ct. 2008) and *People v. Brown*, 925 N.Y.2d 374, 376 (1969).   Both are criminal cases in different contexts:   Neither decision has anything to do with the First Amendment.   And the law quite often permits the police to do things for non-First Amendment reasons, when they would be unable to take the same act when the First Amendment is implicated. Nor can Defendants square their uncited claim that stations are "not offered out to the public for use of expressive activity" and are basically only for police paperwork (DMOL at 20) with the public statements by NYPD top brass explicitly comparing traditional public fora like parks and streets with

---

[30] "It shall be an affirmative defense to a civil action under subparagraphs (i), (iii) and (iv) of paragraph (a)…"

the station house and making a "promise to all 8.6 million New Yorkers" that speech at stations would be "a two way street" and that "going forward, these are your station houses."  Green Ex. 10 at 2.

Further, whatever their effect, the decisions Defendants cite cannot abrogate the binding effect of a Second Circuit decision   In *Provost v City of Newburgh, the Cir.* found — when the finding potentially conflicted with jury fact-findings — "as a matter of law" conduct in a stationhouse is "public."  262 F3d 146, 158 (2d Cir. 2001) (analyzing whether conduct in a police station was "public in nature" such that it triggered N.Y. Pen. L. § 240.20).  So too here — and particularly so in the shadow of the broad rights created by § 79-P and § 14-189 and the City's own promise to its citizens that "Our message to New Yorkers going forward, these are your station houses."  Green Ex. 8 at 2; Green Ex. 10 at 2; *see also, e.g., Dinler v City of NY*, 2012 US Dist LEXIS 141851, at *33 (SDNY Sep. 30, 2012) (summary judgment for RNC plaintiffs where "police granted permission to the protesters on Fulton Street to conduct their march on the sidewalk, only to have that permission abruptly revoked by Monahan minutes later").  Defendants' only arguments otherwise are based on a trial level state criminal court decision, and a half-century old state high court decision, they fail in that they do not address binding — or even the relevant — caselaw.

Moreover, given that authority — to say nothing of the estoppel effect of the statement that "these are your station houses" (Green Ex. 8 at 2, *see, e.g., Stambovsky v. Ackley*, 169 A.D.2d 254 (1st Dep't 1991[31]) — that the public portion of the police station is "public in nature," the First Amendment law is clear:  "peaceful recording of an arrest in a public space that does not interfere with the police officer's performance of their duties is not reasonably subject to limitation."  *Glik v Cunniffe*, 655 F3d 78, 84 (1st Cir. 2011).   That is exactly what Defendants' No Recording Policy restricts here.  There is no serious dispute that the station was at least in *some* sense a public space.

---

[31] "[H]aving reported [the existence of ghosts] in both a national publication (Readers' Digest) and the local press (in 1977 and 1982, respectively), defendant is estopped to deny their existence and, as a matter of law, the house is haunted."

The parties agree that Plaintiff tried to record Defendants in the performance of their official duties. So, her First Amendment right — as well as the fact that the No Recording Policy violates it — is clear.  Indeed, "[t]he same restraint demanded of law enforcement officers in the face of 'provocative and challenging' speech, must be expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces."  *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (cleaned up) (*quoting Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) *and Houston v. Hill*, 482 U.S. 451, 461 (1987)).

Finally, Defendants mount a halfhearted "time, place, and manner" argument that impermissibly ignores the SAC.  As Defendants admit, the "right to record the police on public property exists subject only to reasonable time, place, and manner restrictions, which must be narrowly tailored to serve a significant governmental interest" — and even if the Court steps outside *Provost* (it should not) on the status of the public portion of a police station, a time, place, or manner restriction must still "be reasonable."  DMOL at 19.  Defendants' arguments that the public portion of the station is somehow non-public not only runs into binding authority, but also into the fact of the Freedom of Information Law ("FOIL"):  Plaintiff FOILed extensive video of her arrest, and FOIL does not provide her any special right over any other member of the public.  Indeed, the First Department has squarely held that body-worn camera footage is subject to FOIL.  *Matter of Patrolmen's Benevolent Assn. of the City of N.Y. v de Blasio*, 171 AD3d 636, 638 (1st Dept 2019).  Thus, there is virtually no incremental privacy provided by the No Recording Policy, because everything it covers (at the very least "in the wholly public atrium," SAC ¶ 87) "***can freely be seen by members of the public.***"  SAC ¶ 91 (emphasis in original); *see also, id.* ¶¶ 92-94.[32]  Thus, since the SAC sets out many ways the No

