and this bill goes a long way in moving us in that direction. I applaud the sponsor and I vote in the affirmative.

ACTING SPEAKER AUBRY: Mr. Epstein in the affirmative.

Mr. Goodell.

MR. GOODELL: Thank you, Mr. Speaker. The following Republicans vote yes on this bill: Mr. Ashby, Mr. Schmitt, Mr. Smullen and Mr. Walczyk. Thank you, sir.

ACTING SPEAKER AUBRY: So noted. Thank you.

Mrs. Peoples-Stokes.

Shh.

MRS. PEOPLES-STOKES: Mr. Speaker, if you could please record our colleague, Mr. Sayegh, in the negative.

ACTING SPEAKER AUBRY: So noted.

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

Calendar No. 70, the Clerk will read.

THE CLERK: Assembly No. A01360-A, Cal -- Calendar No. 70, Perry, Heastie, Arroyo, Taylor, D'Urso, Fernandez, Rivera, Hyndman, Niou, Barron, Gottfried, Wright, Fahy, Blake, Richardson, Cruz, Epstein, Rodriguez, Mosley, Simon, L. Rosenthal, Ortiz, Aubry, Otis, Gantt, Crespo, Glick, Joyner, Simotas, Carroll, Davila, Vanel, Steck, Kim. An act to amend the Civil Rights Law, in

relation to recording certain law enforcement activities.

ACTING SPEAKER AUBRY: An explanation is requested, Mr. Perry.

MR. PERRY: Thank you, Mr. Speaker. This bill, the New York -- The New Yorker's Right to Monitor Act, would provide a person not under arrest or in the custody of law enforcement the right to record law enforcement-related activities, retain custody and control of such recordings. The bill would create a private right of action for persons who can, one, establish that they exercised or attempted to exercise their right to record law enforcement-related activities, and, two, an officer acted to interfere with such person's attempt to record law enforcement activity by including, but not limited to, intentionally preventing or attempting to prevent such person from recording; threatening a person -- such person for recording a law enforcement activity; commanding such person to stop recording law enforcement activity; stopping, seizing, searching, ticketing or arresting that person because he or she recorded a law enforcement activity; unlawfully seizing or unlawfully destroying such recording or copying such recording without consent of the person who recorded it. And, lastly, the bill establishes an affirmative defense to a civil action for persons charged with certain violations of the statutory right to record.

ACTING SPEAKER AUBRY: Mr. Ra.

MR. RA: Thank you, Mr. Speaker. Will Mr. Perry yield for some questions?

ACTING SPEAKER AUBRY: Mr. Perry, will you yield?

MR. PERRY: I'm quite inclined to do so; and I do.

ACTING SPEAKER AUBRY: Mr. Perry --

MR. RA: Was that a yes?

Mr. Perry, thank you. I just have a few questions about the need for this bill and then some of the provisions dealing with the custody of the information and of the affirmative defense, but just to start off, you know, in terms of the need for the bill, my understanding is that, you know, many of the Federal Circuit Courts have said that there is a First Amendment right to recording these activities. We -- we certainly have seen, you know, plenty of videos over the, you know, the few weeks of, you know, different activities during many of the demonstrations that have gone on. So, do -- do you believe that people don't currently have the right in New York State to record police activities?

MR. PERRY: Say that again?

MR. RA: Do you believe that under current law, New York -- New Yorkers don't have the right to record police activities?

MR. PERRY: I, and many New Yorkers, especially those who have sought to -- attempted to exercise the right, know they have the right. But this is not about you or I knowing, it's affirming this so that the police agencies like the NYPD will know for sure and not just know, but respect that right. And this bill will provide some

kind of action that will hurt the City and their pocketbooks if they continue to allow officers and to cover for officers who violate that right blatantly, totally in disregard of the Constitutionality of the right.

MR. RA: Okay. So, you know, you said it will hurt the City in the pocketbooks. So, let's -- I want to go back to some -- some of the provision of this, but let's go to that piece of it. There's a private right of action, so that would be against the officer or the municipality employing the officer, or -- or both?

MR. PERRY: Well, in most cases, the officers operate under cover of indemnity by the City. I wish that wasn't the case because it would certainly cause more personal respect for the law. But because officers know that they can get away with it and should they face some attempt to penalize them by a lawsuit which, in most cases, if you follow the decisions of the court, they have lost. They would be more observing of the law and be more respect -- the officers more worthy of respect.

MR. RA: Okay. So, let's -- let's go through this. So, the officer is having some type of interaction with a member of the public, I assume it -- it could potentially be the individual who decides to start recording, or they could be recording a third-party that's having some type of interaction with the police, correct? It could be your -- could you record your own interaction with the police, or is this intended to be for, you know, you see something happening in front of you and you start recording it.

MR. PERRY: Well, of course, if it's practical

physically, a citizen, it's not illegal, they could wear a body camera, in which case, they would be able to physically record interactions between themselves and anybody else. It's kind of awkward if you're involved in physical interaction with the police to be videotaping or recording at the same time. It all depends on the type of equipment that you have. But, that's not usually the case. Usually the case is the police officer is arresting someone or performing his duty as a police officer in some manner and a citizen might not, for -- for all kinds of reasons, want to make a record of what the police officer is doing. Often, it's because people observe the officers misbehaving, or they're misbehaving or misconduct is so frequent and people on the streets, ordinary citizen, is so -- so concerned about it so people are on alert at all times. So, whenever you see a police activity, it's instinctive for you to record it because you -- you -- you can't trust that the officer is going to be protecting the rights of the person that they are attempting to enforce the law against.

