**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Patricia Rodney, | Case No. 22-cv-1445 |
| Plaintiff, | |
| v. | **NOTICE OF SUPPLEMENTAL AUTHORITY** |
| City of New York, et al., | |
| Defendants. | |

Plaintiff submits this Notice of Supplemental Authority to bring the Court's attention to a decision just issued by District Judge Hon. Jessica G.L. Clarke of this Court.  That decision, attached to this Notice, is *Reyes v. City of New York*, 23-cv-6369 (S.D.N.Y., Nov. 2, 2023) ("*Reyes*").  As the parties jointly explained in the most recent status report, the "preliminary injunction sought [and ultimately granted in *Reyes* implicates the same "No Recording" policy at issue in the motion to dismiss here — and Mr. Reyes and the City made similar arguments on the City and State Right to Record Acts / City Administrative Procedure Act to those at issue here."  ECF No. 132 at 2. Importantly, given that *Reyes* granted a preliminary injunction, its analysis was more favorable to the City than the standard the Court would apply on the pending motion in this case.[1]

As for its relevance, as Judge Clarke explains, the No Recording Policy under which Plaintiff here was arrested and assaulted plainly violates the City and State Right to Record Acts.  *See Reyes* at *22-25.  Specifically:

> The Right to Record Acts allow for the recording of "law enforcement activity" and "police activities." Defendant does not dispute that officers interacting with civilians in a police precinct are performing law enforcement or police activities. The Right to Record Acts do not carve out police precinct lobbies as places where individuals are not allowed to record and the Court declines to read that limitation into the Right to Record Acts. Citing to both Right to Record Acts, the NYPD Legal Bureau Bulletin acknowledges that the right to record police activity "is codified in New York State and local law and extends to those

---

[1] The relevance of *Reyes* here is limited on the First Amendment claims because the parties in *Reyes* did not raise — and therefore Judge Clarke did not have an opportunity to pass on — the public statements of the previous Police Commissioner directly stating that police precincts are "shared public spaces" (rather than purely government spaces), and comparing them explicitly to "blocks," "parks," and essentially stating they are public fora.  *See e.g.,* ECF No. 112 at 10; 34-35; ECF No. 113-8 at 2.

individuals in both public places, such as streets, sidewalks, and parks, *as well as* private property such as a building, lobby, workplace, or an individual's own property." NYPD Legal Bureau Bulletin at 3 (emphasis in original).

Defendant offers no opposition to Plaintiff's argument, other than to claim that "[u]nder the First Amendment and as well as the State and City Right to Record Statutes, Plaintiff will not succeed on the merits." Def.'s Mem. at 15. ***Defendant concedes that the Right to Record Acts do not require a forum analysis.*** Tr. 69:24–70:7. And as Plaintiff avers, "the Right to Record Acts go beyond the protections of the First Amendment; they protect the right to record except when someone is physically interfering with law enforcement or breaking the law." Pl.'s Rep. at 7; *cf. Wilson v. City of New York*, No. 06-CV-7777 (LAK) (MHD), 2013 WL 3963451, at *7 (S.D.N.Y. Mar. 15, 2013), *report and recommendation adopted*, No. 06-CV-7777 (LAK), 2013 WL 3963453 (S.D.N.Y. July 31, 2013) (noting that the statute at issue was "even more protective of individuals' rights than the [First] Amendment"). ***Defendant does not argue – nor could it – that the NYPD Procedure, which is an outright ban of all recording, falls under the limited exceptions permitted under the Right to Record Acts.*** Accordingly, the Court finds that Plaintiff is likely to succeed on his claims under the Right to Record Acts.

*Reyes* at *24 (bold emphasis added).

Additionally, given that the City was represented by the same attorney in *Reyes* as it was here, Judge Clarke's analysis of the City's concession that "the Right to Record Acts do not require a forum analysis" essentially decides Defendants' motion to dismiss.  Defendants here adopted the same approach:  Their argument that the No Recording Policy is lawful relies entirely on a forum analysis.  ECF No. 40 at 20-21 (only arguing about the forum in defending the policy).  And, presumably, if pressed, the same lawyer would offer the same concession:  "the Right to Record Acts do not require a forum analysis," which in turn requires the result that No Recording Policy "which is an outright ban of all recording," cannot "fall[] under the limited exceptions permitted under the Right to Record Acts. *Reyes* at *24.

Accordingly, Plaintiff respectfully requests the Court deny Defendants motion for the reasons explained in *Reyes*.  If the same essential basic facts can support a preliminary injunction, they must state a plausible claim.

Respectfully Submitted,

DATED:    November 2, 2023
              Queens, NY

/s/
_____

J. Remy Green
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEANPAUL REYES,

                       Plaintiff,

          -against-

CITY OF NEW YORK,

                       Defendant.

23-CV-6369 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff SeanPaul Reyes ("Plaintiff" or "Reyes") brings this action against Defendant

City of New York ("Defendant" or the "City") alleging that the policy of the New York Police

Department ("NYPD") that prohibits recording in publicly accessible areas of NYPD precincts

violates the First Amendment; the New York State Right to Record Act, N.Y. Civ. Rights Law

§ 79-p; the New York City Right to Record Act, N.Y.C. Admin. Code § 14-189; and the Citywide

Administrative Procedure Act, N.Y.C. Charter §§ 1041–46. ECF No. 1 ("Compl."). Currently

before the Court is Plaintiff's motion for a preliminary injunction seeking to (1) prohibit the

NYPD from enforcing the policy set forth in NYPD Patrol Guide Procedure 203-29(7) and

NYPD Administrative Guide Procedure 304-21(7) (the "Procedure") and (2) require the NYPD

to remove the signs in NYPD precincts setting forth the Procedure. ECF No. 7 ("Pl.'s Mem.").

