**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PATRICIA RODNEY

$\qquad$ *Plaintiff,*

v.

THE CITY OF NEW YORK., ET AL.,

$\qquad$ *Defendants*

Oral Argument Requested

**22-cv-1445 (LAK)(OTW)**

---

**PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION (ECF NO. 148)**

---

**COHEN&GREEN P.L.L.C.**
   J. Remy Green
   Elena L. Cohen
   Jessica Massimi
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

January 12, 2023

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................ii

TABLE OF AUTHORITIES ...................................................................................................iv

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS .......................................................................................................3

      A.     Ms. Rodney makes a simple, reasonable, necessary request of the NYPD. .................3

      B.     Defendants brutally assault Ms. Rodney for saying she was recording them. ..............4

      C.     NYPD encourages the public to view stations as public spaces. ...................................7

STANDARDS OF REVIEW....................................................................................................8

ARGUMENT ...........................................................................................................................9

I.     The R&R's Finding that Plaintiff's RTRA Claim is Well-Pled Requires Finding Her False
Arrest and *Monell* Claims to be Well-Pled.............................................................................9

      A.     An arrest made under an unlawful policy is a false arrest, and the R&R disregarded
binding state law from New York's highest Court to find otherwise............................................10

      B.     The R&R ignores well-settled trespass law requiring a showing of subjective
knowledge. ..................................................................................................................................12

      C.     The R&R's treatment of the requirement for an opportunity to comply ignores due
process requirements....................................................................................................................14

      D.     The individual Defendants lacked arguable probable cause..........................................15

      E.     Even if individual officers could receive qualified immunity, the R&R erred in
dismissing *Monell* false arrest and training claims. ...................................................................16

1.    The Monell policy claim was well-pled.................................................................16

2.    The Monell training claim was well-pled.............................................................19

II.   The R&R Gets Obstruction of Governmental Administration Wrong in Finding there was Probable Cause as a Matter of Law and Impermissibly Disregards Clear Holdings of Intermediate State Appellate Courts...........................................................................................20

A.   The R&R's OGA reasoning fails on its own terms........................................................20

B.   The SAC does not affirmatively plead Plaintiff prevented or attempted to prevent a specific official function (elements 1 and 2), and in failing to address this issue, the R&R disregarded intermediate state appellate decisions.............................................................21

C.   The SAC does not affirmatively plead Plaintiff intended to interfere with a specified government function (element 3)........................................................................................23

III.  The R&R's Reliance on *Reyes*'s First Amendment Analysis Impermissibly Imposed a Preliminary Injunction Standard at the Pleading Stage and the R&R Simply Ignored the NYPD Commissioner's Public "Promise" that Police Stations were Public Forums...................................24

A.   A finding that a plaintiff did not meet his burden on a preliminary injunction is different from a finding his claim is not plausibly pled.......................................................24

B.   An NYPD Commissioner "promis[ing]" stations are public forums makes it plausible, in a motion to dismiss, that they are. ......................................................................................25

CONCLUSION.........................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................8

*Casablanca-Torres v City of NY*,
  2023 US Dist LEXIS 59390, No. 21-cv-10832 (LAK) (SDNY Apr. 4, 2023).........................*passim*

*Case v. City of N.Y.*,
  408 F. Supp. 3d 313 (SDNY 2019)............................................................................ 21, 22

*Case, et al. v. City of N.Y., et al.*,
  233 F. Supp. 3d 372 (SDNY 2017)..................................................................................8

*City of Chicago v. Morales*,
  527 US 41 (1999)..........................................................................................................15

*Dellums v. Powell*,
  184 US App DC 275, 566 F2d 167 (D.C. Cir. 1977) ...........................................................15

*DiFolco v. MSNBC Cable LLC*,
  622 F.3d 104 (2d Cir. 2010) ...........................................................................................8

*Dowling v. City of N.Y.*,
  2013 U.S. Dist. LEXIS 142108 (E.D.N.Y. Sep. 30, 2013) ....................................................21

*Hershey v. Goldstein*,
  938 F Supp 2d 491 (SDNY 2013) ...................................................................................12

*Hilderbrandt v. City of N.Y.*,
  2014 U.S. Dist. LEXIS 128170 (E.D.N.Y. Sep. 11, 2014)....................................................21

*Jackson v. City of N.Y.*,
  939 F. Supp. 2d 219 (E.D.N.Y. 2013).........................................................................12, 21

*Kass v. New York City*,
  864 F.3d 200 (2d Cir. 2017) .....................................................................................20, 21

*Mayes v Summit Ent. Corp.*,
  287 F Supp 3d 200 (EDNY 2018)....................................................................................22

*Monell v Dept. of Soc. Servs.*,
  436 US 658 (1978)...................................................................................................*passim*

*Nakahata v NY-Presbyterian Healthcare Sys.*,
   723 F3d 192 (2d Cir. 2013) ............................................................................................... 24

*Olugbenga Akinnagbe v. City of N.Y.*,
   128 F. Supp. 3d 539 (E.D.N.Y. 2015) ............................................................................... 22

*Papineau v Parmley*,
   465 F3d 46 (2d Cir. 2006) ................................................................................................. 15

*PatersonLeitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*,
   840 F.2d 985 (1st Cir. 1988) ............................................................................................... 9

*People v. Arbeiter*,
   169 Misc.2d 771, 773-4 (1st Dept. 1996) (emphasis added), *app. den'd* 89 NY2d 918 (1996) *and cert den'*d, 520 U.S. 1213 (1997) ............................................................................................. 21

*People v. Basch*,
   36 NY2d 154 (1975) ..................................................................................................... 12, 13

*People v Brown*,
   25 NY2d 374 (1969) ........................................................................................................... 14

*People v Leonard*,
   62 NY2d 404 (1984) ..................................................................................................*passim*

*People v Pennisi*,
   61 Misc 3d 1224[A], 2018 NY Slip Op 51731[U] (Crim Ct, Queens County 2018) .................. 14

*People v Ranieri*,
   144 AD2d 1006 (4th Dept 1988) ........................................................................................ 13

*Pustilnik v Battery Park City Auth.*,
   71 Misc 3d 1058 (Sup Ct, NY County 2021) ..................................................................... 18

*Reyes v City of NY*,
   2023 US Dist LEXIS 196602 (SDNY Nov. 2, 2023) ...................................................*passim*

*Scott v. Harris*,
   550 US 372 (2007) ............................................................................................................... 9

*Shamir v. City of N.Y.*,
   804 F.3d 533 (2d Cir. 2015) ................................................................................................. 8

*Stambovsky v. Ackley*,
   169 A.D.2d 254 (1st Dep't 1991) ........................................................................................ 26

*United States v Segui*,
   2019 US Dist LEXIS 196242 (EDNY Nov. 12, 2019) ....................................................... 13

*V.S. v Muhammad*,
   595 F3d 426 (2d Cir. 2010) ........................................................................................22

*Zellner v. Summerlin*,
   494 F.3d 344 (2d Cir. 2007) ........................................................................................9

**Statutes**

28 U.S.C. § 636(b)(1)(C) ...............................................................................................8

N.Y. Civ. R. L § 79-P ............................................................................................ 17, 19

N.Y. Pen. L. § 140.05 ...................................................................................................11

N.Y. Pen. L. § 195.05 ..................................................................................................20

**Other Authorities**

Barry H. Ginsberg, *Blood Glucose Monitoring: Necessary and Sufficient?*, 1 J. Diabetes Sci. Tech. 612, 612
   (2007) .........................................................................................................................3

Fed. R. Civ. P. 8(a)(2) ....................................................................................................8

Fed. R. Civ. P. 36(a)(4) .......................................................................................... 25, 26

Fed. R. Civ. P. 36(b) .....................................................................................................25

Fed. R. Civ. P. 72(b)(3) ..................................................................................................8

Int'l Diabetes Feder., *COVID-19 and diabetes* (updated May 20, 2021) ........................3

N.Y.C. Admin. C. § 8-107(1)(a). ..................................................................................18

Robert Press, *Crime Down Citywide But Murders Up in the Bronx*, Bronx Chronicle (Jul. 11, 2018)

   ..............................................................................................................................8, 26

U.S. Const. amend. I...............................................................................................*passim*

U.S. Const. amend. IV ....................................................................................................2

## PRELIMINARY STATEMENT

When Plaintiff Patricia Rodney lost her glucometer, her insurance company told her she needed to provide a police report to have it replaced. The interaction the insurance company asked for — between citizens and the police — should be simple, straightforward, and unfraught. That was not to be. Rather than get a simple piece of paper, Ms. Rodney was brutalized, repeatedly lied to, and hospitalized. As it happens, all of that is on video — and that video is profoundly disturbing. *See, e.g.*, ECF No. 113-1.[1] Naturally, Plaintiff sought redress.