---

[32] "Any sensitive information the policy addresses is already well-protected by other policies, laws, and regulations. … For example, but without limitation, if a person attempted to sneak a camera behind the desk at a station, the physical act of crossing the desk into the protected area behind it would be an independent source of probable cause."  Yet, Defendants' arguments talk about the places where "suspects" are held and "witnesses to crimes … are being interviewed" (DMOL at 20).  ***None*** of that takes place in the portion of the station accessible to the public, for obvious reasons.  Responding only to a strawman version of an argument, as the City does here, leaves the actual argument untouched.

Recording Policy is not reasonable (SAC ¶¶ 77-95), offers no marginal benefit beyond other, existing policies (at least as applied), and so on, and Defendants never address these issues, any argument that the policy is a *reasonable* time, place, or manner restriction is waived.  Indeed, Defendants tacitly acknowledge this, concluding — with no reference to reasonability — that because "[t]he section of the policy, which plaintiff alleges is unconstitutional, is limited" in **some** unspecified and unexplored way, "in terms of time, place, and manner," Plaintiff's First Amendment claims "should be dismissed." DMOL at 21.  And Defendants make no argument at all against Plaintiff's narrower "as applied" challenge to the No Recording Policy as far as "it forbids recording in the wholly public atrium where there is no sensitive information in the same way it forbids recording aimed at sensitive information behind the desk." SAC ¶ 88.  So that challenge, at a bare minimum, survives.

But even if it were not waived, Defendants' argument is ill-supported and largely unreasoned. For the First Amendment nuts and bolts, Defendants cite only a New Mexico district decision, *Mocek v City of Albuquerque*, 3 F Supp 3d 1002, 1072 (DNM 2014).  That decision both (1) runs against the vast weight of authority on First Amendment recording rights in finding the right not clearly established (as discussed elsewhere) and (2) concerns an idiosyncratic government operation: TSA checkpoints.  For their part, Defendants never explain why they think TSA checkpoints are like police stations.  And unlike TSA checkpoints, police stations are a place where citizens — like Plaintiff here — have traditionally petitioned their government for redress.  That is, TSA checkpoints are not "traditionally open to the public for expressive activity." *Id.*  But police stations **are** one of major places that citizens exercise their "right to petition the Government for a redress of grievances." U.S. Const. amend. I; *see also, e.g., Rowe v Las Vegas Metro. Police Dept.*, 2022 US Dist LEXIS 21237, at *6 (D Nev Feb. 7, 2022).  Since Defendants cite no relevant authority here — and do not even attempt to explain their citation by analogy — the argument fails.

**VI.  <u>Defendants Concede the No Recording Policy is Barred and Preempted by State and</u>**

**City Law, Dooming the Entire Motion.**

As noted above, Defendants never contest or even address Plaintiff's claim that the No Recording Policy is invalid or preempted as a matter of State (N.Y. Civ. R. L. § 79-P) and City law (N.Y.C. Admin. C. § 14-189).  SAC ¶¶ 6-7; 160; 162-167.  Instead, in responding to what Defendants admit they understand to be a broad claim "that the underlying policy regarding the prohibition of the public to film in a police precinct is an illegal policy," they only discuss the Federal Constitution.  DMOL at 18-21.  That is waiver.