MR. RA: Okay. So if you see, you know, some interaction between an individual and the -- and a police officer and you now want to start recording it. Is there -- what -- what's expected of you under this bill, you know, if you're exercising this right? Do you, you know, stand in a safe distance? Is there anything regarding how close you're able to get to this interaction?

MR. PERRY: I expect no physical interference from the police officer involved or any other police officer. But, as we know, as we see every day, there are thousands of video -- videos,

thousands of recordings of all sorts that show that the police usually begins the action of interfering and the citizen's right to -- to record their working for the -- the -- the citizens of the -- the City; instead, they seem to think that what they're doing needs to be covered up or should not be public and they avoid or try to interfere with and stop the free -- the freedom of the citizen to record what they're doing.

MR. RA: So if -- if you're, you know, recording and you can have this private right of action triggered, it says intentionally preventing or attempting to prevent the person from recording law enforcement activity. Now, you know, suppose there is an arrest being made and, you know, there's one officer, maybe another officer comes to -- to assist that officer and they are blocking the -- the video while they're affecting the arrest. Would you intend that that would be interfering with -- with the person from recording the activity?

MR. PERRY: It's clear that you do not, and this law does not empower or make that claim that an ordinary citizen, or any citizen, has any right to actively, directly interfere in police endeavoring to do their duty in the proper way. Citizens, however, when they see a police officer abusing the right and the honor that we -- and privilege they have to wear the badge and be police officers, when citizens see that, they feel a personal and moral obligation to do something about it. And what we can do, which is legal under the law and the Constitution is to videotape it, record it so that we can seek justice in another way.

MR. RA: And then -- so after the fact of this, right,

the person now has, you know, today, maybe years ago if we were talking about this there might be a tape or whatever, but we would assume on today, you know, it's going to be a cell phone. People carry phones with very good video cameras.

MR. PERRY: Thank God.

MR. RA: So, the custody of that recording under this sits with the individual. If, say, the police department now knows that that recording was -- was taken and they feel it's going to show criminal activity by the person they were apprehending, can the police get access to that -- that video?

MR. PERRY: I'm sure that there is a process, legal, that would enable the police to do that if they choose to seek that. Evidence of a crime, usually the courts will enforce that the citizen hands that over to the proper investigating authorities. So, we don't have to worry about the videotape -- the video -- the video or recording would be about hiding or holding back information from the police.

MR. RA: Okay. But -- so then on top of this, there's, you know, that police officer, if they are accused on this private right of action for unlawful interference, there is, I believe, one affirmative defense that is -- is given here, and that's when the officer had probable cause to arrest the person recording such law enforcement activity for a crime defined in the Penal Law involving obstructing governmental administration. So, my question is, are there any other affirmative defenses, or it's just that so if, you know, you had probable

cause to arrest the person for some -- for some other crime that didn't involve in -- interfering, you know, there's still -- this affirmative defense would not be available to you, correct?

MR. PERRY: Yeah, I don't -- I'm not sure I understand the question.

MR. RA: So, if -- if you, you know, if you're an officer and you are now -- have this private right of action is now filed against you saying you interfered with this individual's statutory right to record, you know, this police -- their police activity.

MR. PERRY: Oh, yeah, I don't understand where you're going. You're saying if the officer interfered with someone's statutory -- statutory right --

MR. RA: No, I'm saying if --

MR. PERRY: The officer should never interfere.

MR. RA: I'm saying if there is an accusation they interfered.

MR. PERRY: Yes.

MR. RA: If there's a private right of action here, like any other civil proceeding we have in the State, sometimes they're filed rightly, sometimes they're -- they're filed maybe somebody feels they got interfered with, but it doesn't necessarily, you know, meet the statutory criteria. So, I'm saying if that officer wants to defend that claim, we are giving them one affirmative defense, correct, only if the individual had -- he had -- the officer had probable cause that the individual committed a crime involved obstructing governmental

administration, correct?

MR. PERRY: Well, I'm not sure exactly what answer you want, but...

MR. RA: I want the answer of what the bill does.

MR. PERRY: The defense to that -- would be that they did not interfere. And if you have people today, if you have people recording, there's going to be evidence available to prove whether they did or not. But often, unfortunately for the citizen who is just exercising their right, too often the police, during their misconduct and bad behavior, takes possession of the recording equipment and, on occasions, have blatantly damaged or destroyed. There are lots of evidences around to show those blatant misbehavior by the police. That's why we need to assert this Constitutional right and then maybe correct it to make it some kind of a criminal act on its own.

MR. RA: Thank you.

Mr. Speaker, on -- Madam Speaker, on the bill.