For the reasons set forth below, Plaintiff's motion for a preliminary injunction is GRANTED.

**FINDINGS OF FACT**

The NYPD has codified the Procedure, which authorizes officers to arrest people who

record inside the lobbies of police precincts, in both its Patrol Guide and its Administrative

Guide. Specifically, in June 2018, the NYPD issued Procedure No. 203-29 in the NYPD Patrol

Guide titled "When a Member of the Service Encounters an Individual Observing,

Photographing, and/or Recording Police Activity." ECF No. 8-1 ("Patrol Guide"). Section 7 states:

> Members of the public are not allowed to photograph and/or record police activity within Department facilities. Members of the service may order any member of the public who is photographing or recording within Department facilities to stop such activity. If such person refuses to stop, they then should be ordered to leave the premises. If such person refuses to leave the premises, members of the service may take proper enforcement action under the trespass statutes (i.e., Penal Law Sections 140.05 and 140.10).

The same language is contained in the Administrative Guide, Procedure No. 304-21, issued in June 2021. ECF No. 8-2 ("Administrative Guide").

The July 2020 bulletin from the NYPD Legal Bureau notes that the Patrol Guide prohibits recording in NYPD facilities and further states:

> When an individual is observed recording inside a Department facility, such as a precinct stationhouse, in any manner, an officer should immediately order the person to stop recording. If the person refuses to stop recording, the officer should order the person to leave the premises. If the person does not stop recording and does not leave the premises, enforcement for trespass is appropriate.

ECF No. 20-2 ("NYPD Legal Bureau Bulletin") at 5.

Plaintiff Reyes is an independent journalist who reports on government accountability and transparency as well as police misconduct. Transcript of Hearing and Oral Argument ("Tr.") 5:20–22. Often, he conducts public business with police officers and records the encounters. ECF No. 9 ("Reyes Decl.") ¶ 3. Reyes then edits the videos of these encounters and posts them on his YouTube channel, Long Island Audit. *Id*. ¶ 4. He also broadcasts his reporting on other social media channels including Facebook, Instagram and TikTok. Tr. 6:8–12. Long Island Audit's YouTube channel has approximately 500,000 subscribers and Long Island Audit has approximately one million subscribers across all channels, with approximately 20 million views each month. Reyes Decl. ¶ 5; Tr. 6:12–16.

Reyes posts videos of his encounters "to educate the public on how their public officials behave," specifically, with respect to how public officials "respect or fail to respect the First Amendment right to record public officials doing their jobs." Reyes Decl. ¶ 6. Reyes began filming and posting videos because he has "seen a lot of police misconduct over the years online" and the lack of accountability and transparency was concerning to him. Tr. 8:2–7. He believes that recording public officials "is an essential means of holding them accountable." Reyes Decl. ¶ 7. Reyes hopes to "draw attention to police abuse through [his] journalism and activism so that such abuse can be addressed and eventually eliminated." *Id*. ¶ 9.

On April 4, 2023, Reyes went to the NYPD's 61st Precinct. Reyes Decl. ¶ 10–11. He had received a tip that the NYPD was arresting people for filming in the precinct lobby. Tr. 10:21–23. Reyes went to the 61st Precinct in order to file a complaint, investigate the situation and report back to his viewers. *Id*. 10:23–11:2; Reyes Decl. ¶ 12. Before entering the 61st Precinct, Reyes began recording a video. Reyes Decl. ¶ 13.

About six minutes after Reyes began recording, Sergeant Tosares Korchimet entered the precinct lobby from the non-public area of the precinct and informed Reyes that he could not record in the precinct, pointing Reyes to a sign that stated: "Members of the public are prohibited from audio/video recording or photography inside this facility." Video Recording ("Pl.'s Ex. 1") at 6:00; Reyes Decl. ¶ 15. Reyes asked for Sergeant Korchimet's name and badge number. Pl.'s Ex. 1 at 6:16. Sergeant Korchimet provided this information while directing Reyes toward the doors leading from the precinct lobby to the outside, stating again that Reyes could not record in the precinct. *Id*. at 6:18. Sergeant Korchimet then walked back into the non-public area of the precinct, and Reyes continued to record. *Id*. at 6:50.

Shortly thereafter, Sergeant Korchimet reemerged into the precinct lobby, along with Officer Giovanni Cucuzza. *Id.* at 7:29; Reyes Decl. ¶ 15. Officer Cucuzza told Reyes that he could not record in the precinct lobby and had to leave. Pl.'s Ex. 1 at 7:29. Sergeant Korchimet and Officer Cucuzza told Reyes multiple times that he was not allowed to record and that he would be arrested if he did not stop recording. *Id.* at 7:40. Reyes did not stop recording and was subsequently arrested. *Id.* at 8:27; Tr. 12:15–16. Reyes was charged with violating New York Penal Law 104.05 and issued a Desk Appearance Ticket. Compl. ¶ 73–74; ECF No. 8-3. The Kings County District Attorney's Office declined to prosecute the arrest. Compl. ¶ 75; ECF No. 8-4.

Two months later, on June 1, 2023, Reyes attempted to record at the NYPD's 75th Precinct and was again arrested (the "June 2023 Arrest"). Compl. ¶ 79; Tr. 13:7–9. He was charged with Trespass, N.Y. Penal Law 140.05; Criminal Trespass in the Third Degree, N.Y. Penal Law 140.10(A); and Obstructing Governmental Administration, N.Y. Penal Law 195.05. ECF No. 8-5. The next hearing in the prosecution for the June 2023 Arrest is in November 2023. Tr. 56:14–17.