Defendants partially moved to dismiss, and the Magistrate Judge's Report and Recommendation (ECF No. 148, the "R&R") recommends granting most of Defendants' motion — leaving only, of those claims moved on, Plaintiff's right to record act claim.

What the R&R misses is this: At the core of this case is the basic incompatibility of the City's policy prohibiting all recording at police stations ("No Recording Policy" or the "Policy") and the City and State Right to Record Acts ("RTRAs"). In short, while the Policy prohibits all recording of any kind at police stations (or even in their atriums, as was relevant here), that Policy "violates the broadly-worded RTRAs which allow for recording of 'law enforcement activity' and 'police activities'" with enumerated — but inapplicable — exceptions. R&R at 12, *citing Reyes v. City of New York*, No. 23-CV-6369 (JGLC), 2023 WL 7212192, at *11 (SDNY. Nov. 2, 2023). Under the Policy, police must arrest people who record and charge them with trespassing. Yet, contrary to binding state law,[2] the R&R found that there was (as a matter of law) probable cause for arrests made in violation of state law.

Thus, the R&R is internally inconsistent. At once, it finds both that (1) Plaintiff has plausibly alleged the No Recording Policy was illegal (under the Right to Record Acts, such that the Court need

---

[1] The Court's Records Office has the official version of this video on file from the previous iteration of this motion (Dkt. No. 47-1), and the Court instructed Plaintiff not to place a new version in the record on this motion. *See* Dkt. No. 110.
[2] This caselaw was raised in opposition, yet not cited in the R&R. In short, trespass charges cannot lie where those trespass charges would "circumscribe the defendant from engaging in constitutionally or statutorily protected conduct." *People v Leonard*, 62 NY2d 404, 408 (1984). This case is exactly what *Leonard* is describing.

1

not reach Defendants' uncontested failure to comply with CAPA) and (2) arrests made explicitly because of that unlawful policy could not be false arrests and the City could never be liable for arrests made under that illegal, written policy.  *Compare, e.g.,* R&R at 6-7 *with id.* at 12.  Since binding state law from New York's highest court resolves this tension, the R&R should be rejected on that ground.

The R&R suffers from other flaws too.  It overlooks well-settled law on obstruction of governmental administration, finding probable cause to arrest for purely passive acts that (presuming the truth of the allegations in the complaint, as the Court must) did not obstruct anything.  Likewise, it facially misconstrues and then only addresses the SAC as solely raising **First Amendment** *Monell* claims— when the theory pled, while it included a First Amendment angle, focuses on the Fourth Amendment and the fact that the City is enforcing the Policy despite its (among other things) RTRA failures.  *Compare, e.g.,* R&R at 14 (describing the *Monell* claim as being that the Policy "violate[s] the First Amendment") *with, e.g.,* ECF No. 90 ("FAC") ¶ 160 (describing the *Monell* theory as challenging the policy that directs officers to make arrests that fail to "comply with New York State and City law protecting the right to record").[3]  And finally, it confuses the standard and state of the record on a preliminary injunction and motion to dismiss in discussing Judge Clarke's *Reyes* decision — and in doing so, fails to address entirely a conclusively established public statement by the NYPD's Commissioner that police stations should be thought of as public forums[4] by all New Yorkers:  an issue deeply briefed here, and not briefed at all or even mentioned in *Reyes*.

For these reasons, those below, and those in the initial papers, the Court should decline to adopt

---

[3] As further explained below, this was also without even discussing a central point in the opposition (ECF No. 112, "PMOL"):  that Defendants waived the underlying scaffolding to most of their motion because "in responding to what Defendants admit they understand to be a broad claim 'that the underlying policy regarding the prohibition of the public to film in a police precinct is an illegal policy,' they only discuss the Federal Constitution."  PMOL at Point VI (pp. 37-43); *see, e.g., id.* at 2 and at 15-16 (highlighting at the outset of each section that Point VI was central).
[4] His exact phrase was "shared public spaces."  ECF No. 113-8 at 8.  He also compared stations to traditional public forums like "blocks" and "parks," saying the station needs to be "a two-way street" for speech.  ECF No. 113-8 at 2.  And he said that making stations public forums "was our promise to all 8.6 million New Yorkers."  *Id.*  Yet, the R&R does not so much as mention these facts, let alone explain how the City could *on a motion to dismiss*, overcome their potential estoppel effect.  *But see, e.g.,* PMOL at 9, 33-35.

the R&R as to Claims One (false arrest), Four (First Amendment retaliation), and Claims Five and Six (together, different *Monell* theories).[5]

## STATEMENT OF FACTS

### A.  Ms. Rodney makes a simple, reasonable, necessary request of the NYPD.

Plaintiff Patricia Rodney is a grandmother who works as a school lunch lady.  She has diabetes.  Second Amended Complaint, Dkt. No. 90 ("SAC") ¶ 30.  She has to check her blood sugar about 5 times a day.  *Id.* ¶ 32.  And she works and worked in an environment — particularly on December 2, 2020, when the events at issue took place — where she faces a high risk of contracting COVID-19, along with the added complications it brings for people with diabetes.  *Id.*; Int'l Diabetes Feder., *COVID-19 and diabetes* (updated May 20, 2021).[6]  Plaintiff also has a history of high blood sugar, and had been hospitalized for it in the recent past.  SAC ¶ 33.  With that in the background, in November 2020, Plaintiff lost her glucometer — a medical device that is necessary for her to live.  *See* SAC ¶¶ 28-34; Barry H. Ginsberg, *Blood Glucose Monitoring: Necessary and Sufficient?*, 1 J. DIABETES SCI. TECH. 612, 612 (2007) ("There is little doubt of the need for self-monitoring of blood glucose (SMBG) in patients using insulin.").

Plaintiff's insurance company told her that to obtain a new glucometer, she was first required to file a police report for the missing glucometer.  SAC ¶ 30.  They also instructed her that they required her to fax to them an actual copy of the police report.  *Id.* ¶ 31.  Thus, in accordance with the insurance company's requirements, on November 30, 2020, Plaintiff spoke to a police officer inside the 62nd Precinct stationhouse to get her police report.  *Id.* ¶ 34.  The officer gave her a blank report form, and Plaintiff filled it out as required.  *Id.* ¶¶ 35-36.  She then asked this police officer for a copy of the report so that she could fax it to her insurance company and obtain her glucometer.  *Id.*  The police

---

[5] This leaves the R&R's fair trial rights (Claim Two) decision unchallenged, for expedience.

[6] *Available at* https://www.idf.org/aboutdiabetes/what-is-diabetes/covid-19-and-diabetes/1-covid-19-and-diabetes.html.

officer responded to Plaintiff's request by telling her, essentially, "I can't give you a copy of this paper you filled out. I have to make an official report. You can come back Wednesday [, December 2] to get this report." *Id.* ¶¶ 37-38.

### B. Defendants brutally assault Ms. Rodney for saying she was recording them.

As instructed, Plaintiff returned to the stationhouse to obtain her police report on December 2. SAC ¶ 39. One of the Defendants spoke to Plaintiff inside the stationhouse and refused to give Plaintiff a copy of the police report, even though another officer specifically told Plaintiff to return to that stationhouse to obtain a copy when she filed the report. *Id.* ¶ 40. That Defendant and Defendant Sergeant Hernandez both (1) spoke to Plaintiff inside the stationhouse (specifically in the atrium area) and (2) refused to give Plaintiff a copy of the police report. *Id.* ¶¶ 42-43.

At this point, Plaintiff was in the atrium of the stationhouse — a place separated by a sealed door from even the ***public*** part of the station's interior (to say nothing of any private portion of the station). SAC ¶ 46. Not only is it well pled, but it is now an undisputed fact that, Plaintiff was not blocking access to anything.[7] SAC ¶ 46-49; ECF No. 113-12 at 6 (RFAs 27(A) and 27(B)).[8] The video shows, and Defendants have ***admitted***, that all 5 people who attempted to pass through the door managed to do so. ECF No. 113 ("Green Decl."). ¶¶ 4-8; ECF No. 113-12 at 6.

As seen in the video, Plaintiff tries everything she can to get the officers to honor their promise to give her the piece of paper she needs to obtain medical care necessary to keep living — something, as a citizen of New York City, she has every right to do. And until Defendants state they are activating their body cameras, matters — while tense — remained peaceful. *See* ECF No. 113-1 at 0:00-1:25.