Defendants make no argument that the NYPD has a right to have policies (1) expressly barred by general purpose state and city law or (2) that directly conflict with clear provisions of state or city law.  Indeed, despite Plaintiff making clear in the opening to the complaint (not to mention her first opposition) that she is challenging the No Recording Policy as "unauthorized under City law" because "the City Council has long since made the legal decision that citizens must be allowed to record all the public activities of the NYPD" (SAC ¶¶ 6-7), Defendants do not even mention City law.  And across their entire motion, Defendants present no argument at all on how the No Recording Policy could ever be squared with the plain text of either § 79-P or § 14-189.  Even given a second opportunity on their new motion, in the fact of a direct challenge, Defendants once again fail to argue the No Recording Policy is legal.  Since they failed to do so, they have waived the argument and may not present it for the first time on reply.  *Tardif,* 991 F.3d at 404 n.7.  That said, though Plaintiff submits the Court should not wade into the merits because of the clear waiver, she addresses them below (though in abbreviated form) in an abundance of caution.[33]

The logical consequence of that waiver is that all of Defendants' major arguments fail; if the No

---

[33] Should Defendants present an argument against preemption on reply, and the Court is not inclined to find it waived, Plaintiff asks that the Court issue an order allowing her to respond — since she should have the opportunity to respond to Defendants' arguments.

Recording Policy is void, that alone is a free-standing basis to sustain nearly all of Plaintiff's claims.[34] Here's why.  Each major argument Defendants make turns on the initial assertions that (1) there was probable cause to arrest plaintiff and (2) the order they gave Plaintiff to leave the precinct was lawful. But each of those assertions in turn relies on the No Recording Policy's legal validity:  Defendants' only argument they were allowed to instruct Plaintiff to leave the station — and then, in turn, only argument they were allowed to arrest Plaintiff — is that she violated the No Recording Policy.  But if the No Recording Policy was an impermissible usurpation of state and city authority (it was) and unlawfully passed (it was), then Defendants' arguments lose their scaffolding and crumble:  any request to disperse lacked a "legitimate basis" and in "unlawfully inhibit[ed and] circumscribe[d] the [plaintiff] from engaging in constitutionally or statutorily protected conduct."  *People v. Leonard*, 62 NY2d at 411.

### A.  The No Recording Policy conflicts with the plain text of State and City law.

Section 79-P and N.Y. Admin. C. § 14-189[35] are very similar — and for the same reasons explored above, each preempts and voids the No Recording policy.  Both provisions codify citizens' rights to record police activity broadly, with no carve out for activities in stations.  *See, e.g.*, § 79-P(1)(b) ("Law enforcement activity" is "***any*** activity by an officer acting under the color of law") (emphasis added); § 14-189(a) (same definition, but for "police activities").  Each creates a private right of action.  § 79-P(c)(3); § 14-189(c).  And given the definition each uses for police "activity," each only contains extremely narrow exceptions to the broad right to record they create:

> "A person … has the right to record ['***any*** activity by an officer acting under the color of law' (§79-P(1)(b))] … [except that n]othing in this subdivision shall be construed to permit a person to engage in actions that ***physically interfere*** with law enforcement activity or ***otherwise constitute*** a crime defined in the penal law involving obstructing

---

[34] Defendants' motion to dismiss Plaintiff's affirmative § 79-P claim (as distinct from the argument discussed in this section that 79-P preempts the No Recording Policy), Defendants' arguments on *Monell* liability outside the § 79-P preemption issue, Defendants' primary fair trial rights argument (although it does thwart the argument that the material falsehoods and omissions were not material because "officers had probable cause to arrest" (DMOL at 14)), and Defendants' qualified immunity arguments (except insofar as they turn on arguable probable cause) are unaffected by this waiver.  All other arguments proceed from the foundation of probable cause, which does not exist without the No Recording Policy.

[35] Plaintiff has not brought an independent claim under N.Y. Admin. C. § 14-189 because it would be duplicative of her § 79-P claims.

governmental administration."