Thank you, Mr. Perry. So, I -- I do have some concerns with -- with this, one of which is what I mentioned earlier that, you know, the individual, there's no requirement of maintaining a safe distance. I think it's going to be very easy in any circumstance if, you know, if there's multiple officers involved and somebody blocks the recording. I think it's going to be very easy to file one of these actions saying that your right to record has been interfered with. And -- and I think that, yes, you're going to be able to defend it by saying,

*Okay, I was just doing, you know, I was affecting an arrest, I was questioning somebody. I was assisting maybe another officer who -- who needed backup in a situation,* but, you know, I think there should be some ability to make an affirmative defense and make a showing that, you know, you were engaged in your routine procedures of an arrest and it happened to block somebody's video.

Now, you know, we're going to talk a lot about video over the next couple days. There's some -- some body camera bills, which -- which are fine. And I think the officers, you know, many support that because they feel it protects them and -- and you're able to have a complete recording of something. Taking something that we already know is a right and making it statutory so that there's a civil right of action which, by the way, now basically has an affirmative defense and the equation is changed by the person being actually arrested. I mean, I don't know, if I -- if we're that concerned that there's such misconduct, I -- I might be, then, concerned that people would be arrested just to have that defense. I think our law enforcement officers, you know, more often than not are -- are there trying to do their jobs in the vast majority of the time, and this is going to create, I think, additional interference with them doing that. I think the better way for transparency is things like body cameras and those type of entities which we're -- we're going to be talking about in some of the other bills. Thank you, Madam Speaker.

ACTING SPEAKER WOERNER: Mr. Reilly.

MR. REILLY: Thank you, Madam Speaker. Will

the sponsor yield?

ACTING SPEAKER WOERNER: Will the sponsor yield?

MR. PERRY: Certainly.

ACTING SPEAKER WOERNER: The sponsor yields.

MR. REILLY: Thank you, Mr. Perry. So, I know that we had a conversation about this bill and coming from the aspect of protecting the public and the officers when they are interacting. I want to make it clear that I -- I definitely believe that they have the right to film, but don't you -- do you think that it would be a -- a good policy for the State to set a boundary, a buffer zone so that there aren't unnecessary interactions on the street when they get -- when somebody's getting too close. I was thinking something like eight feet, ten feet.

MR. PERRY: So, I recall we had a discussion and I gave due consideration to your suggestion. In discussing that kind of amendment or change to the law as it is, it became quite obvious to me that that could be used as some subterfuge to -- or allowing a putting something in the law that would easily enable the police to, by their actions, overdoing it. You asked for 25 feet, and it was quite complicated to determine where would that 25 start and where would it end, and from what angle or area would that measurement begin. The bill, as it is, provides adequate protection to the police officers because it, you know, "Nothing in this subdivision shall be construed

to permit a person to engage in actions that physically interfere with law enforcement activity or otherwise constitute a crime." So, I think that that concern is adequately dealt with in the bill.

MR. REILLY: So if -- so if the police are on the scene and they're taking police action and a crowd forms and they're filming, but they seem to be converging on the scene where there's whatever police activity is being done. If a police officer maintains that buffer, another police officer, and stands there, doesn't touch the camera or anything, is that considered interfering? But they can't -- say they -- they don't have the right angle to film what they want to. Would that be considered under this bill as interfering?

MR. PERRY: Well, I -- I -- I don't think that ordinary action by the police would -- could be -- we could -- we would make that determination based on the -- the language in this bill. But, I might -- you -- you're a former police officer.

MR. REILLY: Correct, in your precinct.

MR. PERRY: And -- that's right. And so, you have some knowledge I accept of what you're talking about. But I have been involved in my community, working, being involved in activities that the police make arrests when citizens are in that kind of a situation. And what I noticed is that on many occasions, and I don't know if that's a tactical training that police receive, but often, especially when they are aware that there's a video camera or somebody is video -- now they seem to be always aware of that. But the police will cover the action or the activity by the police so that it's

sometimes almost impossible to view and to videotape what the police is actually doing, because they form this -- this wall type of barrier around the suspect and usually have police positioned so they will keep any citizen from getting too close. If they do that as lawfully as they can and they do not -- but they do not try to take a person's camera or knock it from their hands, if they think that person may have gotten something, which is my observation and I'm sure that if you've been in these situations, you may have also had that observation.

So, we have to be mindful of the acts and the practical situation that occurs, and this bill is -- is -- the language we have put together in the best way we can to make sure that nothing in it would restrict the police from protecting themselves while they're making arrest, and for being able to enforce freely, not worried about people feeling they have other right to -- to -- to disturb their action.

MR. REILLY: Okay. So one last question. So, I know that we talked about OGA, right, Obstructing of Governmental Administration. So, if someone is filming on the street and we have, you know, unfortunately, a crime scene, a male shot on, say, you know, one of our streets, that since that -- that's a crime scene, they wouldn't be able to film inside a designated area, correct? So, if the police establish a line to maintain that crime scene for the investigation, having them stay behind that line would be permissible; is that correct?

MR. PERRY: There's no language in this bill that

would prohibit the police from being able to do that freely. What we are concerned about as lawmakers and as citizens is abuse, abuse of power, violation of citizen's right, the right to monitor to the greatest extent as long as -- so long as you do not interfere with the police activity. We're not saying, we're not going to condone that and we're not inviting people to do that. What we want to do with this legislation is to make sure that our police departments across the State understand that this right should be respected, and that this right is sacred. And that whatever they do as police officers, they do it in the name of the people. They do it on the word that they're protecting us. And that means they should be doing things that protect us in every way. All our rights should be preserved and protected. That is the greatest authority and challenge to a police officer. And if you don't have the moral compass to make that judgment, you shouldn't be wearing the badge.