Reyes would like to continue his investigations into the NYPD. *Id.* 12:25–13:1. He has stated that people want him to help them file complaints and record the interactions, and subsequently post the video on his social media channels. *Id.* 13:3–13:5. Reyes claims that he is not able to do so, because he will be arrested again. *Id.* 13:6–7; Reyes Decl. ¶ 22.

On July 24, 2023, Reyes filed his Complaint. Reyes alleges that the Procedure, by prohibiting recording in the lobbies of police precincts, violates the First Amendment, the New York State Right to Record Act and the New York City Right to Record Act. Compl. ¶¶ 87–111, 121–30. Reyes further alleges that the Procedure qualifies as a rule pursuant to the Citywide

Administrative Procedure Act and that the NYPD did not undergo the required rulemaking process, making the Procedure null and void. *Id.* ¶¶ 112–20. On July 25, 2023, Reyes moved for a preliminary injunction to (1) prohibit the NYPD from enforcing the Procedure and (2) require the NYPD to remove the signs in precincts setting forth the Procedure. Pl.'s Mem. at 23. On September 28, 2023, this Court held an evidentiary hearing and oral argument on Plaintiff's motion for a preliminary injunction.

## CONCLUSIONS OF LAW

The Court first considers the parties' arguments regarding whether the Court must abstain from deciding the matter, pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). After finding that abstention is not warranted, the Court considers whether Plaintiff has met the factors for a preliminary injunction, concluding that he does here.

**I.    The Court Need Not Abstain From Exercising Jurisdiction Under *Younger***

**A.  *Younger* Abstention Standard**

The *Younger* doctrine generally prohibits federal courts "from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger*, 401 U.S. at 43–44); *see also Younger*, 401 U.S. at 43–45 (describing the reasons for the "longstanding public policy against federal court interference with state court proceedings," including "Our Federalism"). "So long as such challenges relate to pending state proceedings, proper respect for the ability of state courts to resolve federal questions presented in state court litigation mandates that the federal court stay its hand." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 2 (1987).

The Supreme Court has explained that *Younger* abstention applies in only three "exceptional circumstances": (1) "ongoing state criminal prosecutions"; (2) "certain civil enforcement proceedings"; and (3) "pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989)) (internal quotation marks omitted). These three exceptions "define *Younger*'s scope." *Id*. at 78.

Before invoking *Younger*, a court may consider three additional factors: whether there is "(1) an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) provides an adequate opportunity to raise federal challenges." *Id*. at 81 (cleaned up). "[T]hese conditions are not dispositive; they are, instead, <u>additional</u> factors appropriately considered by the federal court before invoking *Younger*." *Cavanaugh v. Geballe*, 28 F.4th 428, 432 (2d Cir. 2022) (citing *Sprint*, 571 U.S. at 81) (internal quotation marks omitted) (emphasis in original).

A federal court may nevertheless intervene in a state proceeding upon a showing of "bad faith, harassment or any other unusual circumstance that would call for equitable relief." *Younger*, 401 U.S. at 54. "A state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception." *Diamond "D" Const. Corp.*, 282 F.3d at 199.

## B.  Application

The parties dispute the impact of Plaintiff's state criminal prosecution on this action. Plaintiff argues that he is not seeking federal intrusion into an ongoing state criminal prosecution and that Plaintiff's criminal case will not be affected by the relief sought. Pl.'s Mem. at 7.

Defendant argues that enjoining the NYPD from enforcing the Procedure would impact the state court proceeding for the June 2023 Arrest. ECF No. 20 ("Def.'s Mem.") at 11.

But merely impacting a proceeding, as the City maintains would happen here, is not enough to warrant abstention. Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). *Younger* abstention is applicable when the plaintiff "in the federal action seek[s] to enjoin or otherwise supervise" or interfere with a pending state criminal prosecution. *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 538 (S.D.N.Y. 2018). As such, federal courts have abstained pursuant to *Younger* when asked to enjoin state proceedings or issue declaratory relief against the state proceeding. *See, e.g.*, *Diamond "D" Const. Corp.*, 282 F.3d at 193 (finding that the district court was required by *Younger* to abstain from taking jurisdiction over a claim seeking an injunction of ongoing state administrative proceedings); *Kirschner v. Klemons*, 225 F.3d 227, 235–37 (2d Cir. 2000) (declining to exercise jurisdiction under *Younger* and abstaining from hearing the plaintiff's claims for declaratory relief against a state proceeding); *Schlagler v. Phillips*, 166 F.3d 439, 443 (2d Cir. 1999) (holding that the district court should have abstained under *Younger* and not issued an injunction barring prosecution under a New York state penal statute).

Here, Plaintiff is not seeking an injunction against the Kings County District Attorney's Office nor declaratory relief with respect to the state proceeding. Pl.'s Mem. at 7, 23. He is also not seeking to enjoin the enforcement of the statutes he was charged with violating. Instead, Plaintiff asks that the Court prohibit the NYPD from enforcing the Procedure going forward, claiming that the Procedure is unconstitutional and violates state and local law. *Id.* at 1.