---

[7] Defendants attempt to dispute this fact. That is facially improper. At a minimum, a reasonable jury could, viewing the video, determine that Plaintiff was not blocking anything because nearly a dozen people walk through the door while Plaintiff was supposedly blocking it. *See* Green Ex. 1 at 0:00-1:15; Green Decl. ¶¶ 5-6.

[8] Indeed, based on the video, Plaintiff may have even been standing beyond the door's opening radius. But even if she were not, the door is not materially obstructed. SAC ¶¶ 42-45; *see also, generally,* Green Ex. 1. At most, the video shows that Plaintiff very briefly breaks the plane of the door with her hand at a moment no one is using it. Green Decl. ¶ 7; ECF No. 113-1 at 0:38; 1:03.

Everything changed when Plaintiff said she was recording.  SAC ¶¶ 51-58.  Defendants say they are activating their body cameras, and in turn, Plaintiff says, "This is my camera," and holds up her iPhone.  *Id.* ¶ 54.  Her intention in doing so was pure First Amendment-protected expression:  She wanted Defendants to feel she knew her rights as a citizen, and was afraid that without knowing they were being recorded, Defendants would abuse her.  SAC ¶ 54 n. 3.  Instead, following well-trod (but unlawful) NYPD policies, Defendants gave an (unlawful — under, at a minimum and as explained by the R&R itself, the RTRAs) order and — without allowing time to comply — immediately jumped to brutal violence.  *Id.* ¶¶ 57-59.[9]

With no warning, justification, or legal excuse, Defendants handcuffed Plaintiff's wrists and shackled Plaintiff's ankles, pushed Plaintiff to the ground, and began twisting Plaintiff's arms, causing Plaintiff to cry out in pain.  SAC ¶ 59.  Defendants used that force to bring Plaintiff to the ground.  *Id.*  And despite Plaintiff's cries and total lack of resistance, Defendants continued to use extreme force against her.  *Id.* ¶ 60.  Defendants broke Plaintiff's elbow (or in technical terms, caused an avulsion fracture).  *Id.* ¶ 61.  While abusing her, Defendants screamed in audible, teeth-gritted rage, "I'm not playin' with you!," "That's it, you're going to jail," and the like.  *Id.* ¶ 62; Green Ex. 1 at 1:35-2:07.  The brutality had obvious physical consequences:  Plaintiff sustained pain and swelling to both elbows, arms, and wrists, including, but not limited to, an avulsion fracture of her left elbow.  SAC ¶ 63.  Once her elbow was broken, Plaintiff was not physically capable of putting her arm behind her back without extreme pain — and she told Defendants as much (indeed, she screamed it at them, then

---

[9] The R&R claims that Plaintiff "slides to the ground as the officers approach her."  R&R at 7 n. 7.  That was error.  That is not what is pled, nor is it what appears in the video.  Rather, officers begin a physical takedown of Plaintiff, and she is dragged to the ground.  Officers can be seen obviously making contact with Plaintiff before she "slides" anywhere.  Green Decl. ¶ 9 (screenshotting each moment in the sequence of events).  *See also,* SAC ¶ 59 (Defendants "pushed Plaintiff to the ground") and 117 ("defendants subjected plaintiff to excessive force, in part, by causing her body to slam to the ground").  Throughout the "slide[]," officers hands are on Plaintiff in multiple places and the camera is shaking.  A reasonable jury could easily find that Plaintiff did not affirmatively "slide[]" to the ground" — and certainly did not do so "as the officers approach her," given the unambiguous video showing officers began their physical arrest of, and made contact with, Plaintiff before anything else happened.  Green Decl. ¶ 9.

spoke it through tears at them), which they ignored.  ECF No. 113-1 at 1:35-2:07.

Defendants' actions caused Plaintiff's protective face mask to fall below her nose.  SAC ¶ 64.
One of the Doe Defendants then punitively adjusted Plaintiff's mask to cover her entire face before
calmly walking away.  SAC ¶ 65.  That act served no legitimate purpose:  the only possible purpose it
served was to humiliate, mock, and embarrass Plaintiff.  SAC ¶¶ 64-65 (screengrabs from a different
video); Green Ex. 1 at 2:47-2:53.  And, tellingly, Defendants do not even try to explain, address, or
even reference this act anywhere in their memo (nor did they address it in reply on the first motion).

Defendants then took Plaintiff (still handcuffed) to a local area hospital to receive treatment for
the injuries she sustained when they assaulted her.  SAC ¶ 70.  Defendants then brought Plaintiff back
to the 62nd Precinct where they continued to detain her for several additional hours.  *Id.* ¶ 71.
Defendant Clemente swore out the criminal complaint against Plaintiff.  *Id.* ¶¶ 71-72.  She made several
false statements that she knew to be false when she made them.  *Id.* ¶¶ 71-73.  Specifically, she swore
that Plaintiff "resist[ed] lawful arrest by extending and locking [her] arms and refusing to turn onto
[her] stomach while [Clemente] attempted to place [Plaintiff] in handcuffs."  SAC ¶ 71.  That statement
is false or deliberately omits all material context:  Defendants were sitting on Plaintiff the entire time.
*See generally,* ECF No. 113-1.  For this motion to dismiss, Plaintiff has pled — and the Court must
accept as true — that she did everything she could to comply with the (unlawful) order she was given
once the beating started.[10]  But she was unable to:  Defendants prevented her from complying with
the demand to move her arms, both (1) by breaking her elbow and (2) by holding and sitting on her
arms.  Indeed, all Defendants muster in their memo is a sheepish "plaintiff did not *immediately*
comply with requests for her to turn onto her stomach while officers are attempting to handcuff her,"

---

[10] Further cementing this conclusion, Defendants' response to the RFAs was to say it was impossible to deny the assertion
that Defendants "intended to arrest Plaintiff for recording."  ECF No. 113-13 at 13 (RFA No. 30; compare, e.g., RFA No.
36 (denying a similar allegation about intent).  In other words, Defendants concede at a *minimum* this is a fact in dispute:
if this was something so far from dispute that the Court could ignore the SAC, Defendants would be able to deny the
RFA without qualification.

DMOL at 3 (emphasis added) — which is itself a substantial departure from the statement Defendant Clemente put in the charging instrument:  that Plaintiff was "refus*ing*" to turn over."[11]

Defendant Clemente forwarded these false and misleading allegations or caused the allegations to be forwarded to the Kings County District Attorney's Office despite the false nature of the allegations.  SAC ¶ 73.  At her arraignment, Plaintiff acceded to an adjournment in contemplation of dismissal and her charges were eventually dismissed.  SAC ¶¶ 74-75.  That adjournment was consistent with Plaintiff's innocence.  *Id.*

The charges Plaintiff faced — trespassing and OGA — are exactly what the No Recording Policy instructs officers to charge people for when they record.  *See* ECF No. 113-12 ¶ 7.  And indeed, as in *Reyes v. City of New York*, 23-cv-6369, those charges are exactly what someone who does nothing *besides* record will face.  Put otherwise, the charges here demonstrate specifically that Plaintiff was arrested for recording, and nothing else.

At no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the conduct engaged in by their fellow officers.  SAC ¶ 77.  At all times, Defendants were acting within the scope of their employment, in furtherance of the City of New York's interests, and without legal justification or excuse.  *Id.* ¶ 78.

### C.  NYPD encourages the public to view stations as public spaces.[12]

Around the same time as the No Recording Policy emerged, the NYPD made public statements

---

[11] Neither party made arguments on Plaintiff's fair trial rights claims about what Plaintiff was charged with.  Had Defendants done so — or the Court asked such questions at oral argument — Plaintiff would have amended or sought leave to amend to clarify Plaintiff was indeed charged with resisting arrest.  *See* R&R at 11 n. 12.  Depending on discovery, Plaintiff may later seek leave to amend to add such a claim, given this confusion.