§ 79-P(c)(2); *see also,* § 14-189(c). Or, put differently, as a matter of ordinary statutory interpretation, each creates a very broad right that is limited ***only*** by actions that "physically interfere" or otherwise constitute OGA with law enforcement activity — wherever that activity may happen to be. And there is no good-faith argument that, at a stationhouse or precinct, police are doing something other than "***any*** activity by an officer acting under the color of law." §79-P(1)(b) (emphasis added); § 14-189(a).

As to § 14-189, the legislative history confirms it was intended to be directly in conflict with the No Recording Policy. And as to § 79-P, the second use of the statutorily defined "law enforcement activity" confirms that ***each*** use refers to activity in a station. Indeed, Defendants implicitly concede as much by arguing that Plaintiff was "physically interfere[ing] with law enforcement activity" when she was physically inside the station. DMOL at 17. And a defined term cannot mean two completely different things within two sentences. *See, e.g., Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024, 1030 (2d Cir. 1990) ("the same word or phrase" should be "construed to have the same meaning" throughout a statute). So the only textually sound reading of the statute requires that the term "law enforcement activity" includes activity in the stationhouse — both in the right to record, and the exceptions thereto.

With that, the question becomes what to do since the No Recording Policy conflicts with both State and City law, written aimed at the NYPD specifically. The answer, as set out below, is that the No Recording Policy is pre-empted — and therefore void as a matter of law.

### B. State and City law preempt the No Recording Policy.

Defendants make no affirmative argument explaining the supposed authority used to pass the No Recording Policy. If they had, it seems likely[36] they would claim their authority came from the

---

[36] Despite exhaustive efforts, neither Plaintiff nor Plaintiff's counsel has been able to locate or acquire a copy of the memo implementing the No Recording Policy.

City's general powers of "home rule."  Local governments have general and broad "home rule" powers under Article IX, § 2 of the New York State Constitution (*see also*, N.Y. Muni. Home R. L. § 10).  That is, the City has general powers to "transact[] its business," and the like.  Defendants have some authority for general station policies (although for many such policies, they must follow rule making procedures).  But whatever power Defendants had to create the No Recording Policy at all, that power is textually circumscribed:  Home Rule only permits rules "not inconsistent with the provisions of the constitution or not inconsistent with any general law."  N.Y. Const. Art. IX, § 2; N.Y. Muni. Home R. L. § 10(1)(ii) (same).  That is, once there is an "inconsistent" provision "of the constitution" or "any general law," home rule powers disappear — and instead, the general law or constitution governs.

The broad schemes in § 79-P and § 14-189 are such "general laws."  On their face, they each reflect an intent to prevent municipalities from engaging in ***anything*** that prevents recording of officers doing their official duties.  They explicitly set out broad general rights, cabined only by "limited exceptions."  *See, e.g.*, Summary of Int. No. 721-B; *accord Arizona v. United States*, 567 U.S. 387, 410 (2012).  Indeed, for the City law in particular, the legislative history reflects a specific intent to preempt the No Recording Policy.  *See, e.g.*, Green Ex. 8.  When a municipality's exercise of power and a legislative restriction "conflict, as they do here, the legislative restriction on the municipality's power prevails."  *Matter of Council of City of NY v Bloomberg*, 6 NY3d 380, 393 (2006).  In short, both the text of the statutes and their legislative history (at least as far as the City law is concerned, if not the State law) makes clear that the No Recording Policy is part of exactly the "sickness" the laws intended to "root … out."  Green Ex. 5 at 33:15-18.  Thus, the Court need not take the step of deciding whether the field has been occupied, because the No Recording Policy does exactly what State and City law prohibit.