MR. REILLY: All right. Thank you, Mr. Perry. On the bill, Madam Speaker.

ACTING SPEAKER WOERNER: On the bill.

MR. REILLY: So, I agree that the public should have the right to film, absolute -- absolutely. The reason why I asked those questions is because I wanted to ensure that we were all on the same page, because, as often, many times I talk up here in -- in the Chamber, I speak about how the words on paper don't transition to the street as they should. So, this put a little clarification. Of course we do not want police officers grabbing people's cameras when they have

the right to form -- to film them. But I also want to make sure that we were all understanding about the -- the proper safety protocols that have to be in place so that we can protect the public and -- and the police officers, and also this -- the point about crime scenes and making sure that people don't infringe upon those areas where an investigation is taking place.

So, Mr. Perry, thank you for the opportunity to clarify those things, and thank you, Madam Speaker.

ACTING SPEAKER WOERNER: Thank you, Mr. Reilly.

Mr. Barron.

MR. BARRON: Thank you, Mr. [sic] Speaker.

On the bill.

ACTING SPEAKER WOERNER: On the bill, sir.

MR. BARRON: You know, the Black Panther Party in the 1960's, to avoid police brutality, in Oakland, California, in the state that allowed for them to carry weapons, used to patrol the police and stay 25, 30 feet from the police as they arrested a black citizen. And they had their weapons and they said, *We have a right to bear arms*, because of the State of California, they have that right, Sacramento and other places, they had a right to do that. They never interfered with the police and they just said, *You can arrest that black citizen, but you're not beating us. You're not going to beat him.* And a lot of the brutality went down. And then what they did is they changed the law to ban the carrying of weapons because of the Black

Panther Party, and then the police began to attack the party.

In this instance, I noticed the prior speakers had to bring up hypotheticals that don't exist. This bill is not because there's a possibility that we might interfere with police in their governmental processes. You're so into protecting the police that you come up with hypotheticals that just don't exist. What we have happening is that when police see that they are being filmed, they attack those who are doing the filming, like the Copwatch group and so many other groups that are just filming, not interfering, and not crossing no yellow police crime scene, that doesn't happen. That doesn't even happen. That's just because they want to protect and put the focus on the police and not on their brutality and not them attacking citizens.

Now, what we're talking about is we have seen police officers, I've seen them, break cameras, break cell phones and do all kinds of things in order to stop themselves from being filmed. And I want to remind you, filming police officers beating us doesn't mean that they'll go to jail. As a matter of fact, do you remember the film of Rodney King? Those police officers walked. Remember the film for my brother, Eric Garner? Watched them, everybody watched it. They walked. They walked.

So, this bill doesn't mean, unfortunately, that they're going to go to jail because we see it. I believe that this protest wouldn't be on the level that it's on now had people not seen George Floyd being choked to death for over eight minutes and saw the smirk on the officer's face, the arrogance, the insensitivity to life, black life.

The intentionally keeping his knee in his neck even after he was unconscious. That's why I think it's Murder 1, premeditated, he planned on doing it once he saw him unconscious, and it certainly was intentional. They'll do that in court, whatever happens in the racist courts. But for us to have a bill like this that doesn't even guarantee that police will go to jail even when you see with your own eyes, because we have a systemic problem. It is not a few bad cops, it's not a few bad individuals. As a matter of fact, when we show these films, you see any cop -- cop that's watching a bad cop do something bad and does nothing, they are bad, too. If you have a blue wall of silence when they are brutalizing and murdering us and those cops that see it do nothing, then there's no such thing as a good cop. There's no such thing as a good cop that watches a bad cop do something and you do nothing. Then you're acting in concert. You saw that poor old man in Buffalo knocked to the ground, head in a puddle of blood. And how many officers walked by that. Every last one of them should have been charged with assault and concert, just like what happens when they pick up our youth and one of them did something wrong, they say you're all acting in concert. And then you know how they tell our community, if you see something, say something. Well, cops, if you see something, say something. Say something.

So once again, this is a bill to me that's a no-brainer. Not only is it a no-brainer, the nitpicking and the things that you come up with, the hypotheticals that you come up with, do people cross the -- the -- the crime scene sometimes? Sure, that happens, and the

police will put them back away, but people don't jump over the yellow lines so they can, you know, interfere with the police doing their job and put the cameras in their face, that doesn't happen. As a matter of fact, in my beloved East New York and other places, they actually rolled up on people on their stoop in their house, in front of their house, took the camera, broke it or took it away from them when they were recording. This is what this bill tries to get at, so let's get at the spirit and the heart of the bill and not come up with these hypotheticals because you want to protect the police who are not protecting the public. They are attacking the public right now. And these are the kinds of bills that we put forth so that these attacks can be less. And I'm not even sure this bill does that, because a lot of police do not pay consequences, even when we see with our own eyes what they have done. And I'm sure many of you can think of things that you've seen on camera and the police still got away with it because it's a whole systemic system, a court system, DAs that don't want to prosecute and judges that don't want to put them away, even after they're found guilty, they don't get jail time.