The relief Plaintiff requests would not, in effect, enjoin the state prosecution. Federal court decisions on federal constitutional questions do not bind state courts. *See Johnson v. Williams*, 568 U.S. 289, 305 (2013) (noting that the decision of a federal court of appeals on a federal constitutional question does not bind a state supreme court); *People v. Kin Kan*, 574 N.E.2d 1042, 1045 (N.Y. 1991) (stating that although "the interpretation of a Federal constitutional question by the lower Federal courts may serve as useful and persuasive authority" for state courts, it is not binding). Likewise, federal court decisions on state law do not bind state courts when a federal question is not involved. *Hartnett v. New York City Transit Auth.*, 612 N.Y.S.2d 613, 616 (N.Y. App. Div. 1994), *aff'd*, 657 N.E.2d 773 (N.Y. 1995). Thus, enjoining the Procedure is not in effect an injunction on the state criminal proceeding as it would not enjoin the prosecution of the June 2023 Arrest.

Defendant argues that if this Court were to issue an injunction, it would have a "chilling effect" on the prosecution for the June 2023 Arrest and would "unquestionably interfere." Tr. 66:19–67:5. Defendant states that "in the face of a high-profile federal case compared to a misdemeanor trespassing case and obstruction of government administration," the Court's decision "would effectively be an injunction upon that prosecution." *Id*. 67:5–11. However, Defendant points to no case – and the Court has not seen any – to support the proposition that a decision by a federal court that would be non-binding on a state criminal proceeding is the kind of interference that *Younger* envisioned.

Because the Court finds that the requested relief would not interfere with the Kings County Prosecution, the Court need not consider the additional factors of whether there is an ongoing state judicial proceeding that implicates important state interests and provides an

adequate opportunity to raise federal challenges.[1] Similarly, the Court need not evaluate Plaintiff's argument that the instant matter involves a "series of repeated prosecutions to which [plaintiff] will be subjected," *Younger*, 401 U.S. at 49, such that there is an exception to *Younger* abstention.

## II.    Plaintiff Meets the Standard for a Preliminary Injunction

### A.  Preliminary Injunction Standard

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and citation omitted). To obtain preliminary injunctive relief, the movant must show that: (1) the movant "is likely to succeed on the merits"; (2) the movant "is likely to suffer irreparable harm in the absence of preliminary relief; and (3) "the balance of equities tips in [movant's] favor" and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) ("Where, as here, the government is a party to the suit, the final two factors merge."); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) ("When 'a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'") (quoting *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016)).

---

[1] That Plaintiff has filed a motion to dismiss in the prosecution for the June 2023 Arrest does not change this analysis.

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). "A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Id*. Where the movant seeks a mandatory preliminary injunction as opposed to a prohibitory preliminary injunction to maintain the status quo, "the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (internal quotation marks and citation omitted).

"To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief. Rather, Plaintiffs must show a likelihood of success on the merits of at least one of their claims." *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022) (quoting *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)).

### B. Plaintiff Has Demonstrated a Likelihood of Success on the Merits of the Right to Record Claims

The Court will now turn to Plaintiff's likelihood of success on the merits under the First Amendment as well as under the New York State and New York City Right to Record Acts. For the reason stated below, the Court declines to consider Plaintiff's Citywide Administrative Procedure Act claim.

#### 1. First Amendment Analysis

Plaintiff brings two claims under 42 U.S.C. § 1983 alleging violations of the First Amendment. First, Plaintiff argues that the Procedure deprives individuals of their First Amendment right to record NYPD officers in publicly accessible areas of NYPD facilities. "To state a claim for relief in an action brought under § 1983, [plaintiff] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged

deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Second, Plaintiff alleges First Amendment retaliation. To state a claim for First Amendment retaliation, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted). Whether Plaintiff is likely to succeed on the merits of his First Amendment claims thus hinges on whether he was deprived of a right secured by the Constitution.

The Court first finds that recording police performing their official duties in public is protected under the First Amendment. Although the Second Circuit has not yet weighed in on whether recording the police is protected First Amendment activity, other circuits have uniformly recognized a First Amendment right to record the police performing their duties in public. *See Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Fields v. City of Phila.*, 862 F.3d 353, 359 (3d Cir. 2017); *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012)' *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). Certain district courts in this circuit have likewise held that the First Amendment protects the right to record the police in public spaces. *See, e.g.*, *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380–81 (S.D.N.Y. 2015); *Gerskovich v. Iocco*, No. 15-CV-7280 (RMB), 2017 WL 3236445, at *6 (S.D.N.Y. July 17, 2017); *Fraser v. City of New York*, No. 20-CV-5741 (NGG), 2022 WL 3045524, at *4 (E.D.N.Y. Aug. 1, 2022). For substantially the same reasons set forth in those opinions, this Court agrees.

Moreover, the City does not contest that the right to record police is protected by the First Amendment. Tr. 75:1–5 ("Q: [D]oes the city dispute at all that there's a First Amendment right to record policy activity? A: No."); *see also* Patrol Guide at 2 ("Individuals have a right to lawfully observed and/or record policy activity . . . in public places, such as streets, sidewalks, and parks, as well as private property in which the individual has a legal right to be present, such as building, lobbies, workplaces or an individual's own property."); Administrative Guide at 2; NYPD Legal Bureau Bulletin at 1 ("Civilians have a constitutional right, as well as express rights under state and local law, to observe and record police officers carrying out their duties.").

### a. Public Forum Doctrine

Although the right to record police conducting official duties in public places is a constitutional right, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Under the prevailing constitutional framework, speech restrictions imposed by the government on the government's property are subject to a "forum based" analysis. *See Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *Cornelius*, 473 U.S. at 800. "[F]ora for expression are classified into four categories, which fall along a spectrum extending from those deserving the greatest constitutional protection to those deserving the least constitutional protection: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum." *Tyler v. City of Kingston*, 74 F.4th 57, 61 (2d Cir. 2023) (quoting *R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011)).