[12] Because the R&R sustains Plaintiff's claim under the RTRA, and Defendants mounted no claim challenging whether the RTRA intended to preempt the No Recording Policy (it did), or any "meaningful defense" to its applicability, the section on the RTRAs legislative history and related failures under the Citywide Administrative Procedure Act is omitted herein.  It appears in PMOL at 7-14.  But with that said, Plaintiff notes that the City RTRA's author submitted an affidavit with his amicus brief specifically attesting, "I intended and expected that passage of the RTRA would supersede the NYPD No Recording Policy and prohibit police officers from impeding recording in public spaces, including such spaces within police precincts."  ECF No. 111-1 at 31 (pdf pagination), ¶ 13.  And faced with that, Defendants chose to mount no legislative history argument at all.

making clear, "Our message to New Yorkers going forward, [is that police stations] are *your* station houses" — that is, per then-commissioner James P. O'Neil, stations should be viewed as "shared public spaces."  ECF No. 113-8 at 8.  Commissioner O'Neil repeated the same line in national and local press.  *See, e.g.,* Robert Press, *Crime Down Citywide But Murders Up in the Bronx*, Bronx Chronicle (Jul. 11, 2018); ECF No. 113-10.  He explicitly compared stations to traditional public fora like "blocks" and "parks," saying the station needs to be "a two-way street" for speech.  ECF No. 113-10 at 2.  "That was our promise to all 8.6 million New Yorkers."  *Id.*  New Yorkers relied on it.

## STANDARDS OF REVIEW

Upon objection, review of the portions of a Magistrate Judge's Report and Recommendation that are objected to is de novo.  *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3).  The Court also has discretion to return any issue to the Magistrate Judge with instructions if some portion of the record merits further or closer review.  *Id.*

On the merits of Defendants' underlying motion, the applicable federal rules require only that a plaintiff plead "a short and plain statement of the claim" to entitle them to discovery.  *See* Fed. R. Civ. P. 8(a)(2).  *See also, e.g., Shamir v. City of N.Y.*, 804 F.3d 533, 556 (2d Cir. 2015).  Under that standard of review, the Court must accept as true all plausibly pled allegations in the SAC and draw all reasonable inferences in Plaintiff's favor.  *See, e.g., Case, et al. v. City of N.Y., et al.,* 233 F. Supp. 3d 372, 382 (SDNY 2017) (citing cases).  If the allegations in the pleadings sufficiently "raise the right to relief above the speculative level," dismissal is inappropriate.  *Bfell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Along with the FAC's allegations, the Court "may consider … documents attached as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010).

As to the video evidence, unless it "blatantly contradict[s]" Plaintiff's version of events, the Court

is constrained to view it, too, in the light most favorable to Plaintiff.  *Cf. Scott v. Harris*, 550 US 372, 378-81 (2007) (same, even at summary judgment).  And to the extent there are any disputed facts related to probable cause or any other material matter, they are for a jury to decide.  *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368, 371 (2d Cir. 2007) (citing cases).

## ARGUMENT

## I.     The R&R's Finding that Plaintiff's RTRA Claim is Well-Pled Requires Finding Her False Arrest and *Monell* Claims to be Well-Pled.

In addressing Plaintiff's RTRA claim, the R&R adopts Judge Clarke's well-reasoned opinion in *Reyes* — and indeed, as the R&R notes, the parties affirmatively agreed that the reasoning in *Reyes* (and any subsequent decision by the Second Circuit) resolves the RTRA claim here.[13]  *See* R&R at 12, *citing Reyes v City of NY*, 2023 US Dist LEXIS 196602, at *33 (SDNY Nov. 2, 2023) and Transcript of November 16, 2023 Conference (ECF 145) at 3 and 14.  As Judge Clarke explained:

> The Right to Record Acts allow for the recording of "law enforcement activity" and "police activities." Defendant does not dispute that officers interacting with civilians in a police precinct are performing law enforcement or police activities. The Right to Record Acts do not carve out police precinct lobbies as places where individuals are not allowed to record and the Court declines to read that limitation into the Right to Record Acts. […]

> Defendant concedes that the Right to Record Acts do not require a forum analysis.  And as Plaintiff avers, "the Right to Record Acts go beyond the protections of the First Amendment; they protect the right to record except when someone is physically interfering with law enforcement or breaking the law." ***Defendant does not argue – nor could it – that the NYPD Procedure, which is an outright ban of all recording, falls under the limited exceptions permitted under the Right to Record Acts.*** Accordingly, the Court finds that Plaintiff is likely to succeed on his claims under the Right to Record Acts

*Reyes* at *33-35 (citations omitted, emphasis added).  And the language here is not a close call; rather "the statutory language as applied to this circumstance is clear and unambiguous."  *Id.* at *31.

---

[13] Because Defendants' papers — as in *Reyes* (submitted by the same counsel, within the same time period, making the same arguments) — amount to a "failure to present any meaningful defense to [the RTRA] claims" (making only the argument, later essentially withdrawn, that somehow First Amendment forum analysis applied to the RTRA), Defendants have no "meaningful defense" in the record.  *Reyes v City of NY*, 2023 US Dist LEXIS 196602, at *31 (SDNY Nov. 2, 2023).  And since "an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate," that leaves the R&R's conclusion on Plaintiff's RTRA claim difficult, if not impossible, to assail.  *Paterson Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Thus, the basic state of play is this: NYPD's No Recording Policy is plainly and unambiguously unlawful under at least the RTRAs. Indeed, the City RTRA's author himself — along with the organization LatinoJustice — submitted an amicus brief explaining that this was the explicit intention of the law, and why it was a good result as a matter of policy. *See generally*, ECF No. 111-1; *see, in particular, id.* at 3-4 (discussing the recordings made by Erik Crespo, in a station, that led to a detective who lied about interrogating Crespo to being "charged with 12 counts of first-degree perjury and eventually sentenced to 4 months in jail" for his deliberate perjury). The No Recording Policy was also very likely unlawful as a matter of administrative law, since no ruling making was ever conducted around it.[14]

### A. An arrest made under an unlawful policy is a false arrest, and the R&R disregarded binding state law from New York's highest Court to find otherwise.

The R&R finds that the complaint sufficiently pled that "Officers did not ask Plaintiff to leave at any point because of her *presence* in the atrium," and instead the trespass charges were "predicated on the allegedly [unlawful[15]] NYPD Policy." R&R at 6-7.

Yet, despite finding that the Policy was ***in fact*** unlawful (R&R at 12), the R&R says the policy could still supply probable cause. R&R at 7. That conflicts with clear precedent from New York's highest Court. *See, e.g., People v Leonard*, 62 NY2d 404, 411 (1984); see also, PMOL at 17-19 (discussing *Leonard* and this issue) at 37-38 (explaining the bigger-picture significance of *Leonard*). That is, it is black letter New York law that "a person in an area generally '"open to the public' ***may not be convicted of trespassing*** … [if the] government fail[s] to prove that the banishment order was

---

[14] *Reyes* declined to reach this issue, because it was unnecessary given the result. *See Reyes* at *35. However, the R&R here improperly brushed this issue aside with no reasoning, given that it dismissed the false arrest claims.

[15] The R&R improperly reduces unlawful to "unconstitutional." R&R at 6. Not so. As pled, the false arrest claim proceeds on the theory that "the No Recording Policy is unlawful under city, state, ***and*** federal constitutional law." ECF No. 112 at 17 (emphasis added) (explaining false arrest claims fail because the No Recording Policy is "(1) preempted, (2) unconstitutional, and (3) illegally adopted"); *see also, generally, id.* at 36-43.

lawful." *Leonard*, 62 NY2d at 411 (emphasis added).  Yet, the R&R never explains how there could be probable cause when the Policy undergirding the trespass charge was unlawful.

To see how that error manifested, start with the specifics of trespass under New York law.  While unexplored in the R&R, there are two kinds of trespass charges:  charges for unlawfully entering a premises or charges for unlawfully *remaining* on a premises.  N.Y. Pen. L. § 140.05, *see also*, PMOL at 17-18.  Defendants' probable cause theory only involves the latter (unlawful *remaining*).

So the important question is this:  What interrupted Plaintiff's otherwise lawful stay in the atrium?  As the R&R explains, it was that "Defendants told Plaintiff about the NYPD Policy, told her to stop recording[], and then told her to leave."  R&R at 6.  That is, it was the Policy.  Yet, the R&R never asks whether the order itself was lawful (although, again, it answers that question in its holding on the RTRA claim).  And that has to be the question because, as New York's highest Court has explained, "a decision to exclude that is predicated on or impermissibly inhibits a constitutionally or a statutorily protected activity will not be lawful."  *Leonard*, 62 NY2d at 411.  Indeed, where "the subject property is publicly owned and maintained, the People may not satisfy their burden of proof on this issue by relying on a presumption that the public official authorized to maintain order on campus discharged his or her responsibility, in the particular instance, in a lawful manner."  *Leonard*, 62 N.Y.2d at 411.