Under either a fully preempted field or a direct conflict approach,[37] the No Recording Policy is preempted and therefore void.  Structurally similar and doctrinally indistinguishable — although dealing with Federal/State preemption — is *Arizona v. United States*, 567 U.S. 387, 410 (2012).  There, because "Congress ha[d] put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances[,]" "[b]y nonetheless authorizing state and local officers to engage in these enforcement activities as a general matter," the state law was "pre-empted by federal law." *Id.*  So too here.  State and City law each "put in place a system in which [City] officers may not make warrantless arrests … based on [recording] except in specific, limited circumstances."  So, "by nonetheless authorizing [City] officers to engage in th[o]se enforcement activities as a general matter," the No Recording policy is "pre-empted by [City and State] law." *Id.*

Also directly on point — and analytically at the City regulatory level, as the preempted No Recording Policy is here (if Defendants had any authority to pass it at all) — is *Syracuse Police Benevolent Assn. v Young*, 156 Misc 2d 513, 519 (Sup Ct, Onondaga County 1992) ("No city regulation which evinces a blanket prohibition against off-duty employment would be valid under this law").  There, as here, a state law established a broad right — there, the "right of policemen to engage in outside employment" (156 Misc. 3d at 516); here, "the right to record any activity by an officer acting under the color of law" (§ 79-P(c)(2) (definition substituted)).  There, as here, the state law spelled out the exceptions permitted.  156 Misc. 3d at 516 (law stated, "any local police officer will be able to engage in outside employment provided…" and then named exceptions).  There, as here, the legislative

---

[37] Under a field preemption approach, "the courts look to whether the State has acted upon a subject, and whether in so acting has evidenced a desire that its regulations should preempt the possibility of varying local regulations." *People v Peak Carting, Inc.*, 11 Misc 3d 4, 9 (2d App Term 2005).  By contrast, a conflict approach asks whether "local laws [or regulations] prohibit what would be permissible under State law, or impose prerequisite additional restrictions on rights under State law, so as to inhibit the operation of the State's general laws." *Zakrzewska v New Sch.*, 14 NY3d 469, 480 (2010).  Because Defendants have waived their challenge in whole, Plaintiff does not take the space to explain at length how the No Recording Policy fails both tests — since the clarity of its failure under conflict preemption suffices.

history "reveal[ed a] primary motivating factor" of meaningfully changing the status quo.  *Id.* at 516.
There as here, arguments about the administration of law enforcement applied.  And there as here,
while "the local authority is not precluded from adopting rules and regulations consistent" with the
applicable law, no "city regulation which evinces a blanket prohibition [of a right a general law creates]
… would be valid."  *Id.* at 519.  Indeed, the main difference between this case and *Young* is that the
Court need not even reach the question of "whether or not any or all of these rules are tailored to
effectively contravene the State's expressed interest" (*id.* at 520) — because the No Recording Policy
is exactly the kind of blanket prohibition the Right to Record Laws both prohibit.

Put bluntly, and more generally, no "blanket prohibition" on recording "any activity by an officer
acting under the color of law' (§79-P(1)(b))" "would be valid under [State and City] law."  156 Misc. 2d
at 519.  That is true even if the blanket prohibition is limited to a specific place — because the statute
itself sets out all applicable exceptions.  *See, e.g., Ohioans for Concealed Carry, Inc. v. City of Clyde*, 120 Ohio
St. 3d 96, 105 (OH 2008) (exercise of police power to prohibit concealed carry of handguns, even
where it specified that the prohibition only applied in city parks, was voided by a statute creating a
general right to concealed carry in the absence of a state or federal law to the contrary).  Other cases
on local rule conflicts involving categorical State or City law all reach the same result:  Where a lower
authority "prohibits that which the [higher authority] permits," it is void.[38]  Any other result would
flip preemption principles on their head.

Thus, because the No Recording Policy is void as a matter of law (and Defendants have waived
any argument otherwise) — and its existence was the but-for cause of the order to disperse Plaintiff

---

[38] *See also, for examples, Ohians for Concealed Carry*, 120 Ohio St. 3d at 105; *Lakeside Lodge v Town of New London*, 158 NH 164,
171 (NH 2008) (limits on the number and size of boats by a Town were ultra vires given the general statutory scheme for
personal boating and docking); *Enbridge Energy Co. v. Dane Cty.*, 387 Wis. 2d 687, 711 (WI 2019) (similar for pipeline
insurance requirements).  *Cf. also, Patrolmen's Benevolent Assn. of the City of NY, Inc. v City of NY*, 142 AD3d 53, 62 (1st Dept
2016) (a law or regulation is preempted when "it would render illegal what is specifically allowed by State law," and a
challenge to local law barring discriminatory conduct by law enforcement failed because "nowhere in the CPL is there
language specifically permitting police officers to engage in such discriminatory conduct") (cleaned up).