So, this is the least we can do. Come on, cut it out, all of these technical things on the police. Protect the people, not the police. The police are not in trouble, the people are.

ACTING SPEAKER AUBRY: Thank you.

Mr. Manktelow.

MR. MANKTELOW: Yes, thank you, Mr. Speaker. Would the sponsor yield?

ACTING SPEAKER AUBRY: Mr. Perry, will you yield?

MR. PERRY: I will, Mr. Speaker.

ACTING SPEAKER AUBRY: Mr. Perry yields.

MR. MANKTELOW: Thank you, Mr. Speaker. Thank you, Mr. Perry. I just have one question on this bill. I'm walking down the sidewalk with my grandson and a car rolls up on the sidewalk, hits my grandson. He's laying on the sidewalk bleeding, and the police officer rolls up to help at the scene. We don't have an EMS or ambulance there at the time. People are now videotaping my grandson on the ground bleeding. Do I have a right to ask the police officer to ask them to stop filming my grandson?

MR. PERRY: You have a right to ask the police officer to do anything that comes into your head. I'd be very sorry that picture you paint for us did include your grandson.

MR. MANKTELOW: Me, too.

MR. PERRY: But this bill does not contribute to any situation like that. And it doesn't handcuff or put any encumbrances on the police to conduct themselves and do their job lawfully. What you -- the incident you made up would have happened in a public space, and anybody have the right to film in a public space. This bill doesn't address that. I don't know if any bill should, or if, you know, that would really -- that's not something I think we could even regulate what happens in a public -- I believe personally if it's in the public eye, it can be videotaped. It can be recorded publicly. There

are cameras all over the place. The police have cameras on -- on -- on roofs and buildings, on lamp -- lampposts, and they videotape me every day whatever I do. You know, you could be fooling around on your wife or your husband, it's videotaped. You don't have anything to do with whether it is or not. It's public space. Anything that happens in public space is subject to being videotaped today. So I hope that nothing like that would ever happen with your grandson, but this bill has nothing to do with that and I don't think we could pass a bill that would even deal with that.

MR. MANKTELOW: All right. So -- so in this situation, the police officer has no recourse to ask someone to stop taping that, correct?

MR. PERRY: The constitutional right to monitor is a sacred constitutional right. And there's no excuses or no reasons that we should try to come up with to take that right from the people. We should not try to fiddle and diddle here to find a reason why the police should be able to step on that right. That is the right of the people. Police officers are hired to protect the people, enforce the law. If it's a right, it's a law. But they don't seem to respect it. So this bill will codify it so that we know for sure nobody have to wait until court to say you have the right or you have the right. We're putting it in the law of New York State, so that if the police transgressioned on that right, you have a cause of action to seek redress as a free citizen with the right to freedom of expression, and one of your free expressions is the one to monitor misbehavior by your police department. Thank

God for the good police officers who have moral compass. But if -- as I said before, if you don't have one, you should not wear the badge. And -- and yet, the people who actually swear you in on the oath to protect the people, if they find -- and they should have a test for your moral compass because that's the problem with police enforcement in America. That's the problem with police enforcement anywhere we got police brutality, killing people. Even last year my granddaughter posted that, *For every day last year except for 26 days, somebody was killed by police in the United States of America*. That's the nation we are.

We need to protect people's rights. The rights of all New Yorkers. That's what we're trying to do. And I just call on my colleagues to use your conscience and make sure that we vote for the people who elected you to protect your rights. There should be no infringement of that right, and we should not tolerate it and we should not enable it. We should do nothing to let those who seek to violate to (unintelligible) in comfort.

I'm tired and I'm fed up. Thank you for the opportunity, Mr. Speaker.

MR. MANKTELOW: Thank you, Mr. Speaker. Nothing else.

ACTING SPEAKER AUBRY: Mr. Perry to close.

MR. PERRY: Thank you, Mr. Speaker. This bill will codify into law and unambiguously affirm by statutory enactment the right of all New Yorkers to record police activity throughout the

State. A quick scan of social media in the past week will have highlighted the benefit and the great need for New Yorkers to be assured that they, indeed, have a right to monitor and record police arrests and other police activity occurring in public spaces on our public streets. These amateur videographers often shine a bright light on police brutality and the abuses of power by those who are sworn to protect us and wear the honorable badge of a police officer, whichever department you work for. However, those who (unintelligible) police activity are often subject to harassment and are false arrests. Indeed, they do so by putting themselves at great physical risk to themselves. And that should never be the case. But the need to codify this right to monitor is paramount.