The first category of public property – "traditional" public fora – are places such as streets and parks which have "immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). "[A] principal purpose of traditional public fora is the free exchange of ideas." *Cornelius*, 473 U.S. at 800. In traditional public fora, content-based restrictions on speech are subject to strict scrutiny, and the government must show that such a restriction is necessary to serve a compelling state interest and is narrowly tailored to achieve that interest. *Perry*, 460 U.S. at 45 (internal citations omitted). Content-neutral time, place and manner restrictions must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id*. (internal citations omitted).

The second category is the "designated" public forum, "which the state has opened for use by the public as a place for expressive activity." *Id*.; *see also Cornelius*, 473 U.S. at 802 ("[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."). The government creates a designated public forum by "intentionally opening a nontraditional public forum for public discourse," *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (internal citation omitted), and the government may choose to close a designated public forum, *Perry*, 460 U.S. at 46. Regulation of designated public fora is "subject to the same limitations as that governing a traditional public forum." *Lee*, 505 U.S. at 678; *see also Perry*, 460 U.S. at 46.

The limited public forum is a subset of the designated public forum. It exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (quoting *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 n.2 (2d Cir. 1998)). "Restrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral." *Make The Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004). "Strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Tyler*, 74 F.4th at 62 (quoting *Hotel Emps.*, 311 F.3d at 545).

Finally, a "nonpublic" forum is public property that the government has not opened for expressive activity by members of the public. *Hotel Emps.*, 311 F.3d at 546. The government may reserve such a forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Perry*, 460 U.S. at 46).

### b. Forum Analysis

In determining the type of forum, courts "examine the forum's physical characteristics and the context of the property's use, including its location and purpose." *Hotel Emps.*, 311 F.3d at 547 (2d Cir. 2002). Courts additionally consider the "government's intent in constructing the space and its need for controlling expressive activity on the property, as evidenced by its policies or regulations." *Id.*; *see also Make The Rd.*, 378 F.3d at 143–44 ("Courts have looked to the policy and practice of the government to ascertain whether it intended to designate a place not

traditionally open to assembly and debate as a public forum as well as to the nature of the property, and its compatibility with expressive activity.") (internal quotation marks omitted). Finally, courts "consider whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Emps.*, 311 F.3d at 547 (quoting *Warren v. Fairfax County*, 196 F.3d 186, 190 (4th Cir. 1999)). "The fact that members of the public are permitted freely to visit a forum . . . does not abrogate its nonpublic status if the visitors are not permitted to express themselves freely in that forum." *Make The Rd.*, 378 F.3d at 144 (cleaned up). Plaintiff argues that a police precinct lobby is a designated public forum. Tr. 60:19–21. Defendant argues that a police precinct lobby is a limited public forum. Def.'s Mem. at 17. Neither party argues that the lobby is a non-public forum.

The Court looks first at how a police precinct lobby is used. Police precinct lobbies are areas generally used by members of the public to reports crimes and obtain information from law enforcement. The lobbies are open to the street or to a small vestibule that opens to the street and are accessible to the public twenty-four hours per day. Pl.'s Mem. at 19. Typically present in the lobby of a police precinct may be civilians who are victims of crimes, such as domestic violence or robbery. Tr. 24:20–25:5. These individuals may be at the precinct in order to report a crime, retrieve a report they had previously made or talk to a member of the detective unit. *Id*. 25:14–22. There may also be confidential informants or those who the NYPD is trying to sign up as confidential informants. *Id*. 25:5–8. Members of the public can also use the lobby to obtain a complaint form alleging officer misconduct, as Plaintiff contends he was doing here.

Second, the Court looks to the government's intent for the forum, as evidenced by the "policy and practice of the government." *Cornelius*, 473 U.S. at 802. Defendant argues that "the forum's purpose is to ensure the public safety." Def.'s Mem. at 16. The City has shown an intent

to ensure that victims of crimes receive emergency social and medical services as soon as possible and enjoy a "freedom from intimidation, threats or harassment." *Id*. at 17 (citing NYS Exec. L. Art. 23 § 641). The NYPD Legal Bureau Bulletin, in stating the reasoning for the Procedure, lays out the government's intent for the forum: "Due to the sensitive nature of what occurs inside police stationhouses, law enforcement agencies can limit expressive activities within the confines of a stationhouse in order to uphold the sanctity of investigations, protect witnesses, and allow officers to perform essential functions without interference." NYPD Legal Bureau Bulletin at 5. There is no evidence that the government intended to open up police precinct lobbies for expressive activities, like peaceful protesting and leafleting, beyond being open to members of the public seeking assistance from the police. Nor is there evidence that these lobbies have been historically used for unrestricted expressive activities. Indeed, those activities would be at odds with the purpose of a police precinct lobby, a space for individuals to seek assistance from law enforcement.

Applying the preceding analysis to the present case, a police precinct lobby is not a designated forum that "the state has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45. Courts "will not find that a public forum has been created in the face of clear evidence of a contrary intent," nor will courts "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803. This finding is consistent with Second Circuit decisions finding public meetings at city hall, waiting rooms at a city agency, school gyms and school newspapers to be limited or nonpublic fora. *See, e.g.*, *Tyler*, 74 F.4th at 61 (analyzing Common Council public meetings held at City Hall as limited public fora); *Make the Rd.*, 378 F.3d at 138, 145–46 (finding that waiting rooms at the Job Center, operated by the Human Resources Administration

of New York City, were not traditional or public designated fora as the government "evidenced its intent to render [the waiting rooms] nonpublic by enforcing a written policy reserving them for 'official business' or for activities 'specifically authorized'"); *Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017) (holding that the school gym during basketball games was a limited public forum as the invitation to parents and spectators to attend such games did not "constitute an invitation to anyone to disrupt the game" with speeches about views on school policy or political issues); *R.O. ex rel. Ochshorn*, 645 F.3d at 539–40 (finding school newspapers to be limited public fora because, among other reasons, the school did not invite all types of expressive activity in the newspaper).