Of course, as noted above, the R&R *does* say what its answer on the validity of the trespass order would be, though it skips it in the false arrest analysis.  In black and white, it explains, "the NYPD Policy violates the broadly-worded RTRAs."  R&R at 12.  Thus, orders given under that Policy "impermissibly inhibit[] … statutorily protected activity" and therefore "will not be lawful."  *Leonard*, 62 NY2d at 411.  That is, the R&R itself explains why probable cause did not and could not exist for trespass.  And beyond that, orders given under the Policy would *also* be unlawful because the No Recording Policy was passed without following CAPA.  So, the R&R errs in finding probable cause for trespass, as a matter of law.

Exactly on point is *Hershey v. Goldstein*, 938 F Supp 2d 491 (SDNY 2013).  There, the plaintiff was "told by the officers to move to the sidewalk," but he "did not do so, but instead repeatedly returned either to the driveway or to the sidewalk area west of it."  938 F Supp 2d at 516.  And that disobedience appeared on video and was admitted.  *Id.*  But for ***other*** legal reasons, "Hershey ha[d] fairly pled that the officers' restrictions on him were *not* valid" (*id.* (emphasis in original)), just as here the R&R acknowledges Plaintiff has fairly pled the officers' restrictions violated the RTRA.  Thus, "[b]ased on the pleadings, it is plausible that the evidence will establish that the officers' orders were not lawful, and therefore that, as in *Leonard*, the officers 'unlawfully inhibited or circumscribed the defendant from engaging in constitutionally or statutorily protected conduct.'"  *Id.* (alterations adopted)*, quoting Leonard*, 62 NY2d at 411.[16]  Just so here:  Defendants cannot show the SAC, as a matter of law, pleads there is probable cause for trespass, because Defendants were not allowed — under clear New York law — to revoke Plaintiff's permission to remain in the station under the unlawful No Recording Policy.[17]

In short, the R&R's analysis on trespass fails for reason the R&R itself explains.

## B. The R&R ignores well-settled trespass law requiring a showing of subjective knowledge.

Beyond the order itself, the R&R also elides well-settled knowledge requirements in its trespass analysis.  Under New York law, on a "remaining" theory of trespass, "a person who enters upon premises accidently, or who honestly believes that he is licensed or privileged to enter is not guilty of any degree of criminal trespass."  *People v. Basch*, 36 NY2d 154 (1975).  Thus, on a motion to dismiss, a plaintiff would need to affirmatively plead she "[had] knowledge that remaining is unlawful" for

---

[16] OGA is discussed more below, but the footnote *Hershey* offers on this issue (938 F Supp 2d at 517 n.9) is instructive here too.

[17] For similar reasons, an OGA charge for disobeying an order could not lie here either — although the R&R does not appear to argue it would — because a "Plaintiff[']s failure to comply with an (unjustified) order … cannot, without more, create the predicate probable cause to justify her arrest for obstruction of governmental administration."  *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013).

dismissal to be appropriate.  *People v Ranieri*, 144 AD2d 1006, 1008 (4th Dept 1988).  And thus, the "relevant inquiry would thus be whether [Ms. Rodney] reasonably believed [she] had a right to remain at [the station], despite [un]lawful orders that [she] depart."  *United States v Segui*, 2019 US Dist LEXIS 196242, at *28 (EDNY Nov. 12, 2019).

The R&R itself thus explains that the SAC does not include probable cause because of Plaintiff's belief.  It acknowledges that the SAC plausibly pleads "[Plaintiff] believed the reason for the direction was based on an [unlawful] N[YP]D Policy."  R&R at 6-7.  That is, the R&R quite literally says Plaintiff honestly believed she was privileged to stay.  True, the R&R notes that Plaintiff shook her head in response to a request she leave (*id.*), but that does not overcome the well-pled fact that she "honestly believe[d] that [she wa]s licensed or privileged to" stay.  *People v. Basch*, 36 NY2d 154 (1975).  And beyond that, not only was Plaintiff's belief ***honest***, but as the R&R itself explains, it was ***correct***: Defendants' request that Plaintiff leave, made under the No Recording Policy, was not lawful.  R&R at 12; *Reyes* at *33-35.

Further, the R&R errs when it adds it does not matter that Defendants gave Plaintiff no opportunity to listen to their unlawful orders.  That is, the R&R says the fact that Plaintiff "was given no 'meaningful chance to comply' with that order before she was arrested" is somehow entirely irrelevant "to whether probable cause existed."  R&R at 7-8.  Not so.  For reasons this Court recently explained in another case, the R&R got this piece wrong too.  Because the SAC pleads there was no opportunity for Plaintiff to comply, "the amended complaint does not establish as a matter of law that any NYPD officer had knowledge sufficient to warrant a person of reasonable caution in the belief that plaintiff *knowingly* violated" the No Recording Policy.  *Casablanca-Torres v City of NY*, 2023 US Dist LEXIS 59390, at *9-10, No. 21-cv-10832 (LAK) (SDNY Apr. 4, 2023) (emphasis in original, quotation marks omitted).

As this Court explained in *Casablanca-Torres*, "at this stage the question is only whether plaintiff has raised a plausible inference that probable cause did not exist." *Id.* And as alleged in the complaint and presumed true, once Plaintiff said she was recording, "Defendants immediately escalated, without even allowing a response, from demanding Plaintiff stop recording to assaulting her." SAC ¶ 58. That is, Defendants did not wait to see if Plaintiff would ultimately leave. That permits the plausible inference that Defendants lacked probable cause for the **knowledge** element of a trespass charge — even if they **had** successfully revoked her license to remain in the precinct (as explained above, under *Leonard*, they did not).

### C. The R&R's treatment of the requirement for an opportunity to comply ignores due process requirements.

Beyond being required for the reasons this Court explained in *Casablanca-Torres*, a clear, unambiguous **order** to leave is required for basic due process reasons.

To begin, the R&R mistakenly suggests that Plaintiff "disputes that the police in fact told Plaintiff to leave." R*R at 6. Not quite. Plaintiff did not dispute that officers were "asking" her to leave. She said as much quite clearly. Instead, she made a legal argument that in telling Plaintiff to leave, officers did not give legally sufficient — as a matter of due process — **orders** to leave. That is because the officers made clear they were "asking" (that is the word they used) — not ordering — Plaintiff "to leave." ECF No. 113-1 at 1:17-1:25. Plaintiff also cited cases explaining this issue, and offered footnotes making clear the distinction. *See* PMOL at 18-19, *citing People v Pennisi*, 61 Misc 3d 1224[A], 2018 NY Slip Op 51731[U], *2 (Crim Ct, Queens County 2018) and *People v Brown*, 25 NY2d 374, 377 (1969). And *Pennisi* is directly on point: the officer there "merely … advised [Plaintiff] that [she] would be arrested if he did not stop taking [video footage] inside of the building," which the court held was "facially insufficient" as an order. *See also*, *Brown*, 25 NY2d at 377 ("We are going to talk right here or not at all" and similar statements that implied leaving were not orders); PMOL at 21 n. 20 and 21 ("Though SAC does plead that Defendants made 'decisions to' tell Plaintiff to disperse

(SAC ¶ 151) — because it does appear they did make those decisions — the actual words they said, at least at this stage, are not orders to disperse as a matter of law").

Aggravating that, in explicitly finding that it was irrelevant to Plaintiff's false arrest claim that "she was given no 'meaningful chance to comply'" with even those non-orders she was given, the R&R ignored well-settled due process precepts. Officer cannot "simply disperse" people "without giving fair warning." *Papineau v Parmley*, 465 F3d 46, 60 (2d Cir. 2006). That grows from the basic principle that the law requires a fair opportunity for "ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 US 41, 58 (1999). *See Papineau*, 465 F3d at 60 (*quoting Morales*). And indeed, this appears to be the general principle driving this Court's analysis in *Casablanca-Torres*. Thus, *Papineau* cites *Dellums v. Powell*, and uses its rule that "reasonable opportunity had been given the plaintiffs to leave" before an arrest based on disobeying an order could be constitutionally sound. *Dellums v. Powell*, 184 US App DC 275, 566 F2d 167, 183 (D.C. Cir. 1977). That "reasonable opportunity" was missing here, as the R&R acknowledged. But contrary to the R&R's reasoning, it ***was*** required.

In short, the R&R erred in finding opportunity to disperse totally irrelevant to the probable cause inquiry, and the Court should not adopt that error.