received, along with her arrest and beating (SAC ¶¶ 50, 57, 153-157) — Defendants' arguments for probable cause fail before they begin.  And as noted above, both the last resort canon and the constitutional avoidance canon (the latter only if anything in § 79-P or § 14-189 presents an ambiguity) strongly counsel in favor of taking this path to resolving the motion, since this path avoids pronouncing any broad constitutional rule.

### C.  The No Recording Policy was unlawfully adopted.

As further set out in the *amicus* brief submitted by the Public Advocate of the City of New York and Latino Justice, the No Recording Policy is ***further*** a nullity because of the City's total failure to comply with CAPA.  Plaintiff adopts those arguments in full as if fully set out herein.  But, in short, and as noted above, the City neither offered a comment period nor had the Law Department and Mayor's Office review the No Recording Policy.  That renders it a legal nullity.

### VII. Defendants are not Entitled to Qualified Immunity.

As Defendants concede, on a motion to dismiss, an affirmative qualified immunity argument "will generally face a difficult road."  DMOL at 10, *citing Garcia v. Doe*, 779 F.3d 84, 97 (2d Cir. 2015).  And because it is an affirmative defense, Defendants bear the relevant burden.  *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000).  Qualified immunity exists when either (1) the "conduct [did not] violate[] a federal right" or (2) "the right in question was [not] clearly established at the time of the violation."  *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019).  Defendants cannot satisfy prong one for the reasons above.  On prong two, Defendants' arguments fail because the right to record was clearly established.  And past there, qualified immunity, as a doctrine, is no longer viable.[39]

*First,* a right can be clearly established for qualified immunity purposes by "a robust consensus of cases of persuasive authority."  *Sloley v VanBramer*, 945 F3d 30, 40 (2d Cir. 2019) (New York Court of

---

[39] Plaintiff presents this second argument primarily to preserve it for appeal, and expects the Court will — "unless and until the Supreme Court, Congress, or both alter that doctrine" — reject these arguments as it is "bound" to do.  *McKinney v City of Middletown*, 2022 U.S. App. LEXIS 26863, at *54, n 9 (2d Cir. Sep. 26, 2022) (Calabresi, J., *dissenting*) ("appeal[ling] to the Supreme Court" to "overturn its past holdings" on qualified immunity).

Appeals decision "tip[ped] the balance" of an otherwise non-robust consensus).  For the right at issue — the right to record police in their official duties — four federal circuits have explicitly found that the right to record police is protected by the Constitution.  *See, e.g., Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82, 85 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).  Courts have found those four decisions clearly established "the right to record police activity in public."  *Higginbotham v City of NY*, 105 F Supp 3d 369, 380 (SDNY 2015); *see also, Stolarik v City of NY*, 2017 US Dist LEXIS 168096, at *7 (SDNY Sep. 7, 2017) (decisions "'clearly foreshadowed' the right of journalists—if not all citizens—to record (photograph) police activity in public") (*quoting Higginbotham*).

But building on that consensus, § 79-P, § 14-189, and the NYPD's Patrol Guide itself (SAC ¶ 163) all instruct officers that there is a First Amendment right to document police.  § 79-P Introducers Memorandum (Green Ex. 2 at 5) ("the First Amendment of the United States Constitution openly confers and protects the right of ordinary civilians to record police activity); *see also,* Jun. 18, 2022 Committee Report (Green Ex. 9) at 7 ("The federal constitution protects the right to film police activities generally").  That is, given that NYPD officers would have foreseen the result not just because of four clear decisions of other Circuits, but binding City and State law — and the Patrol Guide — no reasonable officer could reach anything but the conclusion in the PA Letter:  the actions here were "in violation of the Right to Record Act" (PA Letter at 1) — which itself codifies the relevant constitutional right.  And since the SAC sufficiently alleges that everything turns on Defendants' initial choice to enforce the No Recording Policy, for this motion, Defendants cannot establish their entitlement to qualified immunity.