And I thank my -- the Speaker and those who worked hard for this -- the language together and that we have the opportunity to pass this bill. In so many of the recordings which capture blatant police misconduct, the officers on scene often turn their attention to the individual recording the activity in order to hinder the recording to unlawfully seize and destroy the evidence of their wrongdoing, and ultimately, frequent arrests of individuals on trumped-up charges. They end up doing that. I have seen in countless recordings over the last couple of weeks where police officers approached and impeded citizens who were doing nothing more than exercising this right, in no way interfering with their official duties. I have seen recordings where police officers have shined lights on -- on -- on camera lenses of those trying to record. I've seen where they formed a human wall, a

shield, to block the camera's view. Or worse, I've seen police physically knock the camera out of the hands of the monitor. My personal conviction is that anyone with a badge who goes to such great lengths to avoid being filmed, recorded, needs to have more than one camera shine on them. This bill will codify the right of New Yorkers to film and let police officers know that when they act in disobedience to their oath and someone forfeit that right, they will be breaking the law. While the bill doesn't have a specific penalty, it affirms the right of a citizen to go to court and seek redress from the officer who is often indemnified by the employer. So at the end of the day, we may all end up paying because the indemnity to the officers comes out of our pockets as taxpayers. This is -- this bill will give us the incentive to continue to beat down that wall of blue silence, and send a message to our police officers that, *We want you to be alert when you serve. We want you to remember the oath you take to protect the people, and we want you to respect and honor the rights of the citizens. And you will have the full support and thanks of all citizens who feel free to exercise their right.*

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY: On a motion by Mr. Perry, the Senate bill is before the House. The Senate bill is advanced.

Read the last section.

THE CLERK: This act shall take effect on the 30th day.

ACTING SPEAKER AUBRY: The Clerk will record the vote by -- the vote on Rules Report No. 70. This is a fast roll call. Any member wishing to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Ms. Bichotte to explain her vote.

MS. BICHOTTE: Thank you, Mr. Speaker, for allowing me to explain my vote. I want to thank the sponsor for introducing this bill, the New York -- the New Yorker's Right to Monitor Act which grants civilians who are not under arrest the right to record certain law enforcement activities, and the right to maintain custody and control of that recording after the incident. Time and time again we see how individuals are mistreated by the police, and if it were not for video recordings, some individuals would have not received justice. Just a few weeks ago, a video recording surfaced of the heinous murder of Ahmaud Arbery and then again George Floyd. If it were not for the video surveillance that was captured by ordinary civilians, we might not have known the real story. And quite frankly, justice would have never been an option to be served. We would not even be here, because we were able to witness the murder of George Floyd. What --this is why we're here today. Surely, we would have been told that they resisted arrest, and those families might not have been able to see what really happened to their loved ones. In an incident that happened in Buffalo just last week, law enforcement

officers pushed a 75-year-old man, causing him to bleed from his ear. They immediately denied responsibility and said he slipped. Then came the irrefutable truth: The video proof. What happens when there's no video? If -- if this is just what we are seeing when it's captured, how many cases like that are there when we don't have the fortune of being video recorded. How many people were forced to stop recording or told to back up like a reporter in Brooklyn this weekend who was also shoved and cornered so she could not tape the arrest of a peaceful protest -- protestor? No one should be able to be afraid to videotape an injustice as it occurs in there.

So I vote in the affirmative. Thank you.

ACTING SPEAKER AUBRY: Thank you so much. Mr. Ramos.

MR. RAMOS: Mr. Speaker, the people of the United States of America of color have found that a simple device like a cell phone that records video is a life-saving device. And they've opened up that throughout the country. And we have seen video after video of violation of civil rights, and it's become something essential. Anybody who has a young -- black, brown, young person in their home is going to tell them, *Make sure you have your video. If you get stopped by the police, please put it on.* It's a sad state of affairs that we have to tell our children this, that this must be done. This bill affirms that absolute right for people to take a video. To take that video and protect ourselves. We have seen in the many cases of police abuse how in some cases it's -- it has saved lives because police

have backed off because the video was there. In other cases it has brought justice because it has exposed what would have otherwise been a different story, had there not been a video recording there.

So I proudly vote in favor of this bill. Something that brings transparency. And -- and by the way, I want to add that being an officer for 20 years, I welcomed people to videotape. That protects me. As a police officer sometimes you get unfounded allegations against yourself. And if you are doing things right, there should be no reason why you're concerned about somebody standing down the block or standing around the perimeter, outside the crime scene, taking a video. That protects me. That shows that I did my job right if I am doing it right.

So I proudly vote in the affirmative.

ACTING SPEAKER AUBRY: Mr. Ramos in the affirmative.

Ms. Walker.

MS. WALKER: Thank you, Mr. Speaker, for allowing me to explain my vote. I used to be that person who walked through the streets and would record law enforcement making arrests, and I would be told, *Stand over there before we arrest you for interfering with governmental administration*. Or they'd tell the person, *Because she's standing here, we're going to have to arrest you*. And -- but I've just recently had an opportunity to see a -- a real benefit in the 73rd Precinct. We were complaining about this officer who was ravaging our communities. And it wasn't until he was

recorded shoving a young protester down at the Barclay Center that his aggression was on tape. And today he has been removed from the 73rd Precinct, to the benefit of all of the people who have complained about him in the past. And we were just notified that he will be arrested.

So, for me, this particular piece of legislation is just as important as every other piece that we're going to be voting on today. I want to commend the sponsor and I proudly vote in the affirmative.

ACTING SPEAKER AUBRY: Ms. Walker in the affirmative.

Ms. Wright.