Plaintiff argues that "[e]ven if a police precinct were a limited forum dedicated to discussions of public safety, Plaintiff's reporting on police activity is squarely within that dedication," ECF No. 23 ("Pl.'s Rep.") at 9, which would require that the government's restrictions on Plaintiff's First Amendment activities serve a compelling interest and be narrowly tailored to meet that interest. However, in limited public fora, "government entities are permitted to restrict the form or manner of speech offered by members of the public, even if such speech addresses the topic or agenda of that forum." *Tyler*, 74 F.4th at 63. Restrictions on the form or manner of speech need only be reasonable and viewpoint neutral. *Id*. Prohibiting recording in police precinct lobbies is a limitation on the form or manner of speech. As such, the Court will assess whether the Procedure is reasonable and viewpoint neutral.

### c. Reasonableness and Viewpoint Neutrality

The NYPD Procedure will be upheld as long as the policy is "viewpoint-neutral and reasonable in relation to the forum's purpose." *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 656 (2d Cir. 1995) (quoting *Calash v. City of Bridgeport*, 788 F.2d 80, 84 (2d

Cir.1986)). "A restriction will be reasonable if it is wholly consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated." *Make The Rd.*, 378 F.3d at 147 (quoting *Perry*, 460 U.S. at 50–51). Such a restriction "need not be the most reasonable or the only reasonable limitation." *Lee*, 505 U.S. at 683.

Defendant avers that the purpose of the Procedure is privacy, safety and security. Def.'s Mem. at 23 ("[P]ermitting citizens to record in the police precinct vestibules creates safety, privacy and security concerns for members of service and the public."). Indeed, there is a legitimate state interest in protecting the safety of citizens. *See Hill v. Colorado*, 530 U.S. 703, 715 (2000). At police precincts, victims of crimes report crimes or otherwise utilize the services of the NYPD, as do witnesses and confidential informants. "Enabling the public to record these victims when entering the precincts would compromise the safety of those victims and could have a chilling effect on crime reporting." ECF No. 20-5 (Callaghan Aff.) ¶ 6. When individuals come in to report domestic violence or sexual assault, they will come in through the lobby and speak to an officer about what occurred. Tr. 29:22–30:5. Pursuant to the Patrol Guide, officers turn off their body cameras for conversations regarding these types of incidents. *Id*. 30:6–13. Victims and witnesses of crime may be less willing to go to a precinct to make a report if they know that they may be captured on camera doing so. Victims and witnesses also may not want to have their identities memorialized on camera, especially when that recording may be posted online for anyone to access. Individuals may not want the audio of their conversations to be recorded, as they may be sharing personal and intimate details about a traumatic moment they experienced. According to the NYPD, recording confidential informants may also have a chilling effect, as informants may be exposed to reprisals and the investigation in which the confidential informants are participating in may be compromised. Callaghan Aff. ¶ 7.

As to the privacy concerns about recording, Plaintiff points out that crime victims and witnesses have a number of ways to contact the police other than waiting in a public lobby. Tr. 37:8–13. Members of the public are able to call a precinct, 911 or Crime Stoppers. *Id*. 37:14–23. The Special Victims Unit additionally redesigned its facilities so that those reporting sexual assault do not have to wait in precincts. *Id*. 37:24–38:6. If a person wants to report a crime with sensitive details, a precinct can make arrangements for them to do so privately. *Id*. 45:8–12. Crime victims and witnesses are accordingly able to contact the police in such a way as to ensure that they avoid being captured on a recording being made in a police precinct lobby. Plaintiff further notes that it is not illegal to record on the sidewalk outside of a precinct; a person would be able to record victims of crime and confidential informants who are going in and out of a precinct even if that person is not able to record in a precinct lobby. *Id*. 38:7–19. However, these recordings would not capture the conversations that these individuals are having when speaking to police inside the precinct lobby.

Defendant additionally argues that the safety and security of officers in the precincts could be compromised if recording in lobbies were allowed. Not all NYPD precinct lobbies are configured in the same layout. Tr. 23:14–19. In certain precincts, there is a wall separating the lobby from the rest of the precinct, but the wall stops about 10 feet high and is open above. *Id*. 24:5–9. In a configuration such as that, someone who is recording video would be able to record a significant amount of the precinct, *id*. 24:10–12, including potentially prisoners who are in handcuffs or are being transported around the inner parts of the precinct, *id*. 25:8–11. In some precincts, the public may be able to observe what is called the muster room. *Id*. 27:2–3. In muster rooms, sensitive information may be exchanged, such as the location of where a search warrant is to be executed or information regarding persons of interest. *Id*. 27:7–19. In most

precincts, the public is also able to view the area where firearms are secured when a police

officer is walking into an area where they cannot bring their firearm. *Id*. 27:23–28:16. Plaintiff

responds that a person who is in the public area, not recording, could see all of these things. *Id*.

39:4–5. However, being able to view or listen to these occurrences is different from being able to

record them and post them to the internet for anyone to be able to view. Recording creates a

permanent image. Someone can record in high resolution and create images that are not visible to

the naked eye. Audio may pick up on conversations or noises that a person's ear cannot hear.