### D. The individual Defendants lacked arguable probable cause.

For the false arrest claims against individual officers, that leaves the Court's analysis on arguable probable cause and qualified immunity. *See* R&R at 8 n. 9.[18] Again, for basically the reasons this Court explained in *Casablanca-Torres*, "the individual defendants lacked arguable probable cause that plaintiff *knowingly* violated the Curfew Orders." 2023 US Dist LEXIS 59390, at *12. Essentially, Defendants

---

[18] For clarity, Plaintiff concedes that qualified immunity applies for the issues discussed in Point I(A) — that is, the officers relied on a written policy (the No Recording Policy) to arrest Plaintiff, so they receive qualified immunity in that regard, but Plaintiff's path to liability on *Monell* is clear because of that reliance. But because the officers did not wait to arrest Plaintiff and did not have any basis within the four corners of the SAC to evaluate Plaintiff's knowledge, they did not have probable cause.

did not — as a matter of law — have probable cause to believe Plaintiff knew she did not have an honest belief she had a right to remain.  Perhaps their deposition testimony will show they did for reasons beyond the four corners of the complaint.  But at this stage, the complaint's allegations are presumed true.  And the complaint (along with the video) show an escalation from "asking" (not ordering) Plaintiff "to leave" to extreme force within mere seconds. SAC ¶¶ 52-58; ECF No. 113-1 at 1:17-1:25.  *See also, e.g.,* PMOL at 19-21.

Plaintiff also incorporates pp. 44-45 of her previous memo to preserve her right to argue qualified immunity rests on an error in transcribing the bill actually passed by Congress on appeal.  *See* PMOL at 44-45.  But even if the Court finds this case different than *Casablanca-Torres* (it should not), qualified immunity does not somehow make the arrest itself legal — it only excuses the individual defendants from liability.  And indeed, if the individual defendants rely on the existence of the No Recording Policy and the fact that they were trained on it to receive qualified immunity, there is no justification at all to dismiss the *Monell* claims.

So to sum up:  Defendants lacked probable cause because (1) the policy giving rise to probable cause was unlawful and (2) Defendants had no window into Plaintiff's knowledge, because they did not bother giving her a chance to comply with their (unlawful) orders to leave.

### E.  Even if individual officers could receive qualified immunity, the R&R erred in dismissing *Monell* false arrest and training claims.

Finally, the R&R erred in failing to consider the interactions between the individual false arrest claims and the related *Monell* claim.  Part of this error appears to be from a misconception about what was pled.

#### 1.  *The <u>Monell</u> policy claim was well-pled.*

The R&R misconstrues the *Monell* claims pled here as solely being about the First Amendment, concluding that the "Policy does not violate the First Amendment" and therefore "*Monell* liability does not attach."  R&R at 14.  But that is not what was pled.

The *Monell* policy claim is about the fact that "officers may arrest because the City defines filming as interference" with government administration. SAC ¶ 162. That is, it — at its core — about the false arrests, force, and so on, that comes from the No Recording Policy. SAC ¶¶ 152-157.

For the Court to boil down that claim to being only about the First Amendment was improper. And, indeed, when addressing the parallel training claim, Plaintiff she listed the First Amendment ***after*** the RTRAs:

> "Plaintiff's *Monell* training claim is that the City (1) failed to train officers on § 79-P/ § 14-189; (2) failed to train officers that there is a First Amendment right to record officers in any public exercise of their duty; and (3) instead trained them to apply the No Recording Policy (including its express direction to charge people with trespass if they record)."

PMOL at 45. And if there was any confusion, Plaintiff asked for — and was denied — oral argument to clear up exactly this mismatch between Defendants' briefing, Plaintiff's opposition, and the SAC. *See, e.g.,* ECF No. 125 (noting how a "mismatch" in Defendants' papers and Plaintiff's "means that Defendants have failed to address a number of significant arguments in Plaintiff's opposition"). Likewise, Plaintiff made very clear the causal part of her *Monell* claim was about false arrest and excessive force — not just about First Amendment — saying "Defendants decisions to (1) tell Plaintiff she must disperse, (2) direct Plaintiff to leave the station, (3) tell Plaintiff to stop recording, (4) arrest Plaintiff for refusing to leave, (5) use additional force because they believed Plaintiff was not being compliant enough, and each subsequent act, ***all*** happened ***because*** Defendants believed Plaintiff was violating the City's official no recording policy." SAC ¶ 157 (emphasis in original). Yet, the R&R failed to analyze anything beyond the pure First Amendment issues.

Since, at this pleading stage, there is no dispute that the No Recording Policy was "the but for cause of Plaintiff's" arrest, the force used against her, and her injuries, no more is required for a *Monell* policy and practice claim (SAC ¶ 163) — particularly in light of the reasoning behind the R&R's grant of qualified immunity. In fact, elsewhere, the R&R explains exactly why this is so:

> "Moreover, [Officers believed they had probable cause *because Plaintiff is standing in front of a sign that explicitly prohibits recording under the NYPD Policy*, and acting in a manner in which the Defendant police officers believed her to be violating that Policy."

R&R at 7 n. 8 (emphasis added).  Just so:  The Policy is the "because" behind Plaintiff's arrest, and the Policy was illegal.  Indeed, on this front, the R&R erred further by dismissing the claim without addressing CAPA either.  *See* PMOL at 37-38 (making the global point); 43 (arguing CAPA specifically); *see also,* ECF No. 111-1 at 15-17 (arguing CAPA).[19]  The point is that because the No Recording Policy is illegal and interferes with a statutory right, arrests thereunder are unlawful.  That is true whether or not it *also* violates the First Amendment.

To illustrate the point (also discussed in *Leonard*), and perhaps clear up some confusion, consider a clear gap between City/State law and Federal law (unlike here, where there is a live dispute about the federal piece).  There does not appear to be a Federal Constitutional claim protecting against discrimination because of care giver status, but such a claim exists under N.Y.C. Admin. C. § 8-107(1)(a).  *See, for example, Pustilnik v Battery Park City Auth.*, 71 Misc 3d 1058, 1074 (Sup Ct, NY County 2021) (discussing such a claim).  Now imagine NYPD — as it did with the No Recording Policy here — adopts through the Patrol Guide a policy that says any person who comes into a precinct acting as a caregiver will be instructed to leave, and then arrested.  NYPD says this is so the police can talk to the care recipient alone.  A plaintiff-care giver is arrested under that statute and brings a false arrest and accompanying *Monell* claim.  Does the complaint state a claim?

The R&R's approach would say "No."  Essentially, its reasoning runs, since there is no Federal Constitutional claim about the care giver discrimination, there is no *Monell* claim against a policy that violates City law by arresting care givers.  But that cannot be right:  A policy where NYPD arrested every care giver at a station who refused to leave would violate City law.  And the arrests made under that policy do not become any less false simply because someone wrote down the illegal policy —

---

[19] Defendants never presented any argument at all that the Policy was properly passed under CAPA.

though that may be relevant to qualified immunity.  And even if individual officers could get a "just following orders" qualified immunity defense, the policy itself can still be challenged — and indeed, must be challengeable — because it provides the supposed probable cause for the arrests made.

So too here.  The No Recording Policy is unlawful, and it was used to arrest Plaintiff.  That is, in *Monell* terms, it was the "official policy [acting] as the moving force" behind Plaintiff's arrest.  *Monell v Dept. of Soc. Servs.*, 436 US 658, 694 (1978).  And that is so whether or not there is a live First Amendment challenge:  Whether the First Amendment **also** protects the conduct at issue does not make the arrests under the No Recording Policy any more lawful.  Thus, the policy is subject to a *Monell* challenge because it — on the R&R's own terms — causes unlawful arrests.

### 2.  The *Monell* training claim was well-pled.

Plaintiff's *Monell* training claim was a parallel claim to the policy claim.  That is, as noted above:

"Plaintiff's *Monell* training claim is that the City (1) failed to train officers on § 79-P/ § 14-189; (2) failed to train officers that there is a First Amendment right to record officers in any public exercise of their duty; and (3) instead trained them to apply the No Recording Policy (including its express direction to charge people with trespass if they record)."

PMOL at 45.  There is no dispute that is **true** — to say nothing of a dispute that it's well-pled.  The City unambiguously trained officers to apply the No Recording Policy, and that the RTRAs did not apply in stationhouses.  The R&R even offers a clear example of how this training and policy was constantly reinforced to officers, noting that Plaintiff was arrested and assaulted while "standing in front of a sign that explicitly prohibits recording under the NYPD Policy."  R&R at 7 n. 8.

As the SAC pled, "the City trained individual Defendants that New York Civil Rights Law § 79-P and the First Amendment permit a categorical ban on recording in stations."  SAC ¶ 166.  Given that the No Recording Policy is **in writing,** in the primary officer-facing document for officer conduct (the Patrol Guide), it is hard to see how the R&R ultimately found the training claim implausible.  And likewise, given just how much the R&R emphasized that the policy and related training were the motivating force for the officers in suggesting that "it was objectively reasonable for the officers" to

follow that training and policy and arrest Plaintiff (R&R at 7 n. 8), it is hard to see how the R&R rejected the plausibility of causation.