*Second*, "the doctrine of qualified immunity—misbegotten and misguided—should go." *McKinney v City of Middletown*, 2022 U.S. App. LEXIS 26863, at *54 (2d Cir. Sep. 26, 2022) (Calabresi,

J., dissenting).  Section 1983, as codified, in fact *omitted* text Congress passed that would explicitly bar qualified immunity.  Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 165-87 (2023).[40]  Thus, the decisions implementing qualified immunity, put simply, "cannot withstand scrutiny. *McKinney*, 2022 U.S. App. LEXIS 26863, at *54 (Calabresi, J., *dissenting*).

## VIII.   Plaintiff's *Monell* Claims Do Not Exist Outside the Parameters Above.

Defendants ask to dismiss Plaintiff's training claims under *Monell* in Point V(B) (DMOL at 21).  But Defendants do not challenge that the individual Defendants were trained on the No Recording Policy.[41]  Nor could they, as the SAC plausibly alleges that "the City trained individual Defendants that New York Civil Rights Law § 79-P and the First Amendment permit a categorical ban on recording in stations."  SAC ¶ 160.  And Defendants do not challenge the existence of the No Recording Policy.  *See, e.g.*, DMOL at 2.  The parameters of the claim about that policy are well-discussed above.  And since Plaintiff has no *Monell* training beyond that — that is, Plaintiff's *Monell* training claim is that the City (1) failed to train officers on § 79-P/ § 14-189; (2) failed to train officers that there is a First Amendment right to record officers in ***any*** public exercise of their duty; and (3) instead trained them to apply the No Recording Policy (including its express direction to charge people with trespass if they record; *see* Green Ex. 11 ¶ 7) — there is nothing to dismiss on that point.

---

[40] That is, the original text of § 1983 included a clause that statute claims would exist notwithstanding "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary."  *Id.* at 113.  But that clause "was omitted when the Reviser of the Federal Statutes, who lacked any authority to alter positive law, published the first compilation of federal law in 1874."  *Id.*  Thus, when qualified immunity was invented by the Supreme Court, it looked to a version of § 1983 that, at the least, did not expressly bar the judicial innovation.

[41] Plaintiff does not believe Defendants to actually be suggesting that there was "only … a single instance of" members of the NYPD arresting people for violating the No Recording Policy — or that Plaintiff has not plausibly pled that the No Recording Policy is routinely enforced.  DMOL at 21.  Rather, these comments seem to be generic recitations of standards.  Indeed, the data generated under § 14-189 would cast doubt on the good faith of such an argument.  *See,* note 12 above, and the accompanying text.  But Plaintiff respectfully requests permission to amend to add that data, as well as the events alleged in *Reyes v. City of New York*, 23-cv-6369 (including two arrests with identical charges for mere recording) to her complaint if Defendants say otherwise in their reply.

## CONCLUSION

For all the reasons discussed above, Plaintiff respectfully requests that the Court deny Defendants' motion in full.


Dated:    August 18, 2023
           Queens, New York


           Respectfully Submitted,

           **COHEN&GREEN P.L.L.C.**

               /s/
          _____

           **BY:**     J. Remy Green

           Elena L. Cohen
           Jessica Massimi[42]
           1639 Centre St., Suite 216
           Ridgewood, New York 11385
           t : (929) 888-9480

           **GIDEON ORION OLIVER**
           277 Broadway, Suite 1501
           New York, NY 10007
           t: 718-783-3682

---

[42] Law students and clerks Lauren Finzi, Regina Yu, and Diana Woody, who are not yet members of any bar, have provided substantial legal research and writing in preparing this memorandum.