MS. WRIGHT: To explain my vote. Thank you for the opportunity. And I want to commend the sponsor for this bill. This bill is very important. It is a necessary tool for us in protecting the rights of our neighbors, our friends and our communities. As been identified already, there's absolutely no trust throughout the community for police. This -- our -- the common trust that may have existed before has been eroded, and it's been eroded because of abuse, brutality, violence and murder. Murder that's been able to hide behind the shield. And at this moment we are taking steps so that we can bring some light, shed some light on all of the work that is happening in our community. Those that are doing well, as our -- some of our colleagues have said, they will be proven and shown to be doing well, and those who are doing wrong will be brought forward and -- and

identified for exactly who they are as well. This is an opportunity for us to rebuild bridges, for us to rebuild trust within our community, and to make sure that there is open communication. And we need to protect those who are bringing that information forward for us. Of the entire list of cases that were identified by the sponsor wherein the videotaping person was attacked by police, the one thing that wasn't mentioned that was that oftentimes the person taking the video is later arrested so that they can obtain the -- they can have custody of those videos. They can destroy evidence. They can destroy cell phones. That's part of the problem. We've got to create a system where it is known where that people understand that they are safe monitoring what is happening out in the open. As been identified already, that's a public space. And that we should be able to film what is happening in public space. And we should not be setting up any artificial boundaries for where people must stand (unintelligible) reach from.

Therefore, I am voting in the affirmative and I'm very happy with this piece of legislation.

ACTING SPEAKER AUBRY: Ms. Wright in the affirmative.

Mr. Walczyk.

MR. WALCZYK: Mr. Speaker, Black Lives Matter. I vote yes.

ACTING SPEAKER AUBRY: Mr. Walczyk in the affirmative.

Mr. Reilly.

MR. REILLY: Thank you, Mr. Speaker. I just want to just -- just put it on record, even though I did it during the debate, I am for this bill. I think this is a great opportunity to let people know that everyone is watching. And, you know, I'm not sure if some people misunderstood why I was asking the questions I asked, but I just want to reaffirm everybody and reassure that I am voting in the affirmative. Thank you.

ACTING SPEAKER AUBRY: Mr. Reilly in the affirmative.

Mr. Kim.

MR. KIM: Thank you, Mr. Speaker. I just want to commend the Speaker for this bill, and also remind my colleagues that as we speak there is nonstop unwarranted surveillance of everyday people by the police in the form of sidewalk videos and -- and towers that look over us every single day. And they get to watch us without any kind of oversight. And I don't even know where that data goes. I don't know even know who's looking. But I know they are -- they are breaking the -- our civil rights every single day. And for the first time in our history, everyday folks have some sense of empowerment that, you know, we can push back. That we can have something in our own hands to have an immediate sense of justice. And -- and that's what this bill, to me, is about. And just getting a little piece of righteousness back in our lives every single day.

So this -- this is -- like my colleague had said earlier, this is a no-brainer. We shouldn't even be debating this bill. Thank

you, Mr. Speaker.

ACTING SPEAKER AUBRY: Mr. Kim in the affirmative.

Mr. Mosley to explain his vote.

MR. MOSLEY: Thank you, Mr. Speaker. As much as I -- I give praise to our Speaker and our Majority Leader and to our Conference and to my colleagues throughout the State, this bill, along with probably this package, would not probably -- wouldn't be in existence if not for two people. That was Ramsey Orta, who was the whistleblower who would video record a member of the NYPD strangle Eric Gardner back in 2014. And then Darnella Frazier, a 17-year-old high school student who just two weeks ago had the audacity and bravery to record officers who were literally choking the life out of George Floyd in a public and recorded lynching that spread throughout the nation and throughout the world. If those two individuals did not have the ability -- and may I add, Mr. Orta paid a -- a very dear price for that through the retribution of others in higher places -- but if those two individuals had not recorded those two events, we would not be here passing this package of bills. That's a fact. That's not a belief.

So I commend the Speaker and I -- I commend the bill sponsor for putting this bill and having the foresight to put this bill because sometimes it could be easily overseen how important it is for people to be able to record the activities of law enforcement - whether they're doing the right thing or the wrong thing - but

nonetheless, have the ability to do so in an effort to make sure, one, that officers are doing their jobs correctly; but, two, that those who are not doing their jobs correctly and who are abusing the very people that they've been sworn to protect, to bring them to justice.

So I gladly and wholeheartedly vote in the affirmative. Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY: Mr. Mosley in the affirmative.

Mr. Rodriguez.

MR. RODRIGUEZ: Thank you, Mr. Speaker, for allowing me to explain my vote and to echo much of the sentiments in terms of thanking the bill sponsor for introducing this piece of legislation. In a free and open Democratic society we have to affirm this Constitutional right. You may presume that you have the right to take a -- a video, but as we have heard, the repercussions of doing so have -- can be truly, truly devastating to both yourself personally. But we know how important a tool, a life-saving tool this videotaping has become in terms of not just deterring police misconduct, but also uncovering it and to begin national movements to try and change the way that that policing happens. Just to mention some other names, we've heard about Eric Gardner, but to remind people about Philando Castile and Sandra Bland and, most recently, George Floyd. You know, these are instances where time and time again, a videotape or video recording of some tragedy, you know, has reminded us of not just the need to reform, but also the importance of the tools that have

been used to enable this reform.

So I just want to say thank you to the sponsor. It's -- it's -- it's vital that we, you know, that we keep this tool in place to uncover and -- and to push forward, you know, the changes that are necessary in our society, and this all will make sure that those who do that are not penalized as a result.