Editing or manipulating the video after it is taken may present additional concerns.

During the video, Reyes zoomed in on various people and objects, underscoring some of

the City's concerns about allowing recording inside police precinct lobbies. Reyes confirmed that

he zoomed in because he wanted a closer look on people or information inside the precinct. Tr.

16:20–23. A couple minutes into the video, Reyes zoomed in on a police officer, standing in the

doorway in front of a restricted area. Pl.'s Ex. 1 at 2:14. Later, Reyes zoomed in to the restricted

area behind the desk where civilians are able to speak with officers. *Id*. at 5:44. The video

recording also captures the hallway of a restricted area. *Id*. at 2:50. Defendant's witness stated

that there did not appear to be sensitive information down that particular corridor, but that there

can sometimes be posters containing sensitive information that is not generally meant for the

public. Tr. 32:10–17. At one point, the video recording captures Sergeant Korchimet entering a

security code into a keypad. Pl.'s Ex. 1 at 6:48. The video also captures the NYPD security

cameras in the lobby, which Defendant's witness has suggested creates a concern that those

cameras could be documented and memorialized. Tr. 31:20–23.

The City has presented privacy, safety and security interests that are implicated by video

recording in police precinct lobbies. Although Plaintiff has presented countervailing

considerations for each concern raised, based on the evidence currently presented and at this juncture, Plaintiff has not sufficiently refuted the City's claim that prohibiting recording in police precinct lobbies is a reasonable restriction.

A reasonable limitation will still be struck down if it "is in reality a façade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. Plaintiff has not claimed that the Procedure restricting recording in precincts discriminates on the basis of viewpoint, and the Court sees no such way that it does.

Accordingly, Plaintiff has not shown a substantial likelihood of success on the merits with respect to his challenge that the Procedure violates the First Amendment.

### 2. State and City Right to Record Laws

#### a. Supplemental Jurisdiction

The Court is aware that the subsequent claims are not federal ones. Having found that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his federal claims, there is a question of whether analyzing Plaintiff's state and city law claims are appropriate here. The Court finds that it is still appropriate to analyze these claims. First, 28 U.S.C. § 1367(c)(3) does not preclude the Court from doing so. The Court has not, and could not without notice, dismiss Plaintiff's First Amendment claim *sua sponte*.[2]

28 U.S.C. § 1367(c)(1) does not require a different result either. This provision states that the Court *may* decline to exercise supplemental jurisdiction over a claim that "raises a novel or complex issue of State law." The instances in which courts have declined to exercise supplemental jurisdiction over novel claims do not apply to the instant matter. Courts in this circuit have generally declined to exercise supplemental jurisdiction over state claims either

---

[2] The Court notes that the City's deadline to answer, move or otherwise respond to the Complaint was August 29, 2023. As of yet, no response has been filed.

when (1) the state law claim presented "not only a novel question of interpretation of a state statute, but one that involves the state's interest in the administration of its government," *see Seabrook v. Jacobson*, 153 F.3d 70, 71 (2d Cir. 1998), or (2) the state law claim was both novel *and* complex, *see Oneida Indian Nation of New York v. Madison County*, 665 F.3d 408, 438–39 (2d Cir. 2011); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 308 (2d Cir. 2003).

Here, the state and city Right to Record Acts do not involve the state's interest in the administration of its government nor do they present complex issues; the statutory language as applied to this circumstance is clear and unambiguous. Although there are only a handful of cases analyzing the state Right to Record Act, it does not mean the state law is "unsettled" or that there is a novel *issue* for the Court to decide. As described below, the plain language of the statute, combined with the City's failure to present any meaningful defense to these claims, mandate the result here.

### b. Right to Record Acts

The New York State Right to Record Act ("NYS RTRA"), enacted on July 14, 2020, provides that "[a] person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity and to maintain custody and control of that recording and of any property or instruments used by that person to record law enforcement activities . . . ." N.Y. Civ. Rights Law § 79-p(2). Persons are barred from recording if they "engage in actions that physically interfere with law enforcement activity or otherwise constitute a crime defined in the penal law involving obstructing governmental administration." *Id*. The NYS RTRA further creates a private right of action. N.Y. Civ. Rights Law § 79-p(3).

Similarly, the New York City Right to Record Act ("NYC RTRA," together with the NYS RTRA, the "Right to Record Acts"), enacted on August 14, 2020, states that "[a] person may

record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording." N.Y.C. Admin. Code § 14-189(b). The law further provides that "[n]othing in this chapter shall be construed to permit a person to engage in actions that physically interfere with an official and lawful police function, or to prevent the seizure of any property or instruments used in a recording of police activities where the seizure is otherwise authorized by law, or to prohibit any officer from enforcing any other provision of law." *Id.* The NYC RTRA also creates a private right of action. N.Y.C. Admin. Code § 14-189(c).

Plaintiff argues that the broad, straightforward provisions of the Right to Record Acts mean what they say: people can record the police. Pl.'s Mem. at 18. The Court agrees. "Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning." *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 550 (N.Y. 2010) (internal citation omitted); *see also Hayden v. Pataki*, 449 F.3d 305, 314–15 (2d Cir. 2006) ("[I]n interpreting a statute, we must first look to the language of the statute itself, and . . . if the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words.") (internal citation and quotation marks omitted).