But since the SAC plausibly pleads officers were trained on the No Recording Policy, and that (again, as the R&R itself says) the arrest itself because Plaintiff refused to stop recording after being told "about the NYPD Policy" (R&R at 6), Plaintiff's *Monell* training claim is well-pled at this early stage.[20]

## II.   The R&R Gets Obstruction of Governmental Administration Wrong in Finding there was Probable Cause as a Matter of Law and Impermissibly Disregards Clear Holdings of Intermediate State Appellate Courts.

In a single sentence, the R&R says "the officers also had probable cause to arrest Plaintiff for obstruction of governmental [administration[21]], even though the door from the atrium to the main lobby was not completely blocked." R&R at 7. It then offers an "e.g." citation to five pages in *Kass v. New York City*, 864 F.3d 200, 207-211 (2d Cir. 2017) as "analyzing probable cause to arrest for obstruction of governmental [administration], collecting and discussing cases of protestors in purely public spaces arrested for same," without further explanation.

### A.   The R&R's OGA reasoning fails on its own terms.

As *Kass* explains at the outset, the elements of OGA are "(1) a public servant is performing an official function; (2) the individual prevents or attempts to prevent the performance of that function by interfering with it; and (3) the individual does so intentionally." *Id.* at 207. But then *Kass* addresses a profoundly different factual scenario. To the extent the situations are similar, however, even then the R&R errs. *Kass* involves orders to move from one place to another during a protest — which

---

[20] Of note, the training claim may not need much discovery at all, to the extent the City is willing to admit the obvious or its assertion of the Policy as a basis for individual officers' qualified immunity has an estoppel effect.

[21] With two exceptions when quoting documents (*see, e.g.,* R&R at 3 and 3 n. 5), the R&R refers to obstructing governmental administration under N.Y. Pen. L. § 195.05 as "obstruction of governmental authority." *See* R&R at 6, 7, 7 n. 8, 10 and 11.

would only be similar if officers had asked Ms. Rodney to stand in a different place in the atrium. That's not what happened — the order was to stop *recording* and leave entirely.

But even assuming that similarity, most importantly, *Kass* involved someone who was **in fact** obstructing traffic "on a sidewalk in the heart of downtown Manhattan, shortly before 5 p.m." 864 F 3d at 207.   Thus, it fits into the clear rule that, for probable cause, "[t]he Second Circuit requires a showing that the putative offender was 'actually and immediately blocking' the pedestrian or vehicular traffic in question." *Case v. City of N.Y.*, 408 F. Supp. 3d 313, 320 (SDNY 2019), *quoting Zellner v. Summerlin*, 494 F.3d 344, 372 (2d Cir. 2007).  But as explained in the opposition, the opposite is true here:  No traffic or administration was blocked at all, and as seen on the video, every single person moves through the door without any issue.  *See, e.g.,* PMOL at 21.[22]

**B. The SAC does not affirmatively plead Plaintiff prevented or attempted to prevent a specific official function (elements 1 and 2), and in failing to address this issue, the R&R disregarded intermediate state appellate decisions.**

As *Kass* notes, the first and second elements of an OGA charge are that "(1) a public servant is performing an official function" and "(2) the individual prevents or attempts to prevent the performance of that function by interfering with it."  But as the First Department has explained, "prevent" in this context is not hypothetical:  "[t]he word 'prevent' implies 'an **insurmountable** obstacle or impediment.'" *People v. Arbeiter*, 169 Misc.2d 771, 773-4 (1st Dept. 1996) (emphasis added), *app. den'd* 89 NY2d 918 (1996) *and cert den'*d, 520 U.S. 1213 (1997).

---

[22] The R&R's reasoning on OGA did not appear to suggest OGA could lie for the passive refusal to leave.  That was correct, since "[f]ailing to obey a police order, in itself, will not satisfy the requirements of the statute." *Hilderbrandt v. City of N.Y.*, 2014 U.S. Dist. LEXIS 128170, at *10 (E.D.N.Y. Sep. 11, 2014); *see also, Dowling v. City of N.Y.*, 2013 U.S. Dist. LEXIS 142108, at *13-14 (E.D.N.Y. Sep. 30, 2013) (no probable cause for OGA, even where "Plaintiff does not dispute the fact that he did not back up when told to do so, and that he continued to disobey the command when Officer Gasquez repeated it.").  And, given the above — and the R&R's finding that the No Recording Policy violates the RTRAs — "Plaintiff['s] failure to comply with an (unjustified) order … cannot, without more, create the predicate probable cause to justify her arrest for obstruction of governmental administration." *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013).

The R&R's theory appears to be that partially blocking a door — with room such that everyone can still walk through — "prevents performances" of the official function of walking through the door.  But in the same breath, the R&R acknowledges that "the door from the atrium to the main lobby was not completely blocked" (R&R at 7) — that is, that there was no "insurmountable obstacle or impediment," because it was repeatedly, in fact, surmounted. *Arbeiter*, 169 Misc.2d at 773-4. *Accord, e.g., Case v. City of N.Y.*, 408 F. Supp. 3d 313, 321 (SDNY 2019) (denying summary judgment on probable cause for obstructing traffic because "[a]lthough the video depicts individuals gathered on a sidewalk … it does not show any pedestrians attempting to pass at any moment prior to Kushneir's arrest.").  And indeed, Defendants admitted as much.  ECF No. 113-12 at 6 at 6 (RFAs 27(A) and 27(B)).

Here, the R&R was interpreting state law.  And federal district courts "cannot ignore decisions by the Appellate Division whether or not such decisions have articulated a reasoned basis." *Mayes v Summit Ent. Corp.*, 287 F Supp 3d 200, 206-207 (EDNY 2018) ("Even though the R&R is correct that the Court of Appeals has not ruled on the matter, it errs in its belief that this court does not have to follow what the Appellate Division says").  Instead, this Court "is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." *V.S. v Muhammad*, 595 F3d 426, 432 (2d Cir. 2010).

Yet, the R&R does not even grapple with — much less cite "persuasive evidence" the Court of Appeals "would reach a different conclusion" than — the clear statement in *Arbeiter* that the interference element in OGA requires a person to erect an "insurmountable obstacle or impediment" to a government function.  *Arbeiter*, 169 Misc.2d at 773-4.  With that, the R&R clearly errs — and since Defendants never present any argument on *Arbeiter* either,[23] Defendants' argument on this

---

[23] *See, e.g.,* DMOL (never citing *Arbeiter*); ECF No. 64 (never citing *Arbeiter*, despite Plaintiff's substantial argument on the topic).

should have been found waived.  And more to the point, the Court should not — and indeed, likely "is bound" not to (*V.S.* 595 F3d at 432) — find that probable cause exists for OGA when the supposed obstruction was admittedly not an "insurmountable obstacle or impediment." *Arbeiter*, 169 Misc.2d at 773-4

### C.  The SAC does not affirmatively plead Plaintiff intended to interfere with a specified government function (element 3).

The final element of OGA is "an intent to prevent the public servant from engaging in a specific official function." *Olugbenga Akinnagbe v. City of N.Y.*, 128 F. Supp. 3d 539, 546 (E.D.N.Y. 2015) (emphasis added).  Such intent appears nowhere in the SAC — quite the opposite.  *See* SAC ¶¶ 21-25. In fact, it's not even clear anyone at the time thought Plaintiff was blocking the door — much less that Plaintiff knew Defendants thought it was a problem.  Certainly nothing in the video or complaint shows anyone suggesting Plaintiff is blocking the door — Defendants are concerned about recording, not the fact that one of two double doors can only open most of the way.  For the R&R to resolve this fact intensive knowledge issue on a motion to dismiss was error.

Moreover, again, the lack of any opportunity to comply with the orders given — along with the fact that the orders given had absolutely nothing to do with the door — also makes the intent element impossible to resolve on a motion to dismiss, just as this Court explained in *Casablanca-Torres*.  That is, no direction to Plaintiff even mentioned the doors — and there is no reason to think, based on the SAC, she had any reason to think police believed she was obstructing them.  And that is all the more true given that multiple officers literally move through the doors with no issue.  So in the absence of any direction about blocking the doors — and indeed, affirmative evidence no one thought the doors were a problem — "the individual defendants lacked [even] arguable probable cause that plaintiff *knowingly*" obstructed anything.  *Casablanca-Torres,* 2023 US Dist LEXIS 59390, at *12 (emphasis in original).

Thus, the OGA probable cause analysis in the R&R does not hold together, and should not be adopted.

**III.   The R&R's Reliance on *Reyes*'s First Amendment Analysis Impermissibly Imposed a Preliminary Injunction Standard at the Pleading Stage and the R&R Simply Ignored the NYPD Commissioner's Public "Promise" that Police Stations were Public Forums.**

A preliminary injunction is an exceptional remedy.  The standard applied is even higher than that applied ultimately at trial.  It is much higher than the standard applied on a motion to dismiss.  Yet, the R&R says, "Judge Clarke found that the NYPD Policy did not violate the First Amendment because it was both reasonable and viewpoint neutral, and I agree with her analysis," and then goes no further.  R&R at 12, citing *Reyes*, 2023 US Dist LEXIS 196602, at *30 (ultimately holding "Plaintiff has not shown a substantial likelihood of success on the merits").  But *Reyes* was decided on a motion for a preliminary injunction.  And indeed, Judge Clarke did not dismiss any claims in *Reyes* — and the City did not move to dismiss claims, filing an answer instead.[24]

In any event, the R&R's approach here runs into two interrelated problems:  (1) the standard on a motion to dismiss is different than that on a motion for preliminary injunction and (2) there were both different records and claims here.

> **A.   A finding that a plaintiff did not meet his burden on a preliminary injunction is different from a finding his claim is not plausibly pled.**

The first issue speaks for itself:  A preliminary injunction places the burden on a plaintiff, while a motion to dismiss has the burden on the defendant.  Finding a plaintiff "has not shown a substantial likelihood of success" (*Reyes*, 2023 US Dist LEXIS 196602, at *30) is simply different from showing the claim is not plausible.  That is, "[t]o be plausible, the complaint need not show a probability of plaintiff's success."  *Nakahata v NY-Presbyterian Healthcare Sys.*, 723 F3d 192, 197 (2d Cir. 2013).  But that describes exactly the standard on a preliminary injunction.

---

[24] The City has since filed a motion for judgment on the pleadings.

Moreover, Judge Clarke's findings were circumscribed by the testimony put on at the live preliminary injunction hearing she held — and what cross-examination Mr. Reyes happened to engage in, given his claims. Quite sensibly, given the City's concessions in *Reyes*, Mr. Reyes may have elected not to press certain First Amendment issues for strategic reasons.

### B. An NYPD Commissioner "promis[ing]" stations are public forums makes it plausible, in a motion to dismiss, that they are.

Most critical on the second issue is that *Reyes* did not pass at all on the public promises made by former Commissioner James O'Neil that, "Our message to New Yorkers going forward, [is that police stations] are your station houses" and should be viewed as "shared public spaces." PMOL at 10; ECF No. 113-8 at 8; ECF No. 113-10 at 2.[25] He made clear it should be relied on, saying making stations public forums "was our promise to all 8.6 million New Yorkers." ECF No. 113-10 at 2. And if there were any ambiguity about the comparison, he explicitly compared stations to traditional public fora like city "blocks" and "parks," saying the station needs to be "a two-way street" for speech. *Id.*

Plaintiff raised this issue at length in her opposition to the motion. *See, e.g.,* PMOL at 10, 33-35. She also placed in the record Defendants' responses to requests for admission on this issue — and those admissions "conclusively established" the following for this litigation (Fed. R. Civ. P. 36(b)):

- "On or about July 10, 2018, as part of a set of remarks to the press, the then-Police Commissioner stated, regarding all police precincts: 'Our message to New Yorkers going forward, these are your station houses'" (ECF No. 113-13 at 4);

- And he said, "All the people who live, work and visit here will be able to come in and be part of their police department like nowhere else in the five boroughs. This is critical because neighborhood policing and the shared responsibility of public safety in our city require us to come together. It's a two-way street that needs to happen everywhere[…]" (*Id.* at 5).

Then, Defendants said they could not **deny** that "[t]he meaning a reasonable listener would take away from those and related comments was that the NYPD's 'message' and 'promise to all 8.6 million New

---

[25] That is because the plaintiff in *Reyes* did not raise these issues, whether in briefing or at the hearing. *See Reyes v. City of New York*, 23-cv-6369 (JGLC), ECF Nos. 7 (memorandum in support of motion), 23 (reply), and 39 (transcript of hearing).

Yorkers' was that in saying 'going forward, these are your station houses,' the City and its police department meant to convey that all New Yorker should view all precincts — including the 62nd Precinct — as 'public spaces' like 'our parks" or 'out on the block.'" *Id. at* 6. They said it was because "it asks defendants to speculate about what a 'reasonable listener'" would understand. *Id.* Or, put differently, Defendants agree there is at least a fact dispute on whether a reasonable person would understand this to say police stations were being treated as public forums going forward. If Defendants believed the claim was simply wrong, they would deny it. *See, e.g., id.* at 9 (denying that plaintiff "did not physically stop any officer from doing their job"). And if there was some "qualif[ication]" to these statements necessary to understand them, Defendants could have offered it, but decided not to. Fed. R. Civ. P. 36(a)(4). So, at a *bare* minimum, on this motion, it was unambiguously a contested fact whether stations were "shared public spaces" that the City itself promised New Yorkers were "your station houses," comparable to "our parks" or "out on the blocks." Yet, the R&R fails to address these facts — conclusively established for this litigation — at all.

Plaintiff also raised the clear estoppel effect these (conclusively established) promises have on the City's ability to change course and argue police stations are no longer "a two-way street." *Id., citing Stambovsky v. Ackley*, 169 A.D.2d 254 (1st Dep't 1991). *Stambovsky* is the famous "Ghostbusters" case: It holds that a party cannot benefit from making public promises, and then say it didn't mean it — even if the results of that doctrine are somewhat counterintuitive. Its core holding runs:

> "[H]aving reported [the existence of ghosts] in both a national publication (Readers' Digest) and the local press (in 1977 and 1982, respectively), defendant is estopped to deny their existence and, as a matter of law, the house is haunted."

169 A.D.2d at 255. So too here: The NYPD set out to get favorable press by reporting that stationhouses were *no longer* limited forums as they'd been in the past, but had been converted to "shared public spaces" akin to city "blocks" and "parks." ECF No. 113-10 at 2. Its Commissioner repeated these comments to national and local publications alike, and emphasized that stations should

be viewed as "a two-way street" for speech. *Id.,* ECF No. 113-8 at 8, Robert Press, *Crime Down Citywide But Murders Up in the Bronx*, BRONX CHRONICLE (Jul. 11, 2018) ("Our message to New Yorkers going forward, these are your station houses").  Perhaps the City ultimately abandoned this promise, or otherwise publicly revoked it (it does not appear so), or some other action it took later mitigates the estoppel effect and the factual existence of the "two-way street" approach to stations.  But that is a question resolved in discovery, not as a matter of law on a motion to dismiss.[26]

Yet, the R&R says nothing at all on this issue.  The Commissioner's remarks do not appear once in the R&R.  The NYPD's sent an explicit "promise" and "message to New Yorkers" that "these are *your* station houses."  The NYPD's own Commissioner himself compared police stations to "blocks" and "parks."  And no one disputes that those examples are classic public forums.  On a motion to dismiss, then, it is at least *plausible* the Commissioner was right.  Yet, the R&R never explains why it is not plausible the Commissioner was being forthright.

Adding that all up, there is — at a bare minimum — a viable jury question of whether in declaring it was opening up police stations as "two-way streets" and "shared public spaces," the City succeeded made them public forums.  ECF No. 113-8 at 8.  That question should not have been resolved, and cannot be resolved, as it was in the R&R, on a motion to dismiss.  So the Court should reject the R&R on this point too.

---

[26] Defendants have outstanding discovery on this issue, and their initial (overdue) responses were extended to be due January 22, 2024.  ECF No. 156.

## <u>CONCLUSION</u>

For all the reasons discussed above, Plaintiff respectfully requests that the Court decline to adopt the R&R insofar as it recommends dismissal of Claims One, Four, Five, and Six, and instead deny Defendants' motion as to those claims.

Dated:     January 12, 2024
           Queens, New York

                         Respectfully Submitted,

                         COHEN&GREEN P.L.L.C.

                              /s/
                         _____
                         BY:      J. Remy Green

                         Elena L. Cohen
                         Jessica Massimi
                         1639 Centre St., Suite 216
                         Ridgewood, New York 11385
                         t : (929) 888-9480

                         GIDEON ORION OLIVER
                         277 Broadway, Suite 1501
                         New York, NY 10007
                         t: 718-783-3682

28