So as a result, I'll be voting in the affirmative and -- and thank the Speaker for moving this important piece of legislation.

ACTING SPEAKER AUBRY: Mr. Rodriguez in the affirmative.

Mr. Colton.

MR. COLTON: Thank you, Mr. Speaker. I have been voting on bills based upon whether or not they further transparency and whether or not they further make the job of justice more fair and more open and more clear. This bill basically affirms the Constitutional right that everyone has to take a video. And I, therefore, support this bill. I do not believe it is anti-police. I'm a little disturbed by some of the anti-police rhetoric I've heard in the context of discussing this bill. But I think when you photograph, when you take films of something that is going on, it has the possibility of both proving that there was no wrong done as well as proving that there is wrong done. And frankly, the fact that people are aware they're being filmed may make them more careful not to do wrong. To be more careful to comply with procedures exactly.

So I think this bill has a positive effect. I don't think

it interferes with policing. It certainly is not intended to. It's clear that you cannot interfere with -- with an arrest or with an official police action. But I think that it -- it basically affirms the right of citizens to be able to film what is going on, and frankly, I think, you know, people have a right to film, you know, when police are doing things right. Maybe very often that is not happening. Maybe that happens -- film things that police officers do that are very good and protect people and help people. And maybe that needs to be encouraged.

So I withdraw my request and I affirm and vote in the affirmative on this bill.

ACTING SPEAKER AUBRY: Mr. Colton in the affirmative.

Ms. Fahy.

MS. FAHY: Thank you, Mr. Speaker. I, too, rise to speak in favor of this bill. I commend the sponsor, I commend the Speaker, and I commend, by the way, the -- the strong bipartisan support on what I hope will be on this bill as well as on so many bills today. A picture does paint 1,000 words. And in this case, often we have seen a video and -- painting 1,000 -- more than 1,000 words, going back to Rodney King in 1991. That really began to transform the entire movement of really trying to seek some racial justice, really trying to seek some reforms, very necessary police reforms. And we more than know that had we not had that video of George Floyd, we might not be here today. And I think it is that video that really was able to capture a picture, capture a moment that I hope -- I hope in the

end he will not have died in vain because we will make some very true, serious and long overdue reforms.

So, yes, this bill affirms the ability to record actions, and I could not be -- and I do think it's well-intended. Just a couple of days ago in my community up at Stuyvesant Plaza, a lovely video was recorded of a Guilderland police officer talking to a young boy who wanted to see the inside of his police car and talk about how he wanted to dream about growing up to be a police officer. And that was a young African-American man. It was a beautiful exchange. And so let's hope that we'll see more of those types of positive exchanges going forward.

I dedicate my vote today to Mark Frey and Mousa Kanay, two young boys that I have mentored for decades, who have been very moved by the events over the last couple of weeks. And I thank, again, the bill sponsor and so many for all the work that they have done these last couple of weeks, and I hope will make changes for decades to come.

Again, I vote in the affirmative. Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY: Ms. Fahy in the affirmative.

Ms. Cruz to explain her vote.

MS. CRUZ: Thank you, Mr. Speaker. You know, I want us to -- I want to first thank the sponsor of the bill and the Speaker for -- for getting us to the point we're at. It is acceptable to

have these conversations because for a very long time not only were we not being heard as a community, but I don't think we dreamed of the bipartisan support that this kind of bill has now. I think we all understand - not to quote the Fresh Prince of Bel-Air - but one of the things that he said recently was, "It's not that this country is being more racist, it's that it's finally being filmed." And I think there's something to be said about the fact that was it not for the fact that we have cell phones and that we have cameras, lots of what we see today, lots of what we know as murders - because they were murders - would have never been captured. And so think about all those other times where there have been interactions. And I wanted you to think about it in both ways. Interactions between the police and members of the community where folks have been hurt, where folks have been murdered, where folks are -- are making allegations that maybe are not true. I think this is something for both sides to be okay with. Because this isn't about anything other than we need transparency if we're going to get as close as we can to having a more just society. And the idea that I, as a member of the community, or anybody in my community, should have the right to record what a police officer is doing, an encounter should be protected. And so I think my colleagues on the other side of the aisle who are going to be supportive of this because I think it shows -- it shows us that as a community we've come a long way to truly understand that this is not about being against the police, this is about being for the community. Understanding that community members have a right to record and a

right to know what is happening.

And with that, I vote in the affirmative.

ACTING SPEAKER AUBRY: Ms. Cruz in the affirmative.

Mr. Goodell.

MR. GOODELL: Thank you, sir. The following Republicans are voting no on this bill: Mr. LiPetri, Mr. Barclay, Mr. Friend, Mr. Lalor, Mr. Montesano, Mr. Schmitt, Mr. Fitzpatrick, Mr. DeStefano, Mr. Ra and Mr. Palumbo.

Thank you, sir.

ACTING SPEAKER AUBRY: So noted. Thank you.

Are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Mr. Speaker, would you please call on Mr. Goodell for an announcement?

ACTING SPEAKER AUBRY: Mr. Goodell for the purposes of an announcement.

MR. GOODELL: Thank you very much. Thank you very much, Mr. Speaker. And thank you, Majority Leader, for a productive day on some interesting and somewhat challenging bills sometimes. It was good to see that we had a lot of support in a lot of different areas.