The Right to Record Acts allow for the recording of "law enforcement activity" and "police activities." Defendant does not dispute that officers interacting with civilians in a police precinct are performing law enforcement or police activities. The Right to Record Acts do not carve out police precinct lobbies as places where individuals are not allowed to record and the Court declines to read that limitation into the Right to Record Acts. Citing to both Right to Record Acts, the NYPD Legal Bureau Bulletin acknowledges that the right to record police activity "is codified in New York State and local law and extends to those individuals in both public places, such as streets, sidewalks, and parks, *as well as* private property such as a

building, lobby, workplace, or an individual's own property." NYPD Legal Bureau Bulletin at 3 (emphasis in original).

Defendant offers no opposition to Plaintiff's argument, other than to claim that "[u]nder the First Amendment and as well as the State and City Right to Record Statutes, Plaintiff will not succeed on the merits." Def.'s Mem. at 15. Defendant concedes that the Right to Record Acts do not require a forum analysis. Tr. 69:24–70:7. And as Plaintiff avers, "the Right to Record Acts go beyond the protections of the First Amendment; they protect the right to record except when someone is physically interfering with law enforcement or breaking the law." Pl.'s Rep. at 7; *cf. Wilson v. City of New York*, No. 06-CV-7777 (LAK) (MHD), 2013 WL 3963451, at *7 (S.D.N.Y. Mar. 15, 2013), *report and recommendation adopted*, No. 06-CV-7777 (LAK), 2013 WL 3963453 (S.D.N.Y. July 31, 2013) (noting that the statute at issue was "even more protective of individuals' rights than the [First] Amendment"). Defendant does not argue – nor could it – that the NYPD Procedure, which is an outright ban of all recording, falls under the limited exceptions permitted under the Right to Record Acts. Accordingly, the Court finds that Plaintiff is likely to succeed on his claims under the Right to Record Acts.

### 3. Citywide Administrative Procedure Act

Because the Court finds a substantial likelihood of success on the merits for the Right to Record Act claims, and because the Court finds that Plaintiff has demonstrated irreparable harm absent the issuance of a preliminary injunction, *infra* Section II(C), and that the balance of the equities favors granting a preliminary injunction, *infra* Section II(D), the Court declines to analyze Plaintiff's claim under the Citywide Administrative Procedure Act. *See Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 327 n.2 (S.D.N.Y. 2011) ("Because the Court finds that Plaintiff

has shown a likelihood of success on the merits of its [federal] claim, the Court declines to address Plaintiff's likelihood of success on its claims under . . . state law.").

### C. Plaintiff Makes a Strong Showing of Irreparable Harm

In addition to demonstrating the likelihood of success on the merits, Plaintiff must also make a strong showing of irreparable harm absent the issuance of a preliminary injunction. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal citation and quotation marks omitted).

The Court finds that Plaintiff has made a strong showing of irreparable harm. Plaintiff records and posts videos "to educate the public on how their public officials behave" and to hold police officers accountable. Reyes Decl. ¶¶ 6–7. He states that recording and posting videos is necessary to report on law enforcement's "lack of accountability" and "lack of transparency." Tr. 8:2–7. If Plaintiff were to wait until the end of a trial for a decision in his favor, he would not be able to, in the meantime, provide a window of transparency into police officers exercising their duties. "Transparency in government, no less than transparency in choosing our government, remains a vital national interest in a democracy." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 14 (D.C. Cir. 2009). Moreover, the prospect of the Procedure being enforced has already caused Plaintiff to forgo recording in police precinct lobbies. Reyes Decl. ¶¶ 22–24. Without an injunction, Plaintiff faces a choice between pursuing filming the police – something that New York law unequivocally permits him to do – or being arrested because of NYPD's continued enforcement of this Procedure. In light of the ongoing nature of this harm, monetary damages would not adequately compensate him for his injuries. Accordingly, this factor weighs in favor of granting the preliminary injunction.

### D. Balance of the Equities and Public Interest Weigh in Plaintiff's Favor

In addition to a substantial likelihood of success on the merits and a strong showing of irreparable harm, Plaintiff must also show that the balance of equities tips in his favor and that granting the preliminary injunction would serve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court must "balance the competing claims of injury, consider the effect on each party of the granting or withholding of the requested relief, and pay particular regard to the public consequences in employing the extraordinary remedy of preliminary relief." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y 2019) (internal citation omitted).

As stated above, the City has made a colorable showing that privacy, security and safety concerns are implicated by recording in police precincts. Those interests, however, are not so great that they outweigh the enforcement of clear laws duly passed by elected state and city officials. In passing the Right to Record Acts, the legislatures presumably considered the privacy, security and safety concerns that might result from a broad statute allowing the public to record law enforcement, and they found that transparency and accountability of law enforcement officials outweighed those concerns. The Court finds no basis to disturb that decision.

Law enforcement is part of the democratic system of government and the public has a legitimate interest in seeing how law enforcement operates. *Cf. Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035–36 (1991) (noting that "[t]he public has an interest in [the] responsible exercise" of the discretion granted police and prosecutors). "Access to information regarding public police activity is particularly important because it leads to citizen discourse on public issues . . . ." *See Fields v. City of Phila.*, 862 F.3d 353, 359 (3d Cir. 2017); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) ("Filming the police and other public officials as

they perform their official duties acts as a watchdog of government activity and furthers debate on matters of public concern.") (cleaned up).

Accordingly, the Court finds that the balance of equities tips in Plaintiff's favor and the injunction is in the public interest.

## CONCLUSION

For the reasons stated herein, Plaintiff's motion for a preliminary injunction is GRANTED. Defendant is hereby enjoined from enforcing the Procedure in NYPD police precinct lobbies except to the extent consistent with the New York State and City Right to Record Acts. Defendant is further required to remove any signs inconsistent with this Order. The Clerk of Court is directed to terminate ECF No. 7.

Dated: November 2, 2023
      